FILED

Oct 23  3 52 PM '03

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MEI ROGUS, | § | CIVIL ACTION |
| | § | Case No. 3:02-CV-1778 (MRK) |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BAYER CORPORATION, | § | |
| | § | |
| Defendant. | § | OCTOBER 22, 2003 |

## LOCAL RULE 56 (a)1 STATEMENT

1.  Plaintiff was employed by Bayer Corporation ("Bayer") as the Plant Controller at its Berlin, Connecticut manufacturing plant from April 5, 1999 until June 13, 2001. (Rogus Dep. 13)

2.  The Berlin Plant manufactures a plastic film material that is used in the automobile and printing industries and other applications. (Rogus Dep. 32-33)

3.  Bayer is a subsidiary of a German Corporation, Bayer AG. Bayer is not a publicly traded company. Bayer's parent company's stock is traded on the German exchange. (Rogus Dep. 37-38)

4.  The plaintiff was hired by Richard Fuhrman, the Plant Manager, and reported to him during her employment. (Rogus Dep. 34, Exh. 5)

5.  Fuhrman reported to Peter Geise, General Manager for Bayer's film business, whose office was located at Bayer's headquarters in Pittsburgh, Pennsylvania. (Rogus Dep. 36, Fuhrman Dep. 6)

341508

6.      As Plant Controller, plaintiff's duties were to oversee the site accounting, payroll and financial reporting functions, and to perform ad hoc projects. (Rogus Dep. 35)

7.      Plaintiff was given a performance evaluation in February 2000 for the partial year which she had worked in 1999, in which plaintiff's performance was rated as "Meets Expectations." (Rogus Dep. 39-40, Exh. 6) Plaintiff commented on the evaluation, when she signed it on February 28, 2000, that "Management team has been working very hard to improve the working environment for all employees. I also enjoyed my supervisor's management style -- provides clear direction, a good communicator, decisive and respect other people. Overall, I love the job, company and people." Plaintiff testified that this statement was true. (*Id.* 40, Exh. 6, page 4)

8.      On March 1, 2001, plaintiff was given a second performance evaluation covering calendar year 2000. She was again rated as "Meets Expectations." (Rogus Dep. 41, Exh. 7)

### *Sexual Harrassment Claim*

9.      Plaintiff alleges that she was sexually harassed by Don Telesca, the Human Resources Manager for the Berlin plant, a peer of the plaintiff who also reported to Fuhrman. (Rogus Dep. 42-43)

10.      The sexual harassment began in May 1999 and ended in July 1999, after she reported it to Fuhrman. (Rogus Dep. 43)

11.      The harassment consisted of Telesca's making comments about plaintiff's appearance, her wardrobe. He would say she was very attractive, "Miss America." When plaintiff objected, he told her that he was just complimenting her and did not stop the remarks. He also would hang around

341508

- 2 -

plaintiff a lot, which bothered her. He did not ask her for a date, sexually proposition her or use any vulgar language. (Rogus Dep. 44-45, 47)

12. The incident which prompted Ms. Rogus to complain to Fuhrman was when Telesca put his arm around her shoulders. That was the only time that he had touched her. (Rogus Dep. 45-46)

13. Bayer had in place a policy which prohibited sexual harassment and provided for reporting of incidents to the employee's immediate supervisor or alternative managers. Plaintiff had been provided with this policy as part of a manual given to managers. (Rogus Dep. 49-50, Exh. 8)

14. After plaintiff's complaint, Fuhrman met with Telesca and reported back to the plaintiff that Telesca said that he would stop his remarks. Fuhrman told the plaintiff that she should let him know if Telesca continued to make those comments to her. Fuhrman later checked with the plaintiff to ensure that the conduct had stopped and plaintiff confirmed to him that it had. (Rogus Dep. 51-52)

### *Retaliation Incidents*

15. Plaintiff claims that the incidents described in Paragraph 12 (A) to 12 (F) of her Complaint constitute the primary incidents of retaliation which are the subject of her claim (Rogus Dep. 53), along with four other incidents described below. These constitute all of the incidents alleged to be retaliatory. (Rogus Dep. 61)[1]

---

[1] These same incidents are described in plaintiff's Affidavit prepared for filing with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). (Rogus Exh. 39)

341508                                  - 3 -

### a. First Incident

16. On December 8, 1999, plaintiff was given a written letter of reprimand for conduct which Fuhrman considered to be insubordinate. (Rogus Dep. 62, Exh. 9)[2]

17. Fuhrman issued the reprimand because he believed that the plaintiff had not only countermanded his directive about a business trip, but had lied to him as well. (Fuhrman Dep. 10-15, Exh. 3)

18. Plaintiff objected to the disciplinary action and wrote a letter of rebuttal. (Rogus Dep. 64, Exh. 9, page 2) She met with Fuhrman and discussed the incident, but Fuhrman refused to remove the letter from her file, instead agreeing that plaintiff's rebuttal would be attached. (Rogus Dep. 64-66, Exh. 9, page 3)

19. Plaintiff appealed the letter of reprimand to the corporate ombudsman, Tim Romps, who assigned a Corporate Human Resources Manager, Stuart Redshaw, to investigate plaintiff's complaint. (Rogus Dep. 67-70; Fuhrman Dep. 10-12)

20. An investigation report dated February 10, 2000 was prepared by Redshaw. The report discusses Rogus' complaints of sexual harassment, retaliation and her complaint relating to the reprimand. (Fuhrman Dep. 11, Exh. 4). It was recommended that the letter of reprimand be removed from plaintiff's file and replaced with a verbal warning in the form of a note to her file counseling her that she must abide by the directives of her manager. (*Id.* Page 3, Furhman Dep. 11-12)

---

[2] The handwritten notes on Exhibit 9 are the plaintiff's. (Rogus Dep. 62-63)

341508                              - 4 -

21.  Fuhrman complied with Redshaw's recommendation and replaced the reprimand letter with a handwritten note dated January 26, 2000, following verbatim the language suggested by Redshaw. (Fuhrman Dep. 12-14, Exh. 5, Rogus Dep. 72-73, Exh. 11)[3]

22.  Rogus did not suffer any adverse employment consequences as a result of the letter of reprimand or counseling note. (Rogus Dep. 73-74)

### b. Second Incident

23.  In February 2000, Fuhrman told the plaintiff that it did not reflect well on him that a member of his staff had complained to the ombudsmen, and that if any disagreement should arise in the future, she should not contact the ombudsman, but that she should talk to corporate human resources or Peter Geise, Fuhrman's manager. (Rogus Dep. 78-79) Fuhrman recalls telling plaintiff to bring her concerns first to him, before going outside the plant. (Fuhrman Dep. 47)

### c. Third Incident

24.  In July 2000, another warning letter was placed in the plaintiff's file, without notification to her. (Complaint ¶12 (E), Rogus Dep. 79-80, Exh. 12).

25.  Fuhrman put the note in plaintiff's file as a record of counseling, because he had had problems with what he characterized as stubbornness over accounting issues, and because he believed she had applied a different standard to Telesca's expense reports than to others', including his own. (Fuhrman Dep. 15-19, Exh. 6)

---

[3] Rogus apparently believed that she was given an option to keep the letter of reprimand in the file for six months, then have it removed, instead of placing a replacement in the file. (Rogus Dep. 77-78)

341508                                    - 5 -

26.     Plaintiff found the July 2000 note in her file in October, when she was going through her personnel file. ((Rogus Dep. 80) She wrote a letter to Fuhrman objecting to the note. (Rogus Dep. 80-81, Exh. 13)

27.     Plaintiff met with Fuhrman, who would not remove the July 2000 note from her file. She next complained to Geise, Fuhrman's superior, who also looked into the matter and advised plaintiff that he believed that the note should stay in her file. (Rogus Dep. 81-86)  When plaintiff objected to this, Geise arranged for an investigation by the Corporate Human Resources Department and Ray Newhouse, a Vice President in the corporate financial area. (Rogus Dep. 86, 95-96)

28.     After a series of meetings with the plaintiff (Rogus Dep. 87-96), the conclusion of the investigation of plaintiff's complaint was that the July 2000 note should be removed from her personnel file, but that the January 27, 2000 note, relating to the letter of reprimand, should remain in the file.[4]  A report of the investigation was made. (Fuhrman Dep. 19-20, Exh. 9; Rogus Dep. 86)

29.     Plaintiff did not suffer any adverse employment consequences as a result of the July 2000 file entry. (Rogus Dep. 86-87)

30.     Plaintiff's reason for concluding that the reprimand and counseling letters were retaliatory is that she believed Telesca was involved in them, that Fuhrman respected Telesca's opinions and Telesca was hostile to her after her complaint. (Rogus Dep. 96-98)  Fuhrman had never criticized her for her complaint. (Rogus Dep. 98-99)

---

[4]     Plaintiff's November 2000 complaint also related to the January 27, 2000 note, discussed above, because she had thought that the letter of reprimand would stay in her file for six months and be removed, instead of being replaced with a counseling warning. (see Rogus Dep. 78, Exh. 13)

341508                                  - 6 -

        *d.*  *Miscellaneous Incidents*[5]

31. In August 2000, in a meeting where the subject being discussed how to reward employees who had gone out of their way to do their job, someone brought up that the plaintiff and another employee had gone to Wisconsin for an audit over the weekend, as an example of someone who went out of her way to do her job. Plaintiff contends that Telesca said that the other employee could be rewarded, but "Mei, you don't count." (Rogus dep. 54, 56-58)

32. In early 2001, at a meeting where the prior year's financials were being discussed, Telesca allegedly said something like "Even Miss America is trying to claim credit," then looked at Fuhrman and they both laughed. (Rogus Dep. 54-56)

33. In April 2001, someone put a Dilbert comic strip on plaintiff's door, that said "I am the newest sadist in the accounting department." (Rogus Dep. 58-60).

34. In December 1999, at a Christmas lunch, plaintiff, another employee and Telesca were waiting in line to be served. The other employee said she was going to have a dessert. Plaintiff responded "Yeah. Go ahead. Enjoy life." Telesca said "Yes, this woman loves to live on the edge." (60-61)

### *Plaintiff's Discharge from Employment*

35. Plaintiff was discharged on June 13, 2001 for falsification of company documents, in that she was found to have substantially enhanced the resume of an applicant for an Accountant I position, whom plaintiff had recommended hiring in December 1999. (Rogus Dep. 100-01, Exh. 18;

---

[5] These are the several incidents of alleged retaliation which were not mentioned in plaintiff's complaint. (Rogus Dep. 54)

Fuhrman Dep. 23, 48-49) The applicant was Hsiu-Chin Chen ("Chin Chen") who, like plaintiff, was a native of Taiwan. Plaintiff was the hiring manager, but the decision had also to be approved by Telesca and Fuhrman. (Rogus Dep. 101-02)

        *a.*    *Chin Chen Resume Alteration*

36.    Both Fuhrman and Telesca favored hiring a different candidate for the Accounting I position for which Chin Chen had applied, but plaintiff was insistent on hiring Chin Chen. (Rogus Dep. 187, 197; Fuhrman Dep. 27-28)

37.    Plaintiff told Chin Chen that plaintiff wanted to hire her because she was having problems with Telesca and that she wanted someone who would stand up for her. She also informed Chin Chen that Telesca favored hiring another applicant, whose credentials were better. (Chin Chen Dep. 18, 54-55)

38.    Chin Chen came to the plaintiff's attention as a candidate for an accounting job through a mutual friend, a Cliff Chen (not related to Chin Chen)[6], who worked for Bayer in a different location. (Rogus Dep.106-07, Chin Chen Dep. 6-10)

39.    Plaintiff provided Chin Chen, through Cliff Chen, with the job description and also gave her, at some point, a list of the standard interview questions which would be asked of her in her interviews. (Rogus Dep. 108-12, Exhs. 20-21, Chin Chen Dep. 9-11, Exh. 1)

40.    Chin Chen submitted a resume to the plaintiff, which resume did not mention the word "computer" and did not indicate any computer skills. The resume also stated that Chin Chen had

---

[6]    Cliff Chen's formal name, which appears on some emails, is Kuang-Yung Chen. (Rogus Dep. 107)

341508                                                - 8 -

graduated from "Shu Kuang Girl's High School." (Rogus Dep. 113, Exh. 22; Chin Chen Dep. 14-15, Exh. 3)

    41.    On November 16, 1999, plaintiff sent an email to Chin Chen with an attachment, stating in the email, in pertinent part:

> I made a few modifications to your resume. I moved the experiences in Taiwan to the top because they are more related to the job you are applying for.
>
> I also changed the Girl's High School to Commercial High School.
>
> I add Computer skills in the Strengths (I changed "Summary of Qualification" to Strengths) section. Please add any application that you know.

(Rogus dep. 114, Exh. 23; Chin Chen Dep. 17-20, Exh. 4) The resume as revised by Rogus made the changes noted in the email, and also inserted to the "Strengths" the words: "Strong organizational and managerial skills."

    42.    Plaintiff does not recall having any discussions of qualifications with Chin Chen personally or over the telephone before she made the revisions to her resume. Plaintiff recalls discussing Chin Chen's qualifications with Cliff Chen. (Rogus dep. 116-17, 120-21)

    43.    The final resume submitted to the Company for Chin Chen was sent to plaintiff by Cliff Chen via an email. (Rogus Dep. 119-20, Exh. 25) It contains the changes made by plaintiff and also adds certain computer applications to those stated in the plaintiff's revision. (*Id.*) Chin Chen does not know who made the changes to the final resume. She received a copy from Cliff Chen, who also sent it to the plaintiff. (Chin Chen Dep. 21-27, Exh. 6)

44. In addition to the assistance with Chin Chen's resume, plaintiff also helped Chin Chen draft a thank you letter to the plaintiff after her interview, and told Chin Chen that the letter would also go to Telesca and Fuhrman. (Rogus Dep. 123-28, Exh. 26, Chin Chen Dep. 27-30, Exh. 7)

45. On December 7, 1999, Cliff Chen sent plaintiff an email, referring to the hiring of Chin Chen, stating: "Finally, it's done. Thanks a lot ... for providing a career opportunity to Chin." (Rogus Dep.128-29, Exh. 27)

46. In April 2001, plaintiff met with Chin Chen because of problems with her performance. Plaintiff testified that Chin Chen told her in this meeting that she had never touched a computer before. When plaintiff accused her of lying on her resume, plaintiff said that Chin Chen apologized and said that it was Cliff Chen's idea to lie so that she could get the job. (Rogus Dep. 141-42) Plaintiff admitted, however, that she does not know whether Chin Chen was the person who lied about her skills, since the first time any reference was made to computer skills was on a resume sent from plaintiff to Chin Chen. (Rogus Dep. 142)

47. On May 11, 2001, plaintiff met with Chin Chen and gave her a Corrective Action Plan, detailing her performance problems. (Rogus Dep. 144-45, Exh. 28; Chin Chen Dep. 31-35, Exh. 10) Chin Chen asked the plaintiff to just lay her off. (Rogus Dep. 145) Plaintiff suggested to Chin Chen that they find other opportunities within the company to which she could be transferred, but Chin Chen declined. (Rogus Dep. 147, Chin Chen Dep. 35)

48. Within a few days after the May 11, 2001 meeting, Chin Chen went to Fuhrman to complain about her treatment by the plaintiff, and also to offer to be laid off. (Rogus dep. 145-46,

341508

- 10 -

Chin Chen Dep. 35, 38-39; Fuhrman Dep. 26-27) Chin Chen's complaint included a complaint about the plaintiff twice "poking" her. (Chin Chen Dep. 50-52; Rogus Dep. 155, Exh. 30)

49.     Fuhrman arranged for a meeting with the plaintiff to discuss the Mei Rogus situation. Denise Church Ball, the Human Resources Manager[7], also attended the meeting. At the meeting, Fuhrman apprised plaintiff of Chin Chen's complaints and plaintiff's May 11 performance memorandum to Chin Chen was also discussed. (Rogus Dep. 155-56, Exh. 30) Because of the discrepancies between plaintiff and Chin Chen, Fuhrman then arranged for a meeting on the same day among the plaintiff, Chin Chen, himself and Denise Church Ball. (Rogus Dep. 148; Chin Chen Dep. 39)

50.     In the May 25 meeting with Chin Chen, the allegations of Chin Chen about the plaintiff "poking her" or "pointing at her" were discussed. (Rogus dep. 150-52, Exh. 29) Chin Chen's lack of computer skills was also discussed. Plaintiff accused Chin Chen of lying to her. Chin Chen started crying saying that she did not lie to her, that she never lied, that she had told plaintiff everything about her lack of computer skills. At that point the meeting was terminated by Fuhrman. (Rogus Dep. 152-54, Exh. 29; Chin Chen dep. 40-41, 52; Fuhrman Dep. 24)

51.     On May 30, 2003, in order to convince Fuhrman that she had not lied to plaintiff, Chin Chen went to Fuhrman and gave him her original resume as sent to the plaintiff, which made no representations about computer skills (Chin Chen Exhibit 3, Rogus Exh. 22), and also gave him the plaintiff's email to her with changes to the resume to add computer skills and other items (Chin Chin

---

[7] Telesca was terminated in early May 2001, so he was not involved in any of the events leading up to the plaintiff's discharge. (Rogus Dep. 99-100)

Dep. 53-54, 58-60, Exh. 4; Fuhrman Dep. 29-31, 36) She did not give Fuhrman the resume which was attached to the plaintiff's email informing Chin Chen of the changes. (Id.) In Chin Chen's presence, Fuhrman retrieved Chin Chen's final resume, as sent to defendant, and compared it with her original resume. (Chin Chen Dep. 61-62)

52.     On June 8, 2003, Fuhrman and Denise Church Ball met with the plaintiff. She was asked whether she had altered Chin Chen's resume. Plaintiff told them that she helped to proofread her resume, to correct it based on what she had been told, but denied making substantive changes. (Rogus Dep. 160-61, Fuhrman dep. 35, Exh 24). Plaintiff was suspended pending completion of an investigation. (Rogus dep. 161-62; Fuhrman Dep. 38-39)

53.     Fuhrman's testimony and the documentation of the June 8, 2001 meeting indicate that plaintiff refused to provide the name of Cliff Chen to management so that he could be contacted as part of the investigation. (Fuhrman Dep. 50-51, Exh. 24) Plaintiff admits testifying before the CHRO that she refused to give Fuhrman Cliff Chen's name because he was getting disability payments and she did not want to jeopardize that. (Rogus Dep. 135-36) She also testified that she told mutual friends of Chin Chen that Chin Chen should not involve Cliff Chen in the investigation for the same reason. (*Id.* 136)

54.     The investigation after June 8 consisted of discussions among corporate human resources, legal counsel, Denise Church Ball and Fuhrman. (Fuhrman 39-40) The conclusion was that the plaintiff had made the changes in Chin Chen's resume, as stated in her email. (Fuhrman Dep. 48-49) Plaintiff was not shown the email or resume information provided by Chin Chen. (Fuhrman Dep. 35-36)

55.     Plaintiff was informed in a telephone conversation with Fuhrman that she was terminated for falsification of company documentation. (Rogus Dep. 165-66, Fuhrman Dep. 40-41)

56.     Chin Chen was given a written warning for falsification of the resume. (Fuhrman Dep. 50)

### b.     Inventory Variance Issue

57.     On June 1, 2001, plaintiff met with Fuhrman and told him that the reason for a variance which they had been experiencing between actual and book inventory numbers was that the production employees were not reporting all of the waste material on their daily production reports. She also informed Fuhrman that this variance should not be written off, or expensed, but should be applied against the production yield. This would have the result of lowering productivity performance figures. Fuhrman told plaintiff that he would think about it and get back to her. (Rogus Dep. 176-77; see Fuhrman Dep. 44-45)

58.     Fuhrman is the person who had directed the plaintiff to investigate the reason for the variance. (Rogus Dep. 178) This was one of the objectives mentioned in the plaintiff's performance evaluation for 2000, to "work with production manager Tim to resolve the variance problems." (*Id.* Exh. 7, page 5)

59.     The problem which plaintiff was looking into was that there was a difference between the raw materials (resin) which were purchased and the raw materials that were consumed in production. This difference had traditionally been charged as an expense. (Rogus Dep. 181-82; Fuhrman Dep. 45) When Fuhrman became Plant Manager, he began charging some of the variance to production yield. (Fuhrman Dep. 45) He did not want to begin charging the entire variance to

341508                                        - 13 -

yield, because it would have had too great an effect on the productivity plus bonuses of the employees. (*Id.*)

60. Fuhrman did not participate in the productivity-plus bonus program. (Fuhrman Dep. 45-46, 49)

61. There is no evidence that plaintiff reported her conclusions to anyone other than to Fuhrman. After her discharge, plaintiff reported her contention that she was discharged because of the inventory variance issue to the ombudsman. (Rogus Dep. 184-85, Exh. 36) This complaint was investigated by the corporation's internal auditors, who concluded that, until the source of the variance could be confirmed, it should be charged to yield. (Fuhrman Dep. 43) The source of the variance was never determined while Fuhrman was employed by Bayer. (*Id.* 43-44) He testified that the plaintiff had discussed with him that the source of the variance could have been underreporting of scrap by the production employees, as well as over-reporting of finished goods or over-reporting of incoming raw materials. (*Id.* 44)

### *Defamation Claim*

62. Plaintiff has no knowledge of any person making a statement which accused her of any wrongful conduct, except communications within the managerial group which was involved in the decision to discharge her, other than that a production employee told her of a rumor that she and Chin had had a fight after she was discharged. (Rogus Dep. 189-93)

341508

- 14 -

### *Intentional Infliction of Emotional Distress*

63. Plaintiff cannot recall any Bayer employee having engaged in any outrageous behavior respecting her, other than the incidents described above. (Rogus Dep. 193-200)

*[signature]*

Christopher Brigham
Federal Bar No. ct02761
Jennifer L. Groves
Federal Bar No. ct20077
Updike, Kelly & Spellacy, P.C.
One Century Tower
265 Church Street, 10th Floor
New Haven, CT 06510
Telephone: (203) 786-8300
Facsimile: (203) 772-2037

John J. Myers
Federal Bar No. ct11377
Eckert Seamans Cherin & Mellott
44th Floor, 600 Grant Street
Pittsburgh, PA 15222
Telephone: (412) 566-6000

Counsel for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by U.S. mail this 22nd day of October, 2003, upon the following counsel:

Robert B. Muchinsky, Esq.
39 Russ Street
Hartford, CT 06106

_____
Christopher L. Brigham
Commissioner of the United States District Court

341508