# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MEI ROGUS, | § | CIVIL ACTION |
| | § | Case No. 3:02-CV-1778 (MRK) |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| BAYER CORPORATION, | § | |
| | § | |
| Defendant. | § | OCTOBER 22, 2003 |

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Bayer Corporation submits the following memorandum of law in support of it motion for summary judgment.

## STATEMENT OF THE CASE

This action was commenced with a Complaint filed September 18, 2002 in the Superior Court for New Britain. In the Complaint, plaintiff alleges that she was a former employee of defendant, who was discharged in June 2001. The Complaint alleges causes of action for wrongful discharge in violation of public policy (Count 1), sexual harassment in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §46a-60(a)(1)(8) (Count 2), retaliation in violation of the CFEPA, §46a-60(a)(4)(Count 3), intentional infliction of emotional distress (Count 4) and defamation (Count 5).

341508

Defendant removed the case on the basis of diversity of citizenship on October 8, 2003.
Discovery has now been completed and defendant has moved for summary judgment as to all causes
of action set forth in the Complaint.

## STATEMENT OF MATERIAL FACTS

Plaintiff was employed by Bayer Corporation ("Bayer") as the Plant Controller at its Berlin,
Connecticut manufacturing plant from April 5, 1999 until June 13, 2001. (Rogus Dep. 13)  Bayer's
Berlin Plant manufactures a plastic film material that is used in the automobile and priting industries
and other applications. (Rogus Dep. 32-33)  Bayer is a subsidiary of a German Corporation, Bayer
AG. Bayer Corporation is not a publicly traded company.  Bayer AG's stock is traded on the German
exchange. (Rogus Dep. 37-38)

The plaintiff was hired by Richard Fuhrman, the Plant Manager, and reported to him during
her employment. (Rogus Dep. 34, Exh. 5)  Fuhrman reported to Peter Geise, General Manager for
Bayer's film business, whose office was located at Bayer's headquarters in Pittsburgh, Pennsylvania.
(Rogus Dep. 36, Fuhrman Dep. 6)

.      As Plant Controller, plaintiff's duties were to oversee the site accounting, payroll and
financial reporting functions, and to perform ad hoc projects. (Rogus Dep. 35)

Plaintiff was given  performance evaluations in February 2000 for the partial year which she
had worked in 1999, and on March 1, 2001 for calendar year 2000.  In both years, plaintiff's
performance was rated as "Meets Expectations." (Rogus Dep. 39-41, Exhs. 6, 7)  On February 28,
2000, when plaintiff signed her evaluation, she added the comment: "Management team has been

working very hard to improve the working environment for all employees. I also enjoyed my supervisor's management style -- provides clear direction, a good communicator, decisive and respect other people. Overall, I love the job, company and people." (*Id.* 40, Exh. 6, page 4)

### *Sexual Harrassment Claim*

Plaintiff alleges that she was sexually harassed by Don Telesca, the Human Resources Manager for the Berlin plant, a peer of the plaintiff who also reported to Fuhrman. (Rogus Dep. 42-43) The sexual harassment began in May 1999 and ended in July 1999, after she reported it to Fuhrman. (Rogus Dep. 43)

Telesca's harassment consisted of his making compliments about plaintiff's appearance. He would call her "Miss America." When plaintiff objected, he told her that he was just complimenting her and did not stop the remarks. He also would hang around plaintiff a lot, which bothered her. He did not ask her for a date, sexually proposition her or use any vulgar language. (Rogus Dep. 44-45, 47)

When Telesca put his arm around plaintiff's shoulders, the only time that he had touched her, plaintiff reported his conduct to Fuhrman. (Rogus Dep. 45-46)

Bayer had in place a policy, which was given to plaintiff, prohibiting sexual harassment and provided for reporting of incidents to the employee's immediate supervisor or alternative managers. (Rogus Dep. 49-50, Exh. 8)

As a result of plaintiff's complaint, Fuhrman met with Telesca and reported back to the plaintiff that Telesca said that he would stop his remarks and apologize. Fuhrman told the plaintiff that she should let him know if Telesca continued to make inappropriate comments. Fuhrman later

341508                                      - 3 -

checked with the plaintiff to ensure that the conduct had stopped and plaintiff confirmed to him that it had. (Rogus Dep. 51-52)

### *Retaliation Incidents*

Plaintiff identified a handful of incidents which she contends were motivated by retaliation for her having reported Telesca. The incidents described in Paragraphs 12 (A) to 12 (F) of her Complaint constitute the primary incidents of retaliation (Rogus Dep. 53), along with four other incidents described in plaintiff's deposition and discussed below. These constitute all of the incidents alleged to be retaliatory. (Rogus Dep. 61)[8]

The first incident occurred on December 8, 1999, when plaintiff was given a written letter of reprimand for conduct which Fuhrman considered to be insubordinate. (Rogus Dep. 62, Exh. 9)[9] Fuhrman issued the reprimand because he believed that the plaintiff had not only countermanded his directive about a business trip, but had lied to him as well. (Fuhrman Dep. 10-15, Exh. 3) Plaintiff objected to the disciplinary action and wrote a letter of rebuttal. (Rogus Dep. 64, Exh. 9, page 2) She met with Fuhrman and discussed the incident, but Fuhrman refused to remove the letter from her file, instead agreeing that plaintiff's rebuttal letter would be attached to the disciplinary letter. (Rogus Dep. 64-66, Exh. 9, page 3)

Plaintiff appealed the letter of reprimand to the corporate ombudsman, who assigned a Corporate Human Resources Manager, Stuart Redshaw, to investigate plaintiff's complaint. (Rogus Dep. 67-70; Fuhrman Dep. 10-12) An investigation report dated February 10, 2000 was prepared by

---

[8]    These same incidents are described in plaintiff's Affidavit prepared for filing with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). (Rogus Exh. 39)

[9]    The handwritten notes on Exhibit 9 are the plaintiff's. (Rogus Dep. 62-63)

Redshaw. The report discusses Rogus' complaints of sexual harassment, retaliation and her complaint relating to the reprimand. (Fuhrman Dep. 11, Exh. 4). It was recommended that the letter of reprimand be removed from plaintiff's file and replaced with a verbal warning in the form of a note to her file counseling her that she must abide by the directives of her manager, which Fuhrman did. (Furhman Dep. 11-14, Exh. 5; Rogus Dep. 72-73, Exh. 11, page 3)

Plaintiff did not suffer any adverse employment consequences as a result of the letter of reprimand or counseling note. (Rogus Dep. 73-74)

The second incident of alleged retaliation was in February 2000, Fuhrman allegedly told the plaintiff that it did not reflect well on him that a member of his staff had complained to the ombudsmen, and that if any disagreement should arise in the future, she should not contact the ombudsman, but that she should talk to corporate human resources or Fuhrman's manager, Peter Geise. (Rogus Dep. 78-79) Fuhrman recalls telling plaintiff only to bring her concerns first to him, before going outside the plant. (Fuhrman Dep. 47)

In July 2000, another warning letter was placed in the plaintiff's file, without notification to her. (Complaint ¶12 (E), Rogus Dep. 79-80, Exh. 12).

Fuhrman put the note in plaintiff's file as a record of counseling, because he had had problems with what he characterized as stubbornness over accounting issues, and because he believed she had applied a different standard to Telesca's expense reports than to others', including his own. (Fuhrman Dep. 15-19, Exh. 6)[10]

---

[10]    Fuhrman had noted in plaintiff's Performance Evaluation for 1999 that plaintiff "has a lot of self-confidence and can be quite headstrong," so that this July 200 note was not a new observation. (Rogus Dep. Exh. 6, page 4)

Plaintiff found the July 2000 note in her file in October, when she was going through her personnel file. (Rogus Dep. 80) She wrote a letter to Fuhrman objecting to the note and also objecting to the January 26 note which had been placed in her file to replace the December 1999 letter of reprimand. (Rogus Dep. 80-81, Exh. 13) Plaintiff's letter also raised other issues which she had with Fuhrman's handling of accounting or financial matters. Plaintiff met with Fuhrman, who would not remove the July 2000 note from her file. She next complained to Geise, Fuhrman's superior, who also looked into the matter and advised plaintiff that he believed that the note should stay in her file. (Rogus Dep. 81-86) When plaintiff objected to this, Geise arranged for an investigation by the Corporate Human Resources Department and Ray Newhouse, a Vice President in the corporate financial area. (Rogus Dep. 86, 95-96)

After a series of meetings with the plaintiff (Rogus Dep. 87-96), the conclusion of the investigation of plaintiff's complaint was that the July 2000 note should be removed from her personnel file, but that the January 27, 2000 note, relating to the letter of reprimand, should remain in the file.[11] A written report of the investigation and conclusions was made. (Fuhrman Dep. 19-20, Exh. 9; Rogus Dep. 86)

Plaintiff did not suffer any adverse employment consequences as a result of the July 2000 file entry. (Rogus Dep. 86-87)

Plaintiff's reason for believing that the reprimand and counseling letters were retaliatory is that she assumed that Telesca was involved in issuing them, that Fuhrman respected Telesca's

---

[11]    Plaintiff's November 2000 complaint also related to the January 27, 2000 note, discussed above, because she had thought that the letter of reprimand would stay in her file for six months and be removed, instead of being replaced with a counseling warning. (see Rogus Dep. 78, Exh. 13)

opinions and Telesca was hostile to her after her complaint. (Rogus Dep. 96-98) Fuhrman had never criticized her for her sexual harassment complaint. (Rogus Dep. 98-99)

Plaintiff described several other incidents which she contends were retaliatory for her having made a complaint of sexual harassment. In August 2000, in a meeting where the subject being discussed how to reward employees who had gone out of their way to do their job, someone brought up that the plaintiff and another employee had gone to Wisconsin for an audit over the weekend, as an example of someone who went out of her way to do her job. Plaintiff contends that Telesca said that the other employee could be rewarded, but "Mei, you don't count." (Rogus dep. 54, 56-58)

In early 2001, at a meeting where the prior year's financials were being discussed, Telesca allegedly said something like "Even Miss America is trying to claim credit," then looked a Fuhrman and they both laughed. (Rogus Dep. 54-56)

In April 2001, someone put a Dilbert comic strip on plaintiff's door, that said "I am the newest sadist in the accounting department." (Rogus Dep. 58-60).

In December 1999, at a Christmas lunch, plaintiff, another employee and Telesca were waiting in line to be served. The other employee said she was going to have a dessert. Plaintiff responded "Yeah. Go ahead. Enjoy life." Telesca said "Yes, this woman loves to live on the edge." (60-61)

### Plaintiff's Discharge from Employment

Plaintiff was discharged on June 13, 2001 for falsification of company documents, in that she was found to have substantially enhanced the resume of an applicant for an Accountant I position, whom plaintiff had recommended hiring in December 1999. (Rogus Dep. 100-01, Exh. 18; Fuhrman

341508                                        - 7 -

Dep. 23, 48-49)  The applicant was Hsiu-Chin Chen ("Chin Chen") who, like plaintiff, was a native

of Taiwan.  Plaintiff was the hiring manager, but the decision had also to be approved by Telesca and

Fuhrman.  (Rogus Dep. 101-02)

*a.     Chin Chen Resume Alteration*

Both Fuhrman and Telesca favored hiring a different candidate for the Accounting I position

for which Chin Chen had applied, but plaintiff was insistent on hiring Chin Chen.  (Rogus Dep. 187,

197; Fuhrman Dep. 27-28)  Plaintiff told Chin Chen that plaintiff wanted to hire her because she was

having problems with Telesca and that she wanted someone who would stand up for her.  She also

informed Chin Chen that Telesca favored hiring another applicant, whose credentials were better.

(Chin Chen Dep. 18, 54-55)

Chin Chen came to the plaintiff's attention as a candidate for an accounting job through a

mutual friend, Cliff Chen (not related to Chin Chen)[12], who worked for Bayer in a different location.

(Rogus Dep.106-07, Chin Chen Dep. 6-10)  Plaintiff provided Chin Chen, through Cliff Chen, with a

job description, and also gave her a list of the standard questions which would be asked of her in her

interviews.  (Rogus Dep. 108-12, Exhs. 20-21, Chin Chen Dep. 9-11, Exh. 1)

Chin Chen submitted a resume to the plaintiff.  That resume did not mention the word

"computer" and did not indicate any computer skills.  The resume also stated that Chin Chen had

graduated from "Shu Kuang Girl's High School."  (Rogus Dep. 113, Exh. 22; Chin Chen Dep. 14-15,

Exh. 3)

---

[12]     Cliff Chen's formal name, which appears on some emails, is Kuang-Yung Chen. (Rogus Dep. 107)

On November 16, 1999, plaintiff sent an email to Chin Chen with an attachment, stating in the email, in pertinent part:

> I made a few modifications to your resume. I moved the experiences in Taiwan to the top because they are more related to the job you are applying for.
>
> I also changed the Girl's High School to Commercial High School.
>
> I add Computer skills in the Strengths (I changed "Summary of Qualification" to Strengths) section. Please add any application that you know.

(Rogus dep. 114, Exh. 23; Chin Chen Dep. 17-20, Exh. 4)  The resume as revised by Rogus made the changes noted in the email, and also inserted under the heading "Strengths" the words: "Strong organizational and managerial skills."

Plaintiff does not recall having any discussions of qualifications with Chin Chen personally or over the telephone before she made the revisions to her resume.  Plaintiff recalls discussing Chin Chen's qualifications only with Cliff Chen.  (Rogus dep. 116-17, 120-21)

The final resume submitted to the Company for Chin Chen was sent to plaintiff by Cliff Chen via an email.  (Rogus Dep. 119-20, Exh. 25)  It contains the changes made by plaintiff and also added certain computer applications to those stated in the plaintiff's revision.  (*Id.*)  Chin Chen did not make the changes to her resume and does not know who made those changes.  (Chin Chen Dep. 21-27, Exh. 6)

In addition to the assistance with Chin Chen's resume and help with the interview questions, the plaintiff also edited a draft a thank you letter from Chin Chen to the plaintiff after her interview, and told Chin Chen that the letter would also go to Telesca and Fuhrman.  (Rogus Dep. 123-28, Exh. 26, Chin Chen Dep. 27-30, Exh. 7)

On December 7, 1999, Cliff Chen sent plaintiff an email, referring to the hiring of Chin Chen, stating: "Finally, it's done. Thanks a lot … for providing a career opportunity to Chin." (Rogus Dep.128-29, Exh. 27)

In April 2001, plaintiff met with Chin Chen because of problems with her performance. Plaintiff testified that Chin Chen told her in this meeting that she had never touched a computer before. When plaintiff accused her of lying on her resume, plaintiff said that Chin Chen apologized and said that it was Cliff Chen's idea to lie so that she could get the job. (Rogus Dep. 141-42) Plaintiff admitted, however, that she does not know whether Chin Chen lied about her computer skills, since the first time any reference was made to computer skills was on a resume sent from plaintiff to Chin Chen (Rogus Dep. 142), and plaintiff cannot recall ever discussing her computers skill directly with Chin Chen. (Rogus Dep. 116-17, 120-21)

In early May, 2001, Telesca's employment was terminated. (Rogus Dep. 99-100)

On May 11, 2001, plaintiff met with Chin Chen and gave her a Corrective Action Plan, detailing performance problems. (Rogus Dep. 144-45, Exh. 28; Chin Chen Dep. 31-35, Exh. 10) Chin Chen asked the plaintiff to lay her off. (Rogus Dep. 145) Plaintiff suggested to Chin Chen that they find other opportunities within the company to which she could be transferred, but Chin Chen declined. (Rogus Dep. 147, Chin Chen Dep. 35)

Within a few days after the May 11, 2001 meeting, Chin Chen went to Fuhrman to complain about her treatment by the plaintiff. She offered to be laid off. (Rogus dep. 145-46, Chin Chen Dep. 35, 38-39; Fuhrman Dep. 26-27) Chin Chen's complained that the plaintiff had twice "poked" her with her finger. (Chin Chen Dep. 50-52; Rogus Dep. 155, Exh. 30)

Fuhrman arranged a meeting with the plaintiff to discuss the Mei Rogus situation.  Denise

Church Ball, the Human Resources Manager[13], also attended the meeting.  At the meeting, Fuhrman

apprised plaintiff of Chin Chen's complaints and plaintiff's May 11 performance memorandum to

Chin Chen was also discussed.  (Rogus Dep. 155-56, Exh. 30)  Because of the discrepancies between

plaintiff and Chin Chen, Fuhrman then arranged for a meeting on the same day among the plaintiff,

Chin Chen, himself and Denise Church Ball.  (Rogus Dep. 148; Chin Chen Dep. 39)

In the May 25 meeting with Chin Chen, the allegations of Chin Chen about the plaintiff

"poking her" or "pointing at her" were discussed.  (Rogus dep. 150-52, Exh. 29)  Chin Chen's lack of

computer skills was also discussed.  Plaintiff accused Chin Chen of lying to her.  Chin Chen started

crying saying that she did not lie to her, that she never lied, that she had told plaintiff everything

about her lack of computer skills.  At that point the meeting was terminated by Fuhrman.  (Rogus

Dep. 152-54, Exh. 29; Chin Chen dep. 40-41, 52; Fuhrman Dep. 24)

On May 30, 2003, in order to convince Fuhrman that she had not lied on her resume, Chin

Chen went to Fuhrman and gave him the original resume which she had sent to the plaintiff, which

made no representations about computer skills.  (Chin Chen Exhibit 3, Rogus Exh. 22)  Chin Chen

also gave Fuhrman the plaintiff's email to her explaining the additions and changes which plaintiff

made to the resume to add computer skills and other items  (Chin Chin Dep. 53-54, 58-60, Exh. 4;

Fuhrman Dep. 29-31, 36)  She did not give Fuhrman the resume which was attached to the plaintiff's

email informing Chin Chen of the changes.  (Id.)  In Chin Chen's presence, Fuhrman retrieved Chin

---

[13]    Telesca was terminated in early May 2001, so he was not involved in any of the events leading up to the
plaintiff's discharge.  (Rogus Dep. 99-100)

Chen's final resume, as sent to defendant, and compared it with her original resume. (Chin Chen Dep. 61-62)

On June 8, 2003, Fuhrman and Denise Church Ball met with the plaintiff. She was asked whether she had altered Chin Chen's resume. Plaintiff told them that she helped to proofread her resume, to correct it based on what she had been told, but denied making substantive changes. (Rogus Dep. 160-61, Fuhrman dep. 35, Exh 24). Plaintiff was not shown a copy of her email. (Fuhrman Dep. 35-36) Plaintiff was suspended pending completion of an investigation. (Rogus dep. 161-62; Fuhrman Dep. 38-39)

Fuhrman's testimony is, and the documentation of the June 8, 2001 meeting confirms, that plaintiff refused to provide the name of Cliff Chen to management so that he could be contacted as part of the investigation into the falsification of Chin Chen's resume. (Fuhrman Dep. 50-51, Exh. 24) Plaintiff admits testifying before the CHRO that she refused to give Fuhrman Cliff Chen's name because he was getting disability payments and she did not want to jeopardize that. (Rogus Dep. 135-36) She also testified that she told mutual friends of Chin Chen that they should tell Chin Chen not to involve Cliff Chen in the investigation for the same reason. (*Id.* 136)

After the June 8 meeting, the situation was discussed among corporate human resources, legal counsel, Denise Church Ball and Fuhrman. (Fuhrman 39-40) Their conclusion was that the plaintiff had made the changes in Chin Chen's resume, as stated in her email. (Fuhrman Dep. 48-49)

Plaintiff was informed in a telephone conversation with Fuhrman that she was terminated for falsification of company documentation. (Rogus Dep. 165-66, Fuhrman Dep. 40-41) She was also

sent a termination letter stating the reason for her discharge. (Rogus Dep. Exh. 18) Chin Chen was given a written warning for falsification of the resume. (Fuhrman Dep. 50)

*b.      Inventory Variance Issue*

On June 1, 2001, plaintiff met with Fuhrman and told him that the reason for a variance which they had been experiencing between actual and book inventory numbers was that the production employees were not reporting all of the waste material on their daily production reports. She also informed Fuhrman that this variance should not be written off, or expensed, but should be applied against the production yield. This would have the result of lowering productivity performance figures. Fuhrman told plaintiff that he would think about it and get back to her. (Rogus Dep. 176-77; see Fuhrman Dep. 44-45)

Fuhrman is the person who had directed the plaintiff to investigate the reason for the variance. (Rogus Dep. 178) This was one of the objectives mentioned in the plaintiff's performance evaluation for 2000, to "work with production manager Tim to resolve the variance problems." (*Id.* Exh. 7, page 5)

The problem which plaintiff was looking into was that there was a difference between the raw materials (resin) which were purchased and the raw materials that were consumed in production. This difference had traditionally been charged as an expense. (Rogus Dep. 181-82; Fuhrman Dep. 45) When Fuhrman became Plant Manager, he began charging some of the variance to production yield. (Fuhrman Dep. 45) He did not want to begin charging the entire variance to yield, because it would have had too great an effect on the productivity plus bonuses of the employees. (*Id.*)

341508                                                    - 13 -

Fuhrman did not participate in the productivity-plus bonus program. (Fuhrman Dep. 45-46, 49)

There is no evidence that plaintiff reported her conclusions to anyone other than to Fuhrman. After her discharge, plaintiff reported her contention that she was discharged because of the inventory variance issue to the ombudsman. (Rogus Dep. 184-85, Exh. 36) This claim was investigated by the corporation's internal auditors, who concluded that, until the source of the variance could be confirmed, it should be charged to yield. (Fuhrman Dep. 43) The source of the variance was never determined while Fuhrman was employed by Bayer. (*Id.* 43-44) He testified that the plaintiff had discussed with him that the source of the variance could have been underreporting of scrap by the production employees, as well as over-reporting of finished goods or over-reporting of incoming raw materials. (*Id.* 44)

### *Defamation and Intention Infliction of Emotional Distress*

Plaintiff has no knowledge of any person making a statement which accused her of any wrongful conduct, except communications within the managerial group which was involved in the decision to discharge her. She was told by a production employee that he had heard that she and Chin had had a fight after she was discharged. (Rogus Dep. 189-93)

Plaintiff cannot recall any Bayer employee having engaged in any outrageous behavior respecting her, other than the incidents described above. (Rogus Dep. 193-200)

## ARGUMENT

Rule 56(c) of the Federal Rules of Civil Procedure provide for summary judgment where there are no genuine issues of material fact to be tried and, the facts which are not in dispute warrant judgment as a matter of law for the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1223 (2nd Cir. 1994). The determination of what facts are material to a particular claim is made based upon the substantive law upon which that claim rests. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party." *Anderson, supra,* 477 U.S. at 248.

Summary judgment applies no less to employment discrimination and wrongful discharge cases, where state of mind is at issue, than to commercial cases or other areas of litigation. In such cases, the plaintiff must still offer "concrete evidence from which a reasonable juror could return a verdict in her favor." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 61 (2nd Cir. 1998); *Meiri v. Dacon,* 759 F.2d 989, 998 (2nd Cir. 1985) ("[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."). Summary judgment under Rule 56, therefore, is "fully appropriate, indeed mandated, when the evidence [in a discrimination case] is insufficient to support the non-moving party's case." *Distasio, supra.*

### A. Plaintiff's Claim for Discharge in Violation of Public Policy

In the first count of her Complaint, the plaintiff alleges that she was discharged in violation of an unspecified public policy because her employment was allegedly terminated for reporting to the

Plant Manager that certain financial information had been intentionally misreported by production employees in order to enhance the efficiencies of the defendant's production operations. (Complaint ¶5(C)) As more fully explained in plaintiff's testimony, on June 1, 2001, she met with Fuhrman and informed him that the reason for a variance between the amount of raw material purchased and the amount reportedly consumed in production was that production employees were not reporting all of the waste material on their daily production report. She further testified that, as an accounting matter, the variance should not be expensed, but should be applied against the production yield. This would have resulted in lowering productivity performance figures. (Rogus Dep. 176-77).

Summary judgment on Count I of the Complaint is warranted for two independently sufficient reasons. First, plaintiff's allegations and testimony do not establish a cause of action for a wrongful discharge in violation of public policy. Second, plaintiff cannot establish that her report to the Plant Manager caused her discharge.

   *a.*      *Plaintiff does not have a valid public policy discharge claim.*

A cause of action has been recognized by the Connecticut Supreme Court, as an exception to the traditional employment-at-will doctrine, where an employee has been discharged for reasons which contravene a clear mandate of public policy. *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980); *Parsons v. United Technologies Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 79, 700 A.2d 655, 663 (1997). To establish a claim under this exception, the plaintiff must establish that her discharge violated an explicit statutory or constitutional provision or contravened a judicially conceived notion of public policy. *Thibodeau v. Design Group One*, 260 Conn. 691, 698,

341508                               - 16 -

802 A.2d 731, 736 (2002); *Carbone v. Atlantic Richfield Co.,* 204 Conn. 460, 468-70, 528 A.2d 1137 (1987).

Plaintiff's Complaint does not disclose a statutory or judicially mandated public policy which would be violated if she were discharged for making the report described in her testimony, nor is it apparent how the public interest is served by providing a cause of action to an employee who is discharged because of a dispute over how to account for underreported waste.[14]  See *Lowe v. Amerigas, Inc.,* 52 F. Supp. 2d 349 (D. Conn. 1999), *aff'd* 208 F.3d 203 (2d. Cir. 2000) (questioning whether any violation of public policy had been plead where, among other things, plaintiff claimed he was discharged for reporting accounting irregularities).

More fundamentally, Connecticut has enacted a law designed specifically to protect certain whistleblower-employees. Conn. Gen. Stat. §31-51m. This whistle blower law has been held to provide the exclusive remedy for employees who are terminated for "whistle blowing," precluding any common law action in tort or contract for wrongful termination. *Campbell v. Town of Plymouth,* 74 Conn. App. 67, 74, 811 A.2d 243, 250 (2002).  Where the Legislature has created a statutory remedy, a common law cause of action for discharge in violation of public policy cannot be maintained. *Burnham v. Karl & Gelb, P.C.,* 252 Conn. 153, 160-61, 745 A.2d 178, 182 (2000); *Atkins v. Bridgeport Hydraulic Co.,* 5 Conn. App. 643, 648, 501 A.2d 1223 (1985).

The plaintiff, in the present case, could not have asserted a statutory violation under the whistleblower law because her report did not concern a violation of law, nor did she report the matter to "a public body," both of which are required elements of a claim under that law.  Conn. Gen. Stat.

---

[14]      Bayer Corporation is a not a publicly-traded company.  (Rogus Dep. 37-38).

§31-51m (b); *Lowe v. Amerigas, Inc.*, supra, at 360.; *Girgenti v. Cali-Con, Inc.*, 15 Conn. App. 130, 544 A.2d 655 (1988). To hold that a whistleblower whose conduct does not meet the requirements for protection under the whistleblower law can still assert a claim for wrongful discharge would amount to judicially amending the statute. It would be tantamount to holding that an employee who is impaired, but not disabled as defined in the CFEPA, could still maintain a claim for disability discrimination based upon a public policy of prohibiting discrimination against the impaired.

The decisions explicating the tort of wrongful discharge in violation of public policy make it clear that, where there is a statutory remedy for the type of alleged misconduct claimed by the plaintiff, the courts will not decree a public policy tailored to overcome the flaws in the plaintiff's statutory claim.

The decision of the Supreme Court in *Burnham v. Karl & Gelb, P.C., supra,* is virtually on point in this regard. There, the plaintiff alleged a cause of action for wrongful discharge because she was terminated for making a complaint of unsanitary and unhealthy dental practices to the Connecticut State Dental Association. She was precluded from maintaining a claim under the §31-51m because the dental association was found not to constitute a "public body." Despite the fact that plaintiff's claim was not covered by the statute, the Supreme Court held that the existence of a statutory remedy under §31-51m precluded the plaintiff's resort to a common law wrongful discharge claim based upon a violation of public policy. 252 Conn. at 157-58, 745 A.2d at 181.

In *Thibodeau v. Design Group One,* 260 Conn. 691, 802 A.2d 731 (2002) the Supreme Court held that the existence of a statutory remedy for employment discrimination which was unavailable to the plaintiff because her employer had fewer than three employees still precluded the plaintiff's

341508                                      - 18 -

ability to maintain a cause of action for discharge in violation of public policy. 260 Conn. at 718, 802 A.2d at 747.

In *Lowe v. Amerigas, Inc., supra,* this court held that the plaintiff, who could not maintain a claim for violation of the whistle blower statute because he did not report a violation or suspected violation to a "public body," 52 F.Supp. 2d at 360, could not maintain a cause of action for wrongful discharge because such a claim was precluded by §31-51m.

In *Daley v. Aetna Life & Casualty Co.,* 249 Conn. 766, 734 A.2d 112 (1999), the Supreme Court found no public policy implicated, where the plaintiff alleged that she was discharged for staying a home with her children in violation of the public policy embodied in the provisions of the Connecticut Family and Medical Leave Law, Conn. Gen. Stat. §§ 46a-60(a)(7). In rejecting the public policy claim, the Supreme Court noted that the statute did not require an employer to permit an employee to work at home to care for her family. The Court held that it could not ignore the statement of public policy that is represented by the relevant statute, "nor should we impute a statement of public policy beyond that which is represented." 249 Conn. at 804. *See also, Jarrett v. Community Renewal Team, Inc.,* 2003 W.L. 1962835 (Conn. Super. 2003) (holding that an employee who could not demonstrate a violation of the FMLA because he had not given effective notice of his serious health condition, as required by the Act, could not maintain a public policy discharge claim based upon the intent of the statute to protect employees in his situation.).

The foregoing cases require that a claim which falls generally within an area regulated by a statute, satisfy the elements for a claim under the statute. The courts have refused the invitations to

341508                                      - 19 -

fill in the "gaps" left by the legislature by creating a cause of action in tort for wrongful discharge for employees whose claims fall short of the statutory protection.

The Legislature has adopted a law which protects employees who disclose or report wrongdoing, but that statute is limited expressly to the report of such matters to a public body and, for non-public employers, to a report of "a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance.[15]"   As the foregoing decisions make clear, the limitation to only certain whistleblowers and only specified wrongdoing in and of itself reflects a public policy not to open the courts to claims of non-covered whistleblowers.   The Supreme Court has made it clear in such decisions as *Thibodeau* and *Burnham,* discussed above, that public policy is defined, not just by the conduct which is proscribed in the law, but by the exemptions and omissions that appear in the statutes.   To hold that plaintiff's claim in the present case can go forward would amount to judicial creation of a cause of action for whistle blowing in situations where the legislature specifically chose not to do so.

For this reason, therefore, the plaintiff's allegations that she was discharged for reporting improper inventory reporting and accounting activity cannot be sustained under Connecticut law.

     *b.*     *Plaintiff cannot establish that her discharge was motivated by her report of alleged accounting irregularity.*

Claims of wrongful discharge under Connecticut law are evaluated by application of similar standards as are applied to a claim of discharge in violation of the federal discrimination statutes. *LaFond v. General Physics Services, Corp., 50 F.3d 165 (2nd Cir. 1995).*

---

[15]     The statute extends protection against municipal employers to employees who report "unethical practices, mismanagement or abuse of authority." Conn. Gen. Stat. §31-51m (b).

Even were it assumed that the plaintiff in this case could establish a *prima facie* violation of the public policy of Connecticut in connection with her discharge, her evidence is insufficient to permit a reasonable jury to conclude that the reason given by the defendant for her discharge was a pretext for unlawful retaliation.

As discussed more fully below, defendant's explanation for the plaintiff's discharge was that the defendant learned, in late May and early June 2001, that the plaintiff had assisted an applicant whom she was touting for employment, and who would report to her, in putting together a false resume. Not only is plaintiff unable to produce evidence that this explanation is fabricated or not the true reason for her discharge, as discussed below, but the plaintiff has no evidence which would tend to prove that her report relating to the inventory variance *was* a factor in her discharge.

There is little in plaintiff's testimony to suggest why Fuhrman would discharge her for this report. She did not claim that he had done anything wrong. Instead, she reported alleged improprieties by plant production personnel. Furthermore, the recommendation as to the accounting change allegedly made by plaintiff, although affecting the bonuses of the plant personnel, would not have affected the bonus of Mr. Fuhrman, since he was not a participant in the productivity plus program. (Fuhrman Dep. 45-46, 49). Moreover, it was Fuhrman who instructed the plaintiff to investigate the reason for the variance. Furthermore, plaintiff voiced her recommendations to Fuhrman, not to anyone else.[16] Fuhrman was free to disregard the recommendation. Accordingly, there is no logical basis to infer that her report would have negatively affected Fuhrman, unless he made a decision to implement her suggestions. At most, plaintiff can speculate that, *if* she had

---

[16]    He complaint to the ombudsman was made a couple of weeks *after* her discharge.(Rogus Dep. Exh. 36)

341508                                            - 21 -

reported her conclusions to someone higher in authority, Fuhrman *might* have been made to look bad. This speculative rationale is insufficient to show that the reasons given for the plaintiff's discharge were a pretext to mask a retaliatory motive based upon the plaintiff's report relating to inventory variances.

For either of the foregoing reasons, therefore, defendant's motion for summary judgment on plaintiff's claim of discharge in violation of public policy should be granted.

### B. Plaintiff Cannot Establish a Claim of Sexual Harassment

In the second count of plaintiff's Complaint she alleges a cause of action for sexual harassment.

Connecticut General Statute §46a-60(a) (8) makes it an unlawful practice for an employer"

> to harass any employee, person seeking employment or member on the basis of sex.
> Sexual harassment shall, for the purposes of this section, be defined as any unwelcome
> sexual advances or requests for sexual favors or any conduct of a sexual nature when
> … (C) such conduct has the purpose or effect of substantially interfering with an
> individual's work performance or creating an intimidating, hostile or offensive
> working environment. …

The Connecticut courts evaluate claims of sexual harassment under the same standards as are applied by the federal courts in evaluating such claims under Title VII of the Civil Rights Act of 1964. *Brittell v. Department of Correction*, 247 Conn. 148, 164, 717 A.2d 1254, 1264 (1998); *State v. Commission on Human Rights & Opportunities*, 211 Conn. 464, 469-70, 559 A.2d 1120 (1989).

In the present case, defendant is entitled to summary judgment on plaintiff's claim of sexual harassment for two reasons. First, the actions to which she was subjected were not sufficiently severe and pervasive as to alter the terms an conditions of her employment. Second, there is no basis for

341508                                          - 22 -

*respondeat superior* liability, because the defendant took immediate and appropriate corrective action upon learning of the alleged harassment.

      *a.*     *The conduct complained of does not amount to actionable sexual harassment.*

The existence of a hostile work environment[17] is determined by examining the totality of the circumstances. *Leibovitz v. New York City Transit Auth.,* 252 F.3d 179, 188 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 (2nd Cir. 1998). Such circumstances include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986); *Brittell v. Department of Correction, supra,* at 166-67, 717 A.2d at 1265.

"Isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Quinn v. Green Tree Credit Corp., supra,* at 768; *Tomka v. The Seiler Corp.,* 66 F.3d 1295, 1305n.5 (2nd Cir. 1995). *See, Rennie v. Glass, Molders, Pottery Plastics & Allied Workers International Union, AFL-CIO,* 38 F.Supp.2d 209, 214-15 ("The work place must be 'permeated with discriminatory intimidation and insult.'").

Applying these standards to the incidents described by the plaintiff in her testimony shows that the plaintiff was not a victim of sexual harassment in violation of the CFEPA. The only occurrences were inappropriate compliments about the plaintiff's appearance by one person, Don Telesca, and Telesca's general "hanging around" the plaintiff. The conduct went on for a short

---

[17]    Plaintiff admits that there was no request for sexual favors or propositions. (Rogus Dep. 44-45, 47).

period of time. The only touching of the plaintiff was when Telesca put his arm around her shoulders on one occasion. (Rogus Dep. at 44-47). Plaintiff was not sexually propositioned and Telesca did not use any vulgarity. (*Id.*) There is no evidence that the plaintiff was unable to perform her work or that the conduct of Telesca unreasonably interfered with her work performance.

More offensive and prolonged conduct than is alleged in the present case has been held not to be actionable sexual harassment. *See Quinn v. Green Tree Credit Corp., supra,* at 768 (allegations that plaintiff's supervisor told her that she had been voted the "sleekest ass" in the office and deliberate touching of her breasts with some papers); *Winiarski v. State of Conn. Dept. of Public Health,* 273 F.Supp.2d 189 (D. Conn. 2003) (supervisor accused plaintiff of flirting; occasionally spread his legs in a suggestive manner, pulled her toward him and tickled her waist and accused her of being a "difficult woman" when she pulled away); *Viera v. Wal-Mart Stores, Inc.,* 2001 W.L. 394898 (D.Conn. April 18, 2001) (co-worker commented about how nice the plaintiff looked in jeans, using a sexual device, prostitution and swinging from chandeliers and made hooting calls near the plaintiff); *Cioffi v. The Allen Products Co.,* 2000 W.L. 33180448 (D. Conn. Sept. 29, 2000) (allegations of off-color jokes made on numerous occasions by various co-workers; co-worker waived a page containing sketches of male organs in front of the plaintiff).

Defendant's motion for summary judgment as to Count II should be granted, therefore, because the plaintiff cannot show that she was subjected to an actionable, hostile work environment.

    *b.*    *Plaintiff cannot establish respondeat superior liability.*

It is undisputed that the alleged harasser in this case was a co-worker, not a supervisor of the plaintiff. (Rogus Dep. 42-43, Exh. 5). To establish liability for co-worker sexual harassment, the

341508                                              - 24 -

plaintiff must show that "the employer provided no reasonable avenue for complaint, or ... the employer knew (or should have known) of the harassment but unreasonably failed to stop it. *Brittell v. Department of Correction, supra,* at 167-168, 717 A.2d at 1265-66, *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2nd Cir. 1997).

In the present case, neither of these grounds for employer liability exist. It is undisputed that Bayer had a written policy prohibiting sexual harassment and providing its employees with several avenues to obtain redress, and that the plaintiff had been provided with that policy as part of her employment manual. (Rogus Dep. 49-50, Exh. 8). More importantly, when the plaintiff reported her complaint about Telesca, Fuhrman took immediate action to address her complaint and the action was, in fact, effective to stop the harassment. (Rogus Dep. 43, 51-52). In fact, eight months after reporting the harassment, plaintiff wrote in her evaluation comments that "Overall, I love the job, company and people." This is a comment which plaintiff confirmed in her deposition testimony was a true statement. (Rogus Dep. 40, Exh. 6, page 4) Clearly, therefore, defendant had taken appropriate action to stop the alleged harassment.

For this alternative reason, therefore, the defendant is entitled to summary judgment on the plaintiff's claim of sexual harassment.

### C. Plaintiff Cannot Establish Unlawful Retaliation

To establish a case of retaliation under CFEPA, the plaintiff must prove that (1) she engaged in a protected activity; (2) her employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Reed v. A. W. Lawrence & Co.,* 905 F.3d 1170, 1178 (2nd Cir. 1996);

*Bolick v. ALEA Group Holdings, Ltd.,* 2003 W.L. 21998984 (D.Conn. Aug. 5, 2003). If the plaintiff can establish a *prima facie* case of retaliatory discharge, the defendant must produce evidence which, if true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action. If the defendant does so, the burden returns to the plaintiff to adduce evidence sufficient to raise a fact issue as to whether the employer's reason was a pretext for retaliation. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768-69 (2nd Cir. 1998).

Defendant does not dispute that the plaintiff engaged in a protected activity under the CFEPA when she reported Telesca for sexually harassing behavior in July 1999, and also in December 1999 when she informed Redshaw, who was investigating her complaint relative to the letter of reprimand, that she felt that there had been sexual harassment and retaliation. Defendant also does not dispute that it was aware of both of these protected actions.[18]

Defendant submits that it is entitled to summary judgment on plaintiff's retaliation claim because she cannot establish a *prima facie* case of retaliation with respect to the several incidents which occurred before her discharge because these do not amount to adverse employment actions. Furthermore, defendant submits that it is entitled to summary judgment on plaintiff's claim that she was discharged in retaliation for engaging in protected activity because the plaintiff cannot establish a sufficient causal connection between her protected activity and her discharge to make out a *prima facie* case and, alternatively, she cannot show that the defendant's explanation for her discharge was a pretext for unlawful retaliation.

---

[18]    Plaintiff's later complaint, in November 2000, concerning the July 2000 note to her file (Rogus Dep. Exh. 13), did not assert that any conduct was occurring which would violate CEPA.

341508                                    - 26 -

a.     *Allegedly retaliatory incidents.*

An employee suffers an adverse employment action if she is subjected to a "materially adverse change" in the "compensation, terms, conditions or privileges of employment." The action must alter "the terms and conditions of the plaintiff's employment in a materially negative way." *Patrolmen's Benevolent Ass'n v. City of New York,* 310 F.3d 43, 51 (2nd Cir. 2002); *Richardson v. New York Dep't of Correctional Services,* 180 F.3d 426, 446 (2nd Cir. 1999) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices ... unique to a particular situation.") "Not every unpleasant matter short of discharge or demotion constitutes an adverse employment action." *Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2nd Cir. 1997).*

In the present case, the plaintiff's primary claims of retaliation, other than her discharge, involve her being given a written letter of reprimand in December 1999 and the placement in her file of a note of a counseling session in July 2000. Plaintiff's unequivocal testimony was that neither event caused her to suffer any adverse employment consequences. (Rogus Dep. 73-74, 86-87). Furthermore, the severe letter of reprimand was replaced by a milder counseling note due to the plaintiff's complaint, and the file entry relating to the accounting dispute was removed from her file also as a result of her complaint.

A letter of reprimand, in and of itself, does not constitute an adverse employment action under Title VII. *Krause v. City of La Crosse,* 246 F.3d 995, 1000 (7th Cir. 2001) ("The plaintiff-appellant ignores firmly established circuit precedent that a letter of reprimand is not an adverse employment

action unless the letter is accompanied by some other action, such as job loss or demotion."); *Ackel v. National Communications Inc.,* 339 F.3d 376, 385 (5th Cir. 2003); *Weston v. Pennsylvania,* 251 F.3d 420, 431 (3d Cir. 2001).

Even more tenuous, in terms of establishing an adverse employment action, are the remaining incidents related in the plaintiff's Complaint and in her deposition testimony. The plaintiff alleges that Fuhrman told her that she should contact Human Resources or Fuhrman's Manager, Peter Geiss, in the future in the event of a dispute and not contact the ombudsman. (Complaint ¶12 (D), Rogus Dep. 78-79). Plaintiff also mentions two comments by Telesca at meetings, one where he stated that she does not count, in the context of not being eligible for an award for service over and above doing her job, and another where he referred to her as "Miss America." (Rogus Dep. 54-58). She also mentioned an unknown person putting a Dilbert comic strip on her door (Rogus Dep. 58-60) and an incident in a lunch line where Telesca said that the plaintiff "loves to live on the edge." (Rogus Dep. at 60-61). None of these incidents even arguably amount to an adverse employment action. Nor do these incidents collectively rise to the level of "retaliatory harassment." *See Cioffi v. The Allen Products Co.,* 2000 W.L. 33180448 (D. Conn. Sept. 29, 2000) at 11-12.

To the extent that the plaintiff's claim of retaliation is predicated upon these several incidents, therefore, defendant is entitled to summary judgment on her claim.

     *b.*    *The plaintiff cannot establish a causal connection between her protected activity and her discharge.*

Another element of a *prima facie* case of retaliation is that the plaintiff show the existence of a causal connection between the protected activity and her discharge. *Richardson v. New York State*

*Dep't of Correctional Services, supra,* at 443. Plaintiff has no direct evidence that her discharge was related to her complaints of sexual harassment and retaliation, made in July 1999 and December 1999. A causal connection, for purposes of a *prima facie* case, may be shown by a close temporal connection between the protected activity and the adverse action. *Cifra v. General Electric Co.,* 252 F.3d 205, 218 (2d Cir. 2001); *Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir. 1988). In the present case, however, nearly one and one-half years elapsed between the plaintiff's last protected activity and her discharge. This length of time cannot provide the basis for an inference of causation based upon temporal proximity. *See Gallo v. Eaton Corp.,* 122 F. Supp. 2d 293, 303 (D. Conn. 2000)(gap of 23 months); *Johnson v. University of Wisconsin-Eau Claire,* 70 F.3d 469, 480 (7th Cir. 1995)(gap of 20 months discounted evidence of causal connection). Moreover, the timing of the plaintiff's discharge is clearly related to event which were not instigated or controlled by the defendant. In other words, it is not disputed by the plaintiff that Chin Chen made an accusation in late May 2001 that the plaintiff had assisted in falsifying her resume. Chin Chen came forward as a result of the actions of the plaintiff in putting her on a corrective action plan, not as the result of any actions of the defendant. Plaintiff cannot, therefore, establish a *prima facie* showing of a causal connection between her protected actions and her discharge based upon the timing of her discharge.

Nor is there any other evidence tending to associate the plaintiff's discharge with her complaint of sexual harassment or retaliation.

In sum, plaintiff cannot establish a *prima facie* case of retaliatory discharge in violation of the CFEPA. Defendant is entitled, therefore, to summary judgment on the plaintiff's claim of retaliation.

c.    *The plaintiff cannot show that the defendant's explanation for her discharge is a pretext for retaliation.*

Even if this Court were to find that the plaintiff had shown enough of a causal connection to establish a *prima facie* case of retaliation, she must still point to evidence in the record which would permit a reasonable jury to find that the defendant's explanation that her discharge was for falsification of a resume is fabricated or not worthy of belief. *Quinn v. Green Tree Credit Corp., supra,* at 769-70.

The plaintiff agrees that falsification of Chin Chen's resume was a very serious matter. (Rogus Dep. at 104, 173). It is, therefore, a plausible explanation for the discharge of an employee. Plaintiff cannot come forward with evidence that other management employees engaged in similar conduct and were not similarly disciplined. While Chin Chen was not discharged, in the judgment of management her conduct was less serious than that of the plaintiff's and warranted only a letter of warning. (Fuhrman Dep. 48-49). This is consistent with the plaintiff's admission that she did not know whether it was Chin Chen, as opposed to Cliff Chen, who had falsified the resume. (Rogus Dep. 142). In fact, plaintiff admitted that she does not know whether Chin Chen even knew what changes had been made to the resume. (*Id.*). Chin Chen herself testified that she was unaware of who made the changes to her resume and what had been changed. (Chin Chen Dep. at 21-27).

The evidence of the events leading up to the plaintiff's discharge is largely admitted. It is not disputed that Chin Chen was hired on the basis of a resume which substantially overstated her computer skills, and that it was the plaintiff who first made a revision to the resume to add computer skills. It is also undisputed that Chin Chen informed Fuhrman and the other persons involved in the

investigation that she had told the plaintiff before she was hired that she lacked significant computer skills. Those two pieces of information, *i.e.* plaintiff's email explaining how she had changed the resume and Chin Chen's claim that she informed the plaintiff of her lack of computer skills, in and of themselves are sufficient reasons to justify discharge, without any further information. However, in addition to these two facts, it was known to Fuhrman that the plaintiff had pushed to hire Chin Chen over the objections of himself and Telesca. The plaintiff had also assisted Chin Chen by providing her in advance a list of the questions which she could expect to be asked at the interview and that she had even assisted Chin Chen in writing a thank you letter which Chin Chen then was to send to the plaintiff. Finally, while the plaintiff's testimony has been equivocal, changing somewhat between her admitted testimony before the Connecticut Commission and at her deposition, there is substantial evidence that the plaintiff refused to assist in the investigation by providing management with the name of the other individual who had been involved in putting together the false resume. Putting together these facts, there is not only a plausible explanation for the plaintiff's discharge, but a very compelling explanation.

When the plaintiff was asked for the basis of her belief that she was discharged because she had made a complaint of sexual harassment or complained to the ombudsman about Fuhrman, as opposed to the explanation that she had falsified documents, her answer was that the basis for her belief was that Chin Chen was not given the same punishment. (Rogus Dep. at 171-72). It is noteworthy that the plaintiff herself claims to have learned that Chin lied on her resume in April 2001, but that she never herself imposed any discipline. (Rogus Dep. at 173-75)

If the Court determines that a *prima facie* case of retaliatory discharge has been made out by the plaintiff, defendant submits that there is no evidence from which a jury could infer that the reason given for the plaintiff's discharge is false or a fabrication to conceal a retaliatory motive. Summary judgment on the plaintiff's retaliation claim should, therefore, be granted.

### D.    *Intentional infliction of emotional distress.*

The elements of a cause of action for intentional infliction of emotional distress are (1) that the defendant intended to inflict emotional distress; or knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986).

In the present case, defendant is entitled to summary judgment because the plaintiff cannot establish that she was subjected to conduct which was sufficiently extreme and outrageous to satisfy the second *Petyan* element.

It is for the Court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Bell v. Board of Education,* 55 Conn. App. 400, 409-10, 739 A.2d 321 (1999); *Mellaly v. Eastman Kodak Co.,* 42 Conn. Supp. 17, 19 n.1, 597 A.2d 846 (1991).

In *Petyan*, the Court further explicated the element of extreme and outrageous conduct as follows:

> "The rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." 200 Conn. at 254 n.5.

341508                                    - 32 -

In *Dollard v. Board of Education,* 63 Conn. App. 550, 554, 777 A.2d 714 (2001), the Court described the type of conduct which would support the tort as being "conduct that is so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." 63 Conn. App. at 554; *Campbell v. Town of Plymouth,* 74 Conn. App. 67, 78, 811 A.2d 243 (2002). The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior. *Parsons v. United Technologies Corp.,* 243 Conn. 66, 89, 700 A.2d 655 (1997); *Campbell v. Town of Plymouth, supra,* at 78, 811 A.2d at 252. *See, Armstead v. The Stop & Shop Companies, Inc.,* 2003 W.L. 1343245 (D.Conn. Mar. 17, 2003) at 4 (a court evaluates whether the employer's conduct, not the motive behind the conduct, is extreme or outrageous.

The plaintiff testified that she could not specify any extreme or outrageous behavior to which she was subjected by an employee of defendant, other than the incidents and events related previously in her deposition. (Rogus Dep. at 194). She identified Fuhrman, Telesca and Redshaw as being the persons that she felt intended to inflict emotional distress upon her. (*Id.*)

With respect to Fuhrman, besides discharging her, he placed the personnel notes in her file. He did nothing else outrageous. (Rogus Dep. at 194). Telesca made comments about the plaintiff's appearance and put his arm around her shoulders. He also made the three comments to which plaintiff testified in relating her retaliation claim. In addition, she claims that he forced her to hire an employee that she did not want to hire. Those are the only events of outrageous behavior in which plaintiff contends Telesca engaged. (Rogus Dep. at 196-197)

So far as Redshaw is concerned, plaintiff testified that, in his investigation of one of her complaints, "he was very mean instead of his normal cordial smile." By this, plaintiff meant that he kept saying that she was accusing management of doing things, when she did not believe she was making accusations. (Rogus Dep. at 198-99). She also contends that Redshaw should have investigated before Fuhrman discharged her and given her a fair opportunity to explain herself or let her see the evidence. (*Id.* at 199-200).

These actions do not rise to the level of the types of outrageous conduct which have been required in order to sustain a claim of intentional infliction of emotional distress. The courts have dismissed claims involving more serious conduct than is alleged in the present case. *E.g., Appleton v. Board of Education,* 254 Conn. 205, 211, 757 A.2d 1059 (2000) (plaintiff subjected to condescending comments in front of colleagues, two psychiatric examinations, police escort from work place, suspension, forced resignation); *Dollard v. Board of Education, supra,* at 554 (plaintiff hypercritically scrutinized in every aspect of her work and personal life, publicly admonished and made the subject of a plan to force her resignation.

Defendant's motion for summary judgment on Count IV of plaintiff's Complaint should, therefore, be granted.

### E.    Defamation.

The elements of a cause of action for defamation are (1) that the defendant published false statements; (2) that harmed the plaintiff; and (3) that the defendant were not privileged to do so. *Torosyan v. Boehringer Ingleheim Pharmaceuticals, Inc.,* 234 Conn. 1, 28, 662 A.2d 89, 103 (1995); *Kelley v. Bonney,* 221 Conn. 549, 563, 606 A.2d 693 (1992). Communications between managers

341508                                    - 34 -

regarding the review of an employee's job performance and the preparation of documents regarding

an employee's termination are protected by a qualified privilege. *Torosyan, supra,* at 29, 662 A.2d at

103; *Gaudio v. Griffin Health Services Corp.,* 249 Conn. 523, 545, 733 A.2d 197, 211 (1999). To

defeat the qualified privilege afforded to intra-corporate communications, the plaintiff must come

forth with evidence that the statements were made with "actual malice," that is with knowledge of

their falsity or reckless disregard as to their truth. *Tarosyan, supra,* at 29, 662 A.2d at 104; *Malik v.*

*Carrier Corp,* 202 F.3d 97, 108 (2d Cir. 2000)

 In her complaint, plaintiff alleges that defendant defamed her before she was discharged by

publishing statements alleging the falsification of company documents, falsely accusing her of

battering another employee and lying. (Complaint ¶17)

 The allegation as to falsifying documents has to do with alteration of Chin Chen's resume.

(Rogus Dep. 189-90) Plaintiff has no information that this accusation was published other than

among the group of managers who were involved in deciding to discharge her. (*Id.*) As such, under

the authorities cited above, it is a privileged communication and plaintiff must come forward with

evidence that the publisher did not believe that she falsified the resume or acted in reckless disregard

for whether she did or not. As discussed above, in connection with considering plaintiff's evidence

of pretext, the evidence now in the record shows that there was substantial evidence, in addition to

Chin Chen's statement, to support the accusation that the plaintiff participated in creating a false

resume. Indeed, it is uncontroverted that she did so, although she disputes that she did so knowingly.

 The allegation that the plaintiff was accused of battering another employee relates to Chin

Chen's report that plaintiff "poked" her. (Rogus dep. 190) The only statement of which plaintiff is

341508       - 35 -

aware is Fuhrman's telling her that Chin Chen had accused her of poking her. (Id. 191) She has no knowledge of this statement being published otherwise by any person acting on behalf of the defendant. (Rogus Dep. 192-93)

Plaintiff assumes that Fuhrman repeated the accusation, because she said a production employee told her that "they learned that Chin and I had an argument after I was discharged." She clarified that to be a "fight." (Id. 192) The employee did not tell her the source of this rumor. An unattributed rumor cannot be the basis of a defamation claim. *Manning v. Cigna Corporation*, 807 F. Supp. 889, 899 (D. Conn. 1991). *See Szot v. Allstate Insurance Co.*, 161 F. Supp. 2d 596, 608-09(D. Md. 2001) ("Plaintiff's references to the 'rumor mill' created by her former peers' sheer speculation as to the grounds for her termination, without more, is insufficient to establish a claim of defamation against Allstate, the employer"); *Elicier v. Toys R Us, Inc.*, 130 F. Supp. 2d 307, 311 (D. Mass. 2001) ("The mere fact that some Toys 'R' Us employees may have heard a rumor that Elicier was terminated for dealing drugs does not prove reckless publication" by the employer); *Stockley v. AT&T Information Systems, Inc.*, 687 F. Supp. 764, 771 (E.D.N.Y. 1998) ("Proof of a 'grapevine' is not proof of unprivileged communications by AT&T'S executives). Moreover, plaintiff does not have personal knowledge of a publication and the production employee's statement is hearsay, which cannot be considered as evidence on a motion for summary judgment. Rule 56 (e), Fed. R. Civ. P.

Finally, plaintiff's allegation that statements were published accusing her of lying fails because plaintiff has admitted that she is not aware of any such accusation being made to anyone but to her. (Rogus Dep. 193) A publication to the plaintiff is not actionable. *See Backert v. BIC Corp,*

341508                                 - 36 -

2002 WL 31045956 (Conn. Super. Aug. 9, 2002); *Lay v. Stamford Emergency Medical Services, Inc.,* 2001 WL 717477 (Conn. Super. Jun. 4, 2001).

For the foregoing reasons, defendant is entitled to summary judgment on the fifth, and last, count of the Complaint.

## CONCLUSION

Bayer requests that summary judgment be entered in its favor and against the plaintiff on all counts of the Complaint.

Respectfully submitted,

Christopher Brigham
Federal Bar No. ct02761
Jennifer L. Groves
Federal Bar No. ct20077
Updike, Kelly & Spellacy, P.C.
One Century Tower
265 Church Street, 10th Floor
New Haven, CT 06510
Telephone:  (203) 786-8300
Facsimile:  (203) 772-2037

John J. Myers
Federal Bar No. ct11377
Eckert Seamans Cherin & Mellott
44th Floor, 600 Grant Street
Pittsburgh, PA  15222
Telephone:  (412) 566-6000

Counsel for Defendant

341508

- 37 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANT'S**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was

served by first-class U.S. mail, this 22nd day of October, 2003, upon the following counsel:


Robert B. Muchinsky, Esq.
39 Russ Street
Hartford, CT 06106

Christopher I. Brigham
Commissioner of the United States District Court