IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED
9 52 AM '03
U.S DISTRICT COURT
NEW HAVEN, CONN.

| | | |
|---|---|---|
| MEI ROGUS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3: 02 CV 1778 MRK |
| | § | |
| BAYER CORPORATION, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S APPENDIX OF
## DISCOVERY MATERIALS

John J. Myers
Federal Bar No. ct11377
Eckert Seamans Cherin & Mellott
44th Floor, 600 Grant Street
Pittsburgh, PA  15222
Tel. 412-566-6000

Christopher Brigham
Federal Bar No. ct02761
Updike, Kelly & Spellacy, P.C.
P.O. Box 231277, One State Street
Hartford, CT 06123-1277
Tel. 860-548-2600

Attorneys for the Defendant

## TABLE OF CONTENTS

**Plaintiff's Deposition**

**Plaintiff's Deposition Exhibits**

**Hsiu-Chin Chen Deposition**

**Hsiu-Chin Chen Deposition Exhibits**

**Richard Fuhrman Deposition**

**Richard Fuhrman Deposition Exhibits**

1

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF CONNECTICUT

3

4

5   ------------------------x

6   MEI ROGUS,                    :        **ORIGINAL**

7              Plaintiff,         :

8         -versus-               : No. 3:02CV1778(JCH)

9   BAYER CORPORATION,            :

10             Defendant.         :

11  ------------------------x

12

13              Deposition of MEI ROGUS, taken

14  pursuant to Federal Rules of Civil Procedure, at the

15  law offices of Updike Kelly & Spellacy, Hartford,

16  Connecticut, before Jacqueline McCauley, RPR/CSR, a

17  Notary Public in and for the State of Connecticut, on

18  September 18, 2003, at 10:00 a.m.

19

20

21

22

23

24

25

```
 1    M E I    R O G U S,

 2    174 Saddlebrook Path, Southington, Connecticut,

 3              called as a witness, having been first duly

 4              sworn by Jacqueline M. McCauley, a Notary

 5              Public in and for the S.ate of Connecticut,

 6              was examined and testified as follows:

 7    DIRECT EXAMINATION

 8    BY MR. MYERS:

 9         Q.  Good morning, Ms. Rogus. My name is John

10    Myers.  We met at the settlement conference and as you

11    know, I represent Bayer Corporation in the lawsuit

12    that you filed in the Federal Court.  I'm going to

13    take your deposition today and in the course of taking

14    the deposition will ask you a number of questions

15    about your claims.  I would ask because of your accent

16    that you try to speak slowly and speak up so that the

17    court reporter can take down an accurate transcript

18    and also I would ask that you wait until I finish

19    talking before you start and I'll try to wait until

20    you finish before I start and that'll make it easier

21    to get a good transcript.  Is that fair enough?

22         A.  Okay.

23         Q.  Have you ever had your deposition taken

24    before?

25         A.  No.
```

1          Q.   Have you ever been a party to a lawsuit
2    before this one?

3          A.   No.

4          Q.   You've never sued anybody?

5          A.   No.

6          Q.   No one's ever sued you?

7          A.   No.

8          Q.   Have you ever been charged with a
9    commission of a crime?

10         A.   No.

11         Q.   What was your employment with Bayer?

12         A.   April of 1999 to June, 2001.

13         Q.   Do you remember the days?

14         A.   I believe it was April 5 through June 13.

15         Q.   And what was the location of your
16   employment?

17         A.   245 Newpark Drive in Berlin, Connecticut.

18         Q.   Berlin?

19         A.   Yes.

20         Q.   You were at that location the entire time?

21         A.   Yes.

22         Q.   And your job title was what?

23         A.   Plant controller.

24         Q.   Since June 13, 2001 have you been
25   employed?

1    Q.  Okay.  And --

2    A.  I was supposed to continue in May, but

3  after I return to work I was so afraid to take any

4  time off from work I didn't want to take a risk of

5  losing my job.  So I stop going after I return to work

6  in May.

7    Q.  Did you resume after you did lose your

8  job?

9    A.  No, I did not.  It cost money.  I don't

10  want to running up more bill.

11    Q.  You have the same insurance coverage now

12  as you had then, don't you?

13    A.  Yeah, but I still have to pay the co-pay

14  and I just got a bill for one hundred something

15  dollars for all the co-pay I have to pay and that all

16  adds up.

17    Q.  All right.  How did you get your -- how

18  did you come to be employed by Beyer?

19    A.  When I was doing job search through

20  working and one of my friend, Cliff Chen, who worked

21  at Bayer in West Haven site, he send me information on

22  this opening at Berlin site.

23    Q.  Where does -- where did Cliff Chen work?

24    A.  In West Haven, Connecticut.

25    Q.  West Haven?

1          A.   Yes, the pharmaceutical division at Bayer

2     Corporation.

3          Q.   How did you know Mr. Chen?  Is it

4     Mr. Chen?

5          A.   Yes, it's Mr. Chen.  Through his wife

6     Cindy.  His wife was my girlfriend.

7          Q.   Is she a native of Taiwan also?

8          A.   Yes.

9          Q.   And is Mr. Chen a native of Taiwan?

10         A.   Yes.

11                    (Defendant's Exhibit 1, marked for

12                     identification.)

13         Q.   Exhibit 1 -- Defendant's Exhibit 1 is

14     entitled employment application. Is this your

15     application for a job at Bayer?

16         A.   Yes.

17         Q.   You list as a name of referral, Cliff

18     Chen.  Is that the person we have just been

19     discussing?

20         A.   That's correct.

21         Q.   This is filled out in your handwriting?

22         A.   Yes.

23         Q.   Is that your signature on the third page

24     of the exhibit?

25         A.   Yes.

1          Q.  And your handwriting on the fourth and

2    fifth pages?

3          A.  Yes.

4                    (Defendant's Exhibit 2, marked for

5                    identification.)

6          Q.  Exhibit 2 is a letter dated March 16,

7    1999.  Is this the letter offering you employment at

8    Bayer?

9          A.  Yes.

10         Q.  And you signed this letter on March 19,

11   1999?

12         A.  Yes.

13         Q.  This makes reference to an 8 percent, up

14   to 8 percent productivity plus plan bonus.  Is that

15   the bonus that you were describing for me earlier?

16         A.  That's correct.

17                   (Defendant's Exhibit 3, marked for

18                   identification.)

19         Q.  Exhibit 3 is entitled Bayer Corporation

20   agreement.  Is Exhibit 3 an employment agreement that

21   you signed when you were hired by Bayer?

22         A.  Yes.

23         Q.  And your signature appears on the last

24   page of Exhibit 3?

25         A.  That's correct.

1                    (Defendant's Exhibit 4, marked for

2                    identification.)

3          Q.   Exhibit 4 is a resume for Mei Rogus.   Is

4    Exhibit 4 the resume you submitted to Bayer in

5    connection with your application for employment?

6          A.   Yes.

7          Q.   And does this resume truly and accurately

8    relate your professional experience and your

9    education?

10         A.   To the best, yes.

11         Q.   I'm sorry, what did you say?

12         A.   Yeah, to the best, yes.

13         Q.   What is to the best?   I mean, did you

14   actually work at the places and the jobs and true

15   descriptions of your employment?

16         A.   That's correct.   Those are the places I

17   work for and my responsibilities had been always very

18   broad and this is condensed.   I have highlight of the

19   responsibilities, but usually I do a lot more than

20   those.

21         Q.   Let me just mention that it appears to me

22   that I may be missing a page of your resume, because

23   your education seems to stop.   Should there be another

24   page there?   That Master of business administration,

25   is that the only school you listed on your resume?

```
 1            A.   That I don't remember.

 2            Q.   But in any event, your employment history

 3    from 1990 to 1999 is as stated on the first page of

 4    Exhibit 4; is that right?

 5            A.   Yes.

 6            Q.   And you have a business, a Master of

 7    business administration degree from the University of

 8    Hartford?

 9            A.   That's correct, yes.

10            Q.   As plant controller at the Berlin

11    location, what were -- first of all, what is done?

12    What's the function or mission of the Berlin location

13    of Bayer Corporation?

14            A.   Can you explain again?

15            Q.   What do they do there?

16            A.   They make film, plastic film.

17            Q.   Film for use in cameras?

18            A.   No.  For printing industry, for automobile

19    industry, graphic design, cell phones.

20            Q.   When you say film then, this is not

21    photographic film, but some other type of film?

22            A.   That's correct.

23            Q.   It's a type of plastic material?

24            A.   That's correct.

25            Q.   Like the plastic that would be used to, in
```

1    the casing of a cell phone?

2         A.   Yeah.   The kind of plastic that were allow

3    you to print like on the car, dashboard on the car,

4    the cell phone.   You have the things that need to

5    print it out.   That's more like for high end industry.

6         Q.   I'm still not sure I understand what they

7    make.

8         A.   Plastic film.

9         Q.   And the film is used for what?

10        A.   For the industries, for automobile, for

11   cell phone, --

12        Q.   Okay, but I mean --

13        A.    -- graphic design, printing.

14        Q.   Excuse me.   I know what a cell phone is.

15   In a cell phone where would the Bayer film be found?

16        A.   When you see the printing numbers or on

17   the case of the cell phone.   Excuse me, I'm not an

18   engineer or, you know, salesman.   You are trying to

19   make me to sell the product to you.   Unfortunately I

20   am not a salesman here, but that's what it's used

21   there, for printing.   For example, if you see a

22   catalogue that has plastic on it, but you have very

23   high quality printing on the plastic, that's our film,

24   one of the applications that our plastic films could

25   be used.

1       Q.  Okay.  Who was your boss?  Who hired you?

2       A.  Rich Fuhrman.

3       Q.  Did you interview with Mr. Fuhrman before

4  you got the job?

5       A.  Yes.

6       Q.  And was he involved in hiring you?

7       A.  Yes.

8       Q.  Did you continue to report to Rich Fuhrman

9  the entire time you worked for Bayer?

10      A.  Yes.

11      Q.  I have as Exhibit 5 an organization chart.

12             (Defendant's Exhibit 5, marked for

13              identification.)

14      Q.  This has a date in the lower left-hand

15  corner it says January 18, 2000.  Is Exhibit 5 an

16  accurate description of the Berlin plant organization

17  chart as of the date that appears on the document?

18      A.  Yes.

19      Q.  Now, according to this chart in addition

20  -- you reported to Rich Fuhrman and then you had a

21  couple of employees that reported to you; is that

22  correct?

23      A.  That's correct.

24      Q.  One was named Helen and one was named

25  Hsiu-Chin Chen?

35

1      A.   That's correct.

2      Q.   And then is that your handwriting

3   underneath?

4      A.   No.

5      Q.   Apparently at some point Helen Kjellquist

6   retired and was replaced by Tammy Erickson.  Did that

7   happen?

8      A.   That's correct. When I left in June of

9   2001, all three of them were working for me.

10      Q.   Then across the top where your name

11   appears there's a number of other employees and titles

12   reporting to Rich Fuhrman.  Is that level, are they

13   your peers, people who are at the same level as you in

14   the organization?

15      A.   That's right.

16      Q.   Can you tell me what your, what basically

17   your duties were as a plant controller?

18      A.   I oversee the Berlin site accounting,

19   payroll and the financial reporting functions and ad

20   hoc projects like Y2K, access database revision, site

21   mainframe administration, a bit involved in IT area of

22   responsibility.

23      Q.   The organization chart indicated that the

24   Berlin plant is, has in part of the heading polymers

25   division.  Is that the business unit of Bayer that you

SANDERS, GALE & RUSSELL
(203) 624-4157

1    worked in?

2          A.   When I worked there, it was called

3    plastics division.

4          Q.   Okay.  Was plastics a part of the polymers

5    division?

6          A.   No.   They use plastics division.

7    Polymers, as I remember, was used before, but then it

8    was changed to plastics when I was there.

9          Q.   So you were part of or the Berlin plant

10   was part of a division, which was referred to as the

11   plastics division as you remember?

12         A.   Yes.

13         Q.   It had previously been called the polymers

14   division?

15         A.   I remember that was, yeah, the history.

16         Q.   And where was the plastics division

17   headquartered?

18         A.   Pittsburgh.

19         Q.   Pennsylvania?

20         A.   Pennsylvania.

21         Q.   So that who was Rich -- to whom did Rich

22   Fuhrman report?

23         A.   Peter Geise, G-E-I-S-E.

24         Q.   And Mr. Geise was located where?

25         A.   Pittsburgh, Pennsylvania.

37

1          Q.   Do you know  -- Bayer Corporation, do you

2    know whether that was a publically traded company?

3          A.   It had been public traded company in

4    Europe, in Germany.  When I left in June of 2001, the

5    stock wasn't in New York Exchange --

6          Q.   Was not?

7          A.    -- market yet.

8          Q.   I'm sorry, was not?

9          A.   Was not at the time I left, but we were

10   preparing at that time to get the stock to be listed

11   in New York Exchange.  It was supposed to be listed,

12   you know, but it has been delayed and delayed.

13         Q.   When you say the stock was traded in

14   Europe, Germany, whose stock was traded in Germany?

15         A.   Bayer AG.

16         Q.   And Bayer AG is what with respect to Bayer

17   Corporation?

18         A.   It's the parent company of Bayer

19   Corporation.

20         Q.   So Bayer Corporation, your employer, was

21   owned by a German company named Bayer AG; is that

22   correct?

23         A.   That's correct.  When I was there, that's

24   the organization.

25         Q.   And the stock that was traded in Germany

1    on the German Stock Exchange, was that the stock of

2    Bayer AG?

3              A.   I believe so.

4              Q.   Now, the stock that you said has been

5    delayed, but they were preparing to trade on the New

6    York Stock Exchange, that would be Bayer AG stock not

7    Bayer Corporation stock, correct?

8              A.   I thought it was to be Bayer Corporation.

9              Q.   Do you know that?

10             A.   That I don't know all the detail, I'm

11   sorry.  I don't know it was -- I never been involved

12   in what kind of, under which corporation this is going

13   under, no.

14             Q.   In any case while you worked there the

15   only publically traded company that you were aware of

16   was the parent company traded in Germany, correct?

17             A.   I remember you could buy the stock here,

18   buy the Bayer's Corporation stock here.  If you want

19   to, you chose to, and there's a process.  I don't

20   understand all the financial thing, but you could

21   still buy the stock, yes.

22             Q.   But through the German Stock Exchange?

23             A.   Probably.  I never done that so I don't

24   know the process, I'm sorry.

25             Q.   And the stock you could buy, was that the

1    stock of Bayer AG is what I'm asking you, the parent

2    company?

3            A.   That's -- I think so, yeah.

4            Q.   Do you know whether Bayer AG, the parent

5    company, owned other, had other subsidiaries besides

6    Bayer Corporation?

7            A.   I'm sorry, I don't know.

8            Q.   You don't know?  Did you say I don't know?

9            A.   That's correct.

10           Q.   Did you -- as an employee of Bayer

11   Corporation in Berlin, Connecticut, did you receive

12   periodic performance evaluations, written performance

13   evaluations?

14           A.   Yes.

15                   (Defendant's Exhibit 6, marked for

16                    identification.)

17           Q.   Defendant's Exhibit 6 is a performance

18   management form that has your name on it and it states

19   it covers the period from April 5, 1999 to December

20   31, 1999.  Is Exhibit 6 a performance evaluation that

21   you received as a Bayer employee?

22           A.   Yes.

23           Q.   Did you sign this form on the last page?

24           A.   Yes.

25           Q.   And you signed it -- what was the date on

1    which you signed the form?

2         A.   February 28, 2000.

3         Q.   Did you write the comments that appear

4    under the heading employee comments just above your

5    signature?

6         A.   Excuse me?

7         Q.   Do you see the section of the form that's

8    headed employee comments?

9         A.   Yes.

10        Q.   Are those your comments that you wrote

11   beneath, that appear there?

12        A.   Yes.

13        Q.   And your overall rating -- is this the

14   first written evaluation that you received as a Bayer

15   employee?

16        A.   Yes.

17        Q.   Your overall rating was an average rating

18   of meets expectations; is that true?

19        A.   Yes.

20        Q.   Who gave you this evaluation?

21        A.   Rich Fuhrman.

22        Q.   The comments that you wrote above your

23   signature, are they true comments?

24        A.   Yes.

25                   (Defendant's Exhibit 7, marked for

41

1                      identification.)

2          Q.  Exhibit 7 is a performance management form

3  again.  It says employee name Mei Rogus and it

4  purports to cover the period from January 1, 2000 to

5  December 31, 2000.  Is Defendant's Exhibit 7 a

6  performance evaluation that you were given while you

7  were employed by Bayer?

8          A.  Yes.

9          Q.  Did you sign Exhibit 7 on the last page?

10         A.  Yes.

11         Q.  On what date did you sign this exhibit?

12         A.  March 8, 2001.

13         Q.  Again, there's a section that states

14 employee comments and then there's a couple paragraphs

15 written under that.  Are they your comments that you

16 wrote?

17         A.  Yes.

18         Q.  And the overall narrative assessment, the

19 overall rating that you received again was meets

20 expectations; is that correct?

21         A.  That's correct.

22         Q.  The overall narrative assessment, was that

23 done by Mr. Fuhrman again?

24         A.  Yes.

25         Q.  And this was -- this form was signed by

1    Mr. Fuhrman and also by Mr. Geise, correct?

2           A.   That's correct.

3           Q.   I'm sorry, I may have asked you this.

4    What was the date on which you signed the form?

5           A.   March 8, 2001.

6           Q.   One of the claims that appear in the

7    complaint that was filed with the court in your case

8    is that you were sexually harassed at some point after

9    you were hired by Bayer.  You are aware of that,

10   correct?

11          A.   Correct.

12          Q.   Who sexually harassed you?

13          A.   Don Telesca.

14          Q.   And Mr. Telesca's name appears on the

15   organization chart that we marked as Exhibit 5,

16   correct?

17          A.   Correct.

18          Q.   And his title was HR manager?

19          A.   That's right.

20          Q.   He was a peer of yours?

21          A.   Pardon me?

22          Q.   He was a peer of yours at the same level

23   as you?

24          A.   Yes.

25          Q.   And he also reported to Mr. Fuhrman; is

1     that correct?

2             A.   That's correct.

3             Q.   When did he begin -- when did the sexual

4     harassment, harassing incidents start, if you can

5     recall, approximately?

6             A.   May of 1999.

7             Q.   Would you tell me, please, what he did

8     that you -- this is something that you reported to

9     your boss, Mr. Fuhrman, correct?

10            A.   That's correct.

11            Q.   When did you report that?

12            A.   Beginning of July, 1999.

13            Q.   As I understand it, the sexual harassing

14    incidents stopped after you reported it, correct?

15            A.   Correct.

16            Q.   Would you tell me in that time frame from

17    May until you reported the problem to Mr. Fuhrman,

18    would you tell me what it was that Mr. Telesca did to

19    you that you regarded as sexually harassing?

20            A.   He made comments, compliment me about my

21    looks, my appearance, my wardrobe and --

22            Q.   Would you tell me what he said rather than

23    just characterizing them?

24            A.   Like I was very attractive.  I was Miss

25    America. He would made comment about when I laughed,

SANDERS, GALE & RUSSELL
(203) 624-4157

44

1    "The giggling can drive men crazy."  What made me so

2    uncomfortable was he took every opportunity that he

3    got to talk to me or see me and he always change the

4    subject to my appearance, my look and how attractive I

5    am and even though I told him we are discussing about

6    business, you know, we are not discussing about that

7    and he always say, "Oh, it's a compliment, you know.

8    It's about you look very nice and everything.  It's

9    not a bad thing."  I say, "I understand, but let's

10   focus" and I told him, "Don't call me Miss America.  I

11   am not a Miss America" and he just continued to repeat

12   all this kind of behavior and it just made me very

13   uncomfortable.  So when he started putting his arm on

14   me, around me, I --

15        Q.  Okay.  First of all, I don't want to move

16   onto the touching.  I want to first ask you some

17   questions about his comments, okay, his verbal

18   harassment, okay?  Is what you've described, is that

19   the type of comment that you reported to Mr. Fuhrman?

20        A.  I would think so, yeah.

21        Q.  Did Mr. Telesca ever ask you for a date?

22        A.  No.

23        Q.  Did he sexually proposition you?

24        A.  Can you explain?

25        Q.  Did he say anything to you that suggested

SANDERS, GALE & RUSSELL
(203) 624-4157

1   that he wanted to have sex with you?

2           A.  No.

3           Q.  Did he use any vulgar language?

4           A.  No.

5           Q.  Now, as I understand it, in addition to

6   comments, remarks that you've described, what else did

7   the harassment consist of?

8           A.  He put his arm around me and that I

9   decided I have to speak up. I didn't want to wait

10  until it get worse.

11          Q.  Is that event that prompted you to go to

12  Mr. Fuhrman?

13          A.  Yes.

14          Q.  How many times did he put his arm around

15  you?

16          A.  Once.

17          Q.  When you say his arm, you're saying one

18  arm?

19          A.  Yes, and he pull me toward his body.

20          Q.  Did he have -- where did he have his arm

21  on your shoulders, around your waist or what?

22          A.  Yeah.  He just grab across.  He stood

23  behind me and just grab my arm toward his body.

24          Q.  I'm sorry?

25          A.  He put his arm around me.

SANDERS, GALE & RUSSELL
(203) 624-4157

1          Q.   I know but where?  Was it on your

2    shoulders, around your waist?  Where did he have --

3          A.   Around my shoulders.

4          Q.   Where were you at the time this happened?

5          A.   I was in a computer room talking to an IT

6    contracting employee there, Lisa, and Don came behind

7    me and he put his arm around me.

8          Q.   Around your shoulder?

9          A.   Yes.

10         Q.   Was Lisa there at the time?

11         A.   Yes.

12         Q.   Did he touch you any other times before

13   that?

14         A.   No.

15         Q.   Or after that?

16         A.   No.

17         Q.   Now, how long after he put his arm around

18   your shoulder did you go to Mr. Fuhrman?

19         A.   A few days.  I was afraid to report this

20   to anyone and I discussed with a couple friends and a

21   couple different people first.

22         Q.   And then you went to Mr. Fuhrman?

23         A.   Yes.

24         Q.   Were there any other sexually harassing

25   types of behavior beside what you just described that

1    Mr. Telesca engaged in?

2         A.  He was always sitting next to me for some

3    reason and that made me very uncomfortable and the way

4    he sit he always lean toward me that almost touch me

5    and that's one of the other reason that I wished to

6    stop and I didn't like that.

7         Q.  He would hang around you a lot?

8         A.  That's right.  Yeah. At meetings, at

9    company picnic, when we have a cookout or having

10   pizza, he always sit, come sit next to me and I always

11   had to  -- as soon as he come sit next to me, I got up

12   and move somewhere else and then at meetings he always

13   sitting next to me.  There are times if I get a chance

14   to move away, I would move away right away.  There are

15   times that it was too late for me to get up in a

16   meeting to move and I had to sit there and it made me

17   very uncomfortable.

18        Q.  Did you ever tell Mr. Telesca that you

19   were making, that he was making you uncomfortable?

20        A.  I told him I didn't like that and I ask

21   him to stop making all that kind of comments to me.

22        Q.  Other than telling him not to make those

23   comments did you ever tell him to stay away from you

24   or that you felt he was hanging around you too much?

25        A.  No.  I never told him to stay away from

1   me. I just stay away from him myself.

2          Q.   When he put his arm on your shoulders, did

3   you tell him not to do that or did you tell him that

4   that bothered you?

5          A.   I took that off of sort of right away and

6   I moved forward to stay away from him right away and

7   when he saw me, I wasn't happy and when I saw him, he

8   wasn't happy about that either.

9          Q.   When you say you saw him, did he say

10  anything?

11         A.   No.

12         Q.   Did you say anything?

13         A.   No, because Lisa was there.  I did not

14  want to embarrass him.

15         Q.   Were you aware at the time this was

16  happening that sexual harassment was a violation of

17  Bayer's policy?  Did you know that?

18         A.   I can't remember if I knew that in that

19  time, but I did learn that later when they send out an

20  e-mail about retaliation and sexual harassment.  It is

21  a violate of Bayer policy.

22         Q.   As a manager, weren't you given a book

23  with policies in it, Bayer's policies, employment

24  practices?

25         A.   I believe so, yes.

1       Q.  Did you ever look at it?

2       A.  I believe I did throughout a time when I

3   was working there.  I kind of, you know, look through

4   the sections, I believe.  I can't remember if I did

5   that before or right away or throughout, but I know I

6   have to refer to the Bayer's policy from time to time.

7       Q.  Did you also receive a site handbook?

8       A.  I think so, yeah.

9       Q.  Did you look at the site handbook when you

10  were given -- were you given that when you were hired?

11      A.  I think so, yes, yeah.

12      Q.  Did you look at it, read it, look through

13  it?

14      A.  Usually I do, yes.

15      Q.  Do you remember one way or the other?

16      A.  Oh, I don't remember all the detail.  That

17  is so many hour.  I remember it stated a lot of

18  information -- a lot of -- I remember a lot of the

19  information on the handbook was not related to salary

20  employee.  It's more for waged employees guidelines,

21  things like that.

22                  (Defendant's Exhibit 8, marked for

23                  identification.)

24      Q.  Defendant's Exhibit 8 is a sexual

25  harassment policy.  Do you recognize that as being the

1    Bayer sexual harassment policy that was in the manual

2    you were given?

3              A.   I believe so, yes.

4              Q.   When you reported -- when you went to

5    Mr. Fuhrman, would you tell me about that meeting?

6    What happened?  You know, what did you say, how he

7    responded and so forth?

8              A.   I mention to Mr. Fuhrman that I was to

9    discuss Don's attention to me and his comments

10   constantly to me during almost every occasion we get

11   to talk.  He is an HR -- he was an HR manager.  I was

12   a plant controller.  We had to discuss work together

13   all the time about, you know, the employees' pays and

14   everything and his attention is constant making

15   comments about me.  Whenever he got a chance to talk

16   to me, he would make me very uncomfortable and that

17   got to stop and so Rich Fuhrman ask me what kind of

18   comments he made and I told him all the compliments

19   about my looks and my appearance and so Rich said he

20   would talk to Don.  Rich Fuhrman was kind of surprised

21   Don, as an HR manager, would do things like that and

22   he said he would talk to him right away.

23             Q.   Did Mr. Fuhrman, was he receptive to what

24   you told him?

25             A.   Can you explain what receptive mean?

1              Q.   How did he react?  Was he sympathetic or

2     concerned?

3              A.   Like I said his comment was he was

4     surprised Don as an HR manager would do that, behave

5     like this and he said he would talk to Don right away

6     and he will get back to me after he talk to Don.

7              Q.   Did Mr. Fuhrman get back to you?

8              A.   Yes.

9              Q.   And what happened?  What did he tell you?

10             A.   He said Don told him that Don did not have

11    any bad meaning at all.  It was all compliments, but

12    Don would stop.  He would stop doing that and Rich

13    Fuhrman wanted me to report to him if Don continued to

14    make that kind of comment to me.

15             Q.   Were you satisfied with what Mr. Fuhrman

16    did in response?

17             A.   Yes.

18             Q.   Did Mr. Fuhrman thereafter ask you from

19    time to time whether everything, whether Telesca was

20    doing that anymore?

21             A.   He asked me afterwards, yes.

22             Q.   And you told him it was okay?  I mean,

23    what did you Telesca him I should say?

24             A.   I told him Don had stopped making the

25    comments to compliment me and no more physical