52

1    contact.

2              Q.   Let's take -- is it okay to take a break?

3                   MR. MUCHINSKY:   Sure.

4                   (Whereupon, there was a brief

5                   recess.)

6              Q.   Ms. Rogus, in addition to a claim for

7    sexual harassment in your complaint in this case you

8    have made the contention that you were retaliated

9    against because you reported sexual harassment.   Do

10   you understand that?

11             A.   Yes.

12             Q.   I'm going to show you what I have marked

13   as Defendant's Exhibit 39.

14                  (Defendant's Exhibit 39, marked for

15                  identification.)

16             Q.   I have Exhibit 39.   It's titled affidavit

17   of Mei Rogus and I will say for the record that page

18   two of the affidavit apparently didn't get copied by

19   my people and Mr. Muchinsky has kindly agreed to have

20   page two faxed and we will insert that later.   But

21   other than the fact we are missing page two is Exhibit

22   39 a sworn statement that you signed for the

23   Connecticut Commission on Human Rights?

24             A.   Yes.

25             Q.   And are the statements made in that

1  document true?

2          A.  Yes.

3          Q.  I'm going to show you a copy of the

4  complaint that was filed with the, in the Superior

5  Court in Connecticut in this matter and specifically

6  ask you to look at paragraph 12 of the complaint that

7  has sub parts A through F and this is describing the

8  retaliatory actions that you contend were taken

9  against you and my question to you is is that an

10  accurate description of the events that occurred that

11  you contend were retaliatory up to and including your

12  discharge?

13          A.  Everything is true except I believe the

14  note on item E, June of 2000, the note was dated in

15  July I remember.  The event took place in June, but

16  the note was dated in July.

17          Q.  Okay.  Otherwise is that a recitation of

18  the events that you contend occurred to you that were

19  in retaliation for your having made a complaint or

20  reported that Don Telesca?

21          A.  Yes. There were more other, you know,

22  comments that is not on here that's ongoing, but this

23  are the major retaliation that was written.

24          Q.  These are the primary retaliation events?

25          A.  Yes.

SANDERS, GALE & RUSSELL
(203) 624-4157

54

1    Q.   Well, let me do this.  I want to ask you

2  about these events, because these are the ones that

3  I've seen.

4    A.   Okay.

5    Q.   Would you tell me what retaliatory things

6  occurred to you that are not other than the ones that

7  you have written here in your complaint?  What are we

8  missing?

9    A.   The --

10   Q.   I guess I should ask you of any

11 consequence.  I don't care about a glare, okay?  What

12 other events are not here?

13   A.   Comments at meetings like from Don

14 Telesca.  For example, he would make comments like,

15 "Mei, you are nothing.  You don't count" and laughed

16 with Rich Fuhrman together.

17   Q.   How often did he make that comment?

18   A.   He made that one instant there.  I'm

19 giving you some examples that I can remember.  There

20 were so many different instance that I'm trying to

21 remember as much as I could.  There was also comment

22 about when we were talking about all the performance

23 of the past year in January of 2001 and how we were

24 talking about how where the business has done in year

25 2000 and then Mr. Telesca would say, make a comment

1    say, "Even Miss America is trying to claim credit,"

2    something like that be the term he used, and then look

3    at Rich Fuhrman and the two of them would be smiling,

4    laughing with each other while only three of us know

5    what did he meant, what Miss America meant, you know,

6    and then two of them would be looking at me and then

7    sarcastically laughing at each other, which hurt me so

8    bad, so much that I had to call a colleague in Ohio

9    and, you know, told her about all those comments and I

10    couldn't handle it. At that time I was really upset

11    and I couldn't talk to anyone else on the site,

12    because almost like a secret language. Only three of

13    us understand what's going on and only three of us --

14         Q.  Okay.  Excuse me.  I don't want you to

15    add, you know, editorialize.  I want you to tell me

16    what happened, okay?  As I understand it, you were in

17    a meeting in January of 2001 and Mr. Telesca made a

18    remark to the effect "Even Miss America is trying to

19    claim credit."  Is that what happened?

20         A.  Yes.

21         Q.  And that was followed, you say, by

22    laughing by him and Mr. Fuhrman?

23         A.  Yeah.  And looking at me and then

24    turnaround, look at  -- it looks like they were having

25    so much fun making that joke.

SANDERS, GALE & RUSSELL
(203) 624-4157

56

1          Q.   When you say it was to review performance,
2     are you talking about the performance of the plant?
3     This wasn't your performance evaluation to review, was
4     it?

5          A.   That's correct.   The business of the
6     plant.

7          Q.   How many people were in this meeting?

8          A.   It's quite a few people.   All the key
9     peoples are usually in the meeting there like Chris
10    Hamilton, Tim Conway, all those key people are usually
11    in this kind of meeting.

12         Q.   You are pointing at Exhibit 5?

13         A.   Yeah.

14         Q.   They would be the people shown on there as
15    reporting directly to Mr. Fuhrman?

16         A.   That's correct.

17         Q.   The earlier incident you mentioned where
18    the remark was made by Mr. Telesca, "Mei, you don't
19    count."   What was the context of that comment?

20         A.   It was a discussion about how to reward
21    employees who had gone out of their way to do their
22    job and one of the example someone brought up was like
23    Mei and Chin went to Wisconsin to conduct an audit in
24    Wisconsin over the weekend and we used our time
25    without pay, without overtime pay or anything, but we

1    went out on a business trip over the weekend for the

2    company and employees like this should be rewarded and

3    Don said, you know, "Chin, you know, could be rewarded

4    but Mei, you don't count."

5            Q.  Now this was a program, wasn't it -- I

6    didn't mean to interrupt you.  It was in that context

7    that he said Chin could get a reward, but you don't

8    count?

9            A.  He say something about that, you know,

10   "Mei, we are not talking about you.  You are not it.

11   You don't count."

12           Q.  This was a program for hourly employees,

13   correct, --

14           A.  No?

15           Q.   -- that they were discussing?

16           A.  No.  It's just an overall how to motivate

17   employees to take ownership of the business.

18           Q.  Were they talking about rewarding people

19   at your level or people --

20           A.  Overall.  For every employee.

21           Q.  Who was present at this meeting?

22           A.  It's a management meeting so it would be

23   everyone on the list here will be there.  In addition

24   to those people who will be on the list another one

25   it's Carol Fazine.  She is the HR rep and she always

58

1    come in this kind of meeting.  She is usually there in

2    the meeting, too.

3            Q.  When did that occur?

4            A.  That is in August of 2000.

5            Q.  Now, were there any other incidents that

6    you regarded as retaliatory besides those two and the

7    ones that are in your complaint that we are going to

8    talk about?

9            A.  There are many others and I think that's

10   it for now.

11           Q.  I'm sorry?

12           A.  There are many other comments that made me

13   very upset and that's it.  I remember there was one

14   comic strip was put on my office door one time and the

15   comic, the Dilberts comic strip says, "I am the newest

16   sadist in the accounting department."  It was in April

17   of 2001.

18           Q.  Okay. Who put the comic strip on your

19   door?

20           A.  I don't know.

21           Q.  Do you know whether it was done as a joke?

22           A.  I don't know.

23           Q.  I don't understand why that would be

24   upsetting.  Why would that upset you?

25           A.  Because of the expense report problems

1   with Don, who I always get myself and the accounting

2   staff, he is not one to supply the requested

3   information and his expense report and also Don and

4   Rich Fuhrman had repeatedly requested us to circumvent

5   the company's proper procedure and policies to make

6   exception to make payment to vendor or to cut checks

7   without proper management approval and Helen and I had

8   been very faithful in making sure everything is

9   comprise with corporate policies and all the proper

10  procedures to do things and that took that as someone

11  maliciously putting that kind of remark to me, because

12  we are so, you know, diligent in making sure

13  everything was done properly.

14          Q.   Well, you don't know who did it, right?

15          A.   No, I don't know.

16          Q.   Do you know whether it was referring to

17  you or to Helen or to Chin, the other employees in the

18  department?

19          A.   Well, if it was put on my door, I took it

20  as me.

21          Q.   Well, was this the door to the department

22  or --

23          A.   No.  It's my office door.  Outside of the

24  mailbox there's a mail slot people put files or

25  document for me and it's right there that clipped on

SANDERS, GALE & RUSSELL
(203) 624-4157

1    the mailbox there that everyone could see it.

2         Q.  That was in April, 2001?

3         A.  That's correct.

4         Q.  Any other incidents that come to mind

5    other than what's listed in your complaint?

6         A.  That's what come to my mind for now.

7         Q.  Okay.  Can you take a minute and just

8    think about it, think and see if you can recall any

9    others?

10        A.  There's another one that I remember in

11   December of, that would be 1999 when we were going

12   through this ombudsman investigation and everything

13   and right before Christmas the company had a potluck

14   lunch.  Helen and I were waiting in line and Don

15   Telesca again stood behind me and Helen made a comment

16   about the dessert, "The chocolate looks so delicious."

17   So she took one and she said, "I am going to have

18   desert before my meal" and I said, "Yeah.  Go ahead.

19   Enjoy life" and Don pointed to me and said, "Yes.

20   This woman loves to live on the edge."

21        Q.  Loves what?

22        A.  To live on the edge.

23        Q.  He said that to who?

24        A.  To me and in front of Helen.  I could not

25   understand what he mean.  It seems to me it did not

1    have any relation to Helen's comment or my comment at

2    all.  Why would he make that kind of comment to me?

3    So I ask my husband, I ask my friends what did he mean

4    like and then those are the people who knew what was

5    going on between all the tension and all the

6    investigations going on and they told me, wow, that

7    was a very provoking comment to you there with what's

8    going on, you know, the investigation and everything.

9    That is a very provoking comment.

10              Q.  Any other incidents?

11              A.  That's all I can remember now.

12              Q.  Now going to what is listed in your

13   complaint.  The first incident states that in

14   December, 1999 Mr. Fuhrman, on the recommendation of

15   Mr. Telesca, put a severe reprimand letter in

16   plaintiff's personnel file.

17                   (Defendant's Exhibit 9, marked for

18                    identification.)

19              MR. MYERS:  Exhibit 9 is a

20   memorandum to Mei Rogus dated December 8, 1999 and my

21   question to you is Exhibit 9 has attached to it a

22   December 10 letter from Mei Rogus to Mr. Fuhrman.

23              MR. MUCHINSKY:  I don't think we

24   have number 9.

25              MR. MYERS:  This is Exhibit number

1    9.   Did I say 10?

2                    MR. MUCHINSKY:   No, 9.   You haven't

3    given it to us.

4                    MR. MYERS:   I know I'm describing it

5    for the record.

6                    MR. MUCHINSKY:   I'm sorry.

7              Q.   It has attached to it a December 10, 1999

8    memorandum from Mei Rogus to Rich Fuhrman and then

9    attached to that is a note that is signed at the

10   bottom and dated December 10, 1999.   Ms. Rogus, is the

11   first page of Exhibit 9, is that the severe reprimand

12   letter that you are referring to in your complaint?

13             A.   Yes.

14             Q.   Whose handwriting is on that document?

15             A.   Mine.

16             Q.   Did you sign this and make the comment

17   down at the bottom, "I find the reprimand is unjust as

18   attached stated facts"?

19             A.   Yes.

20             Q.   First of all, I understand you felt that

21   you did not deserve a reprimand for this incident; is

22   that correct?

23             A.   That's correct.

24             Q.   And Mr. Fuhrman disagreed with you; is

25   that correct?

1    A.   That's correct.

2    Q.   How do you know this was done on the

3 recommendation of Don Telesca as you state in your

4 complaint?

5    A.   That's what Rich told me.

6    Q.   Did he tell you Don Telesca recommended it

7 or did he just tell you that he reviewed this letter

8 or that he consulted with him?

9    A.   I remember he said Don -- I remember he

10 said Don had recommended this to him.  He had

11 discussed and consulted with him and Don recommended

12 this to him and that's why he did it.

13    Q.   Is this writing here at the top where it

14 says, appears to quote a conversation Mei Rich Mei

15 Rich.  Is that what was said to you?  I mean, is that

16 what you base this on?

17    A.   No.  It's based -- I'm trying to remember

18 in more detail this.  This is the quick note I jot

19 down during the, our conversation there.  It was just

20 a brief note for myself so I don't forget.

21    Q.   But was this something that was said in

22 your meeting with Mr. Fuhrman what you wrote here,

23 Mei:  Has HR been consulted about the reprimand?

24 Rich:  Yes?

25    A.   Like I say, it's just a quick note for

SANDERS, GALE & RUSSELL
(203) 624-4157

1    myself what I have asked him, but the real

2    conversations are longer than this and I ... If you

3    were asking me is this all we discuss?  It's not so

4    short.  I'm trying to --

5            Q.   No.  I'm just asking these four lines that

6    you've written here, is that something you asked

7    Mr. Fuhrman and he responded as stated here on your

8    note?

9            A.   Yes.

10           Q.   The second page of Exhibit 9, what is

11   that?

12           A.   That's what my reply to Rich Fuhrman's

13   letter of this severe reprimand and I pointed out all

14   the fact to him.

15           Q.   To Mr. Fuhrman?

16           A.   That's right.

17           Q.   So you wrote the second page of this as a

18   rebuttal to the letter of reprimand; is that right?

19           A.   That's correct.

20           Q.   What is the third page?

21           A.   The third page?

22           Q.   Yes, of Exhibit 9.

23           A.   It's Rich Fuhrman's note.

24           Q.   So Mr. Fuhrman prepared the third page?

25           A.   That's correct.  I believe so.

65

```
 1          Q.  And he signed it?

 2          A.  Yes.

 3          Q.  Whose handwriting is on the note where

 4    there's some lines crossed out and the statement "MR,

 5    we did not get into this discussion," so forth?

 6          A.  That was my note.

 7          Q.  That's your handwriting?

 8          A.  I believe so, yes. Part of it.  There were

 9    Rich Fuhrman's notes looks like.  The bottom part

10    looks like Rich Fuhrman's note.

11          Q.  What did you write on this file note?

12          A.  On the copy that my note said we did not

13    get into this discussion.

14          Q.  Does this say we did not get into this

15    discussion ...

16          A.  December 10 meeting, is that what that

17    says.

18          Q.  Excuse me.  I am just asking you if you

19    would read, please, what you wrote.

20          A.  Yeah.  It is December 10, but then I can't

21    read the rest of it there.

22          Q.  Well, does it say meeting below December

23    10?

24          A.  That's right.

25          Q.  And what was your point?  Why did you -- I
```

1    mean, what are you saying here?  Are you talking about

2    -- did you cross out the sentence that's crossed out?

3              A.  I can't remember.

4              Q.  So this doesn't jog any memories as to

5    what your note is on there for?

6              A.  Maybe just -- okay.  I guess the December

7    note when I give this to Rich and we discuss about

8    this here and then on his note here he said we

9    discussed, but I guess when we were discussing about

10   this, we did not get into here.  I was just trying to

11   be more, make sure what we have discussed, what we

12   have not discussed about all the items there.  So

13   that's probably why I might have crossed that out

14   myself.

15             Q.  Okay.  And then Mr. Fuhrman says I do

16   remember discussing this and he dated this; is that

17   correct?

18             A.  I believe so, yeah.  That's his signature

19   there.

20             Q.  Did he give you this file note page three

21   of Exhibit 9 and ask you to read it and make sure it

22   was correct?

23             A.  No. He gave it to me, but he didn't ask me

24   to make sure it is correct.

25             Q.  But you did read it and you corrected this

1  one point or you made this one note on it, is that

2  what happened?

3      A.  I can't remember exactly what went on, how

4  we got into that there.

5      Q.  But other than what you corrected there is

6  it otherwise accurate in terms of what it recites

7  happened?

8      A.  The middle of the first paragraph there he

9  said -- when he ask me about the full refund on the

10  cancelled reservation, I did not tell him what

11  non-refundable reservation.  I told him it was the

12  last minute reservation.  It was very likely not

13  refundable, but I will pay for it.  He told me I will

14  have to pay for it if it is not refundable and I say,

15  "Yes, I will pay for it and I will take the

16  responsibility, because I made a reservation if it is

17  not refundable and I will pay for it myself

18  out-of-pocket and that's no problem."  So we were

19  happy about that.  He was happy about that. The rest

20  of them is correct.

21      Q.  Okay.  Now, as a result of this incident,

22  did you make a -- it states here that you could go to

23  Don and Peter of Pittsburgh HR.  Did you make a

24  complaint?

25      A.  Yes.

1          Q.  First of all, who are Don and Peter?

2          A.  Don, he meant Don Telesca, the HR manager

3    in our site.  Peter, he meant Peter Geise, his

4    supervisor or corporate HR department.

5          Q.  And did you follow-up and make a complaint

6    about this letter?

7          A.  Yes.

8          Q.  And was anything -- did anything happen as

9    a result of your complaint?

10          A.  Corporate HR -- instead of contacting

11    corporate HR people I was afraid that I won't get a

12    fair review on this case here, because I know Don

13    Telesca was --

14          Q.  Excuse me.  Just tell me what you did,

15    okay?

16          A.  Okay.  Since Rich Fuhrman said or whoever,

17    whomever that I felt most comfortable with here.  He

18    told me anyone I want to contact it's fine.  So I

19    contacted ombudsman.

20          Q.  And who was that?

21          A.  Tim Romps.

22          Q.  What happened as a result of your contact?

23    Was anything done?

24          A.  He report this case to corporate HR to

25    conduct the investigation.

69

```
 1          Q.  Was there an investigation done?

 2          A.  Yes.

 3          Q.  Did people meet with you?

 4          A.  Yes.

 5          Q.  And did they meet with Mr. Fuhrman?

 6          A.  I believe so, yes.

 7          Q.  And what was the result of that

 8  investigation?

 9          A.  They found out that the severe reprimand

10  later should not have been issued to me, because Rich

11  Fuhrman had agreed for me to go on my own expense.  So

12  they recommended to have the severe reprimand letter

13  removed from my file and in our meeting in January 26

14  or 27 with corporate HR and Rich Fuhrman we have

15  decided, agreed, we have agreed to leave the reprimand

16  letter in the file for six month.  That's Rich

17  Fuhrman's recommendation there and we have the

18  reprimand letter removed in six month, because I

19  didn't want a permanent note in my file forever.

20          Q.  Okay.  And was the letter, this Exhibit 9,

21  first page, was that removed from your file?

22          A.  It was, yes.

23          Q.  Now, I want to show you a document that's

24  been marked as Defendant's Exhibit 10.

25                  (Defendant's Exhibit 10, marked for
```

```
1                    identification.)
2              Q.  I'll ask you whether this is the
3    investigation report that was done by corporate HR.
4    Do you remember who from corporate HR conducted the
5    investigation?
6              A.  Stuart Redshaw.
7              Q.  Did you see Mr. Redshaw's report of his
8    investigation?
9              A.  I have never seen it before until the
10   CHRO's fact finding process when the company
11   responded --
12             Q.  Okay.
13             A.  -- to me.  That's after I was terminated.
14             Q.  So the only thing that you knew at the
15   time when you worked for Bayer was that there had been
16   an investigation and the upshot of the investigation
17   was that the letter of reprimand would be removed from
18   your file after six months?
19             A.  That's correct.
20             Q.  Did Mr. Redshaw give you any other
21   conclusions as a result of the investigation?
22             A.  No.
23             Q.  Did he meet with you and tell you what his
24   outcome, what his recommendation was?
25             A.  He did, yes, and that's why I said I do
```

1  not -- he told me his recommendation was to replace

2  the severe reprimand letter with a permanent note in

3  my file and I objected so --

4      Q.  You objected to the permanent note?

5      A.  That's correct.  And I say if that's the

6  case, then I would rather to leave the severe

7  reprimand letter in the file for six months and have

8  it removed in six months and he say -- Stuart said

9  that's fine with him as long as Rich Fuhrman and I

10  agree with what we decide to do and he was out of it.

11  He want to go back to Pittsburgh.

12      Q.  Is Exhibit 10 the investigation report

13  that you, I guess, ultimately saw at the CHRO fact

14  finding?

15      A.  I'm not sure if that's the same copy or

16  not.  I don't remember all the detail.  The only thing

17  that brought my attention is the date is February 10.

18      Q.  It's February 10, 2000 is the date.

19      A.  2000 and I remember Rich Fuhrman told me

20  in October of 2000 saying this report was written and

21  given to him prior to our meeting meaning Stuart

22  Redshaw, myself and Rich Fuhrman when we had the final

23  meeting about this investigation and about what we

24  have agreed with, because what we have agreed with was

25  after Stuart Redshaw's report, what is written and

72

1    given to Rich Fuhrman prior to our meeting and that's
2    his recommendation and that's what Rich Fuhrman told
3    me.  So this recommendation was to have the note
4    there, but this wasn't the -- this was done before our
5    meeting anyway so our agreement, which was done
6    verbally, would not be here.
7         Q.  Well, my question was is that the document
8    that you were given at the CHRO fact finding or not or
9    don't you know?
10        A.  I don't know.
11        Q.  Okay.  This is a document that was
12   provided to me by your counsel from his files.  Would
13   you agree with that, Mr. Muchinsky?
14             MR. MUCHINSKY:  I would agree with
15   that.
16             MR. MYERS:  I'm going to hand you a
17   one-page handwritten document, note.  It's been marked
18   Exhibit 11.
19             (Defendant's Exhibit 11, marked for
20                  identification.)
21        Q.  Is that the note that was suggested to
22   replace the severe reprimand letter in your file?
23        A.  Yes.
24        Q.  And this was shown to you or was placed in
25   your personnel file?

SANDERS, GALE & RUSSELL
(203) 624-4157

1          A.   No.   I have never seen this note until

2     October of 2000 when I requested a copy of my

3     personnel file to review --

4          Q.   And this note --

5          A.   -- to make sure the severe reprimand

6     letter was removed and I discover this one here that

7     wasn't supposed to be there.

8          Q.   My only question is is Exhibit 11, this

9     was placed in your personnel file and the letter of,

10    severe letter of reprimand was removed; is that right?

11         A.   That's correct, yes.

12         Q.   And you discovered that when you went

13    through your personnel file in October of 2000, is

14    that what you were saying?

15         A.   That's correct.

16         Q.   Did you suffer any adverse consequences as

17    a result of the letter of reprimand or the note that

18    was replaced other than the fact that they were put in

19    your file?

20         A.   Yes.  I was under such an intense stress

21    and fear because of all the retaliation going on.  I

22    had two miscarriages and that's one of the biggest

23    loss to anyone, any woman can go through.

24         Q.   Let me ask you this.  Did you suffer any

25    adverse employment action?  Did your pay go down?

74

1    Were you suspended without pay?  Did anything happen

2    to you as far as your employment is concerned because

3    of the letter of reprimand or the note that was put in

4    your file to replace it?

5              A.   No.  I was not suffer from reduce paid and

6    -- no.

7              Q.   Let me ask you this, because you offered

8    this information.  When did you suffer two

9    miscarriages?

10             A.   One in 1999 and one in 2000.

11             Q.   Would you tell me the months?

12             A.   November of 1999 and September of 2000.

13             Q.   Do you have a report or any kind of a

14   written opinion from a health care provider that would

15   link anything that happened at Bayer to your

16   miscarriages?

17             A.   No.  I have not told my doctors how --

18             Q.   My question is do you have a report, a

19   written report or opinion, that would link what

20   happened at Bayer with your employment to either

21   miscarriage?

22             A.   All I mention to the doctors when that

23   happened was could it be the stress causing those

24   miscarriages, because that's all my concern there was

25   when I knew I was going through that kind of stress

75

1    and fear and my doctors were all very careful in

2    telling me and trying to tell me it was not my fault.

3         Q.  So is the answer to my question, no, you

4    do not have a report or an opinion in writing from a

5    health care provider?

6         A.  I don't know if doctors took that kind of

7    note down or not.  If they do, they would have some

8    kind of record to show that my concern was the stress

9    could have caused those, but they were telling me, you

10   know, it's not what you have done.  It's not your

11   fault to lose the babies and it just happens.

12        Q.  Who was your physician for each of the two

13   miscarriages?

14        A.  Dr. Andreoli.

15        Q.  Doctor who?

16        A.  Andreoli, John Andreoli.

17        Q.  For both?

18        A.  Yes.

19        Q.  Where is his office?

20        A.  In New Britain.  300 Kensington Road, New

21   Britain.

22        Q.  Did he tell you that either miscarriage

23   was caused by anything related to your employment?

24        A.  No.  I never discuss with him about my

25   employment condition at that time.

1    Q.  So is it your, simply your own personal

2    opinion that there was a connection?

3    A.  I believe so, yeah.

4    Q.  We had earlier marked as a deposition

5    Exhibit 39 an affidavit, Ms. Rogus, and you have

6    identified it as being an affidavit that you signed.

7    However, at the time I was missing page two.  Mr.

8    Muchinsky's office has been kind enough to fax me page

9    two and I am going to insert it as part of the

10   original exhibit, but first I would like you to look

11   at this and just confirm to me that that's part of

12   your affidavit.

13   A.  Yes.

14   Q.  Off the record.

15           (Whereupon, there was a discussion

16           off the record.)

17           (Whereupon, there was a brief

18           recess.)

19   Q.  For Exhibit 39 now we have inserted in the

20   original exhibit page two and that is your complete

21   affidavit, correct?

22   A.  Yes.

23   Q.  We'll break now.

24           (Whereupon, there was a

25           luncheon recess.)

```
 1              Q.  Ms. Rogus, going back to your complaint,
 2   the items we were discussing in paragraph 12.  The
 3   incident that we've just discussed involved in the
 4   severe reprimand letter that's the incident that's
 5   referred to in paragraph A; is that right?
 6              A.  Yes.
 7              Q.  And the -- in paragraph B it refers to in
 8   December, 1999 you contacted the ombudsman to report
 9   this incident and that's -- we're still dealing with
10   the same incident that we just discussed when you
11   called Mr. Romps; is that right?
12              A.  That's correct.
13              Q.  And it states the result of the
14   investigation was to remove the reprimand letter from
15   your file six months later and that's what you've
16   already described, correct?
17              A.  That's correct.
18              Q.  And then in C it refers to, it states that
19   on or about January 26, 2000 Mr. Fuhrman put yet
20   another damaging note in plaintiff's personnel file
21   without notification to the plaintiff and I would like
22   to ask you whether the note that that allegation
23   refers to is Exhibit 11?
24              A.  Yes.
25              Q.  Now, as I understood your testimony, he
```

1    did tell you that he was going to put this note in

2    your file; isn't that correct?

3          A.  No.  The final decision was no note in my

4    file.  The reprimand letter stays in my file for six

5    month and it will be removed in six month.

6          Q.  Oh, I see.  So your point is that you

7    didn't know that he was going to put any note in your

8    file.  You thought the reprimand letter would stay in

9    there?

10          A.  That's correct.

11          Q.  Instead he took the reprimand out and put

12   this in your file, Exhibit 11?

13          A.  That's right.

14          Q.  In sub paragraph D you state in February

15   of 2000 Mr. Fuhrman warned plaintiff, you, not to

16   contact the corporate ombudsman again.  Would you

17   please tell me in what context that came up?

18          A.  He told me that with so many production

19   employees having contacting the ombudsman to complain

20   about so many issues and that didn't look good on him

21   and now I am a member of the staff, management team,

22   and I have contacted the ombudsman to complain and

23   that did not reflect well on him at all and that he

24   asked me if any disagreement in the future or any of

25   this kind of issues comes up again, do not contact the

1  ombudsman.

2        Q.  Was -- did he tell you that you should

3  contact corporate HR or somebody else if you had a

4  problem?

5        A.  He might have told me just, you know, talk

6  to him or, you know, corporate HR or Peter Geise.

7  Probably he would have.  I don't remember exactly what

8  he told me who to contact, but all I remember is he --

9        Q.  Was that in connection with a new incident

10 or was that simply because you had contacted Tim Romps

11 before?

12       A.  Simply because I have contacted Tim Romps

13 before and he wanted to make sure I do not contact him

14 again.

15       Q.  In paragraph E the statement is made that

16 in June, 2000 Mr. Fuhrman put yet another warning

17 letter in your personnel file without notification to

18 you and I believe you indicated earlier that the note,

19 that this is reference to, was in July, was dated in

20 July?

21       A.  That's correct.

22              (Defendant's Exhibit 12, marked for

23              identification.)

24       Q.  I want to ask you whether Defendant's

25 Exhibit 12, which is a typed one-page document signed

SANDERS, GALE & RUSSELL
(203) 624-4157

80

1   by, a document dated July 27, 2000.  Is this the

2   warning letter that paragraph E refers to?

3          A.  That's correct.

4          Q.  Now, I take it you were not aware this was

5   in your file until some time later; is that right?

6          A.  That's correct. That's how I discovered

7   this.

8          Q.  I'm sorry, when?

9          A.  October of 2000.

10         Q.  And that's when you made a request to look

11  in your file?

12         A.  That's correct.

13         Q.  And you looked to see if the severe

14  reprimand letter had been removed; is that correct?

15         A.  That's correct.

16         Q.  And you found this?

17         A.  That's correct.

18         Q.  When you found this in your file, what

19  action did you take?

20         A.  I sent -- I typed up a letter to him and

21  ask him, basically told him I was very surprised to

22  see these two notes there, I wasn't aware of it and it

23  wasn't supposed to be there and also this note

24  represented many facts that was not true.

25         Q.  You are talking about Exhibit 12?

SANDERS, GALE & RUSSELL
(203) 624-4157

1          A.   That's correct.

2          Q.   What did Mr. Fuhrman say?

3          A.   Excuse me, you mean after I give him the

4     letter or ...

5          Q.   Well, I asked you what did you do after

6     you found this and I thought you were telling me that

7     you talked to Mr. Fuhrman.

8          A.   I sends him -- I give him a letter.  At a

9     meeting I gave him a letter.

10         Q.   Well then, let me show you what's been

11    marked as Defendant's Exhibit 13.

12                    (Defendant's Exhibit 13, marked for

13                     identification.)

14         Q.   Unfortunately I put the sticker on the

15    back, because there wasn't any room on the front.

16    Would you tell me is Exhibit 13 the letter that you

17    gave to Mr. Fuhrman after you found this note in your

18    file?

19         A.   That's correct.

20         Q.   You gave Mr. Fuhrman this letter.  What

21    happened next in respect to the July 27, 2000 letter?

22         A.   Corporate HR and corporate VP of

23    controlling, Ray Newhouse, came to Berlin to conduct

24    an investigation.

25         Q.   How did they know about the situation?

1          A.   When I was meeting with Rich Fuhrman about

2     this, all the issues I discuss on this letter here and

3     ask him to remove this two letters, he called Stuart

4     Redshaw to confirm with Stuart Redshaw about our

5     January meeting about final decision if Stuart

6     remember about we agreed to leave the reprimand letter

7     in the file for six month or to put a permanent note

8     there to replace the severe reprimand later and Stuart

9     did not want to talk with us when I was in his office.

10    He ask me to leave the office and he wanted to talk to

11    Rich Fuhrman privately first.  So I walk out of Rich

12    Fuhrman's office and I didn't feel good about that,

13    you know.  We wanted to ask him only simple question

14    and he did not want to be openly discuss with me

15    there.  I didn't feel good about this.  So when I walk

16    out of Rich Fuhrman's office, I went back to my

17    office.  Peter Geise was in, he happened to be being

18    outside there and I saw him in the hallway and I ask

19    him, I say, "Please."  I give Peter Geise, who is Rich

20    Fuhrman's supervisor, I give him a copy of this

21    letter.

22          Q.   Exhibit 13?

23          A.   Yes.  And I explain to him briefly what

24    has been going on and I ask him to objectively review

25    this case here and I ask if I could, he could help to