1    remove these two note off my personnel file.

2         Q.   Now, when you initially gave this letter

3    to Rich Fuhrman, did he, was his belief that what was

4    agreed was that you would replace the reprimand letter

5    rather than remove it in six months?  I mean, did he

6    disagree with you on that?

7         A.   No.  He did not disagree.  He said, you

8    know, he can't remember, but he tried to find his note

9    and he said he didn't have any note with him and so he

10   said, "Well, let's call Stuart Redshaw."  He took out

11   the investigation report and before he took it out and

12   he said this report was given to him that morning

13   before Stuart and myself and Rich meeting in January.

14   So this report, investigation report, would not have

15   reflected our final meetings decision.  So he didn't

16   use this report as guideline.

17        Q.   This report, you are talking about Exhibit

18   10?

19        A.   That's correct.

20        Q.   I guess my question is did he disagree or

21   did he just not remember what was agreed on?

22        A.   He didn't remember exactly.  That's what

23   he said.

24        Q.   Okay.  So you talked then -- while you

25   were outside and Stuart Redshaw and he were meeting

84

1    you talked to Mr. Geise?

2         A.   That's correct.

3         Q.   And asked him to look into this?

4         A.   That's correct.

5         Q.   Did he do it?

6         A.   Yes, he did.

7         Q.   And what was the result of his looking

8    into the matter?

9         A.   He call me a couple weeks later and told

10   me that he had discuss it with Rich Fuhrman and Rich

11   felt that his note was justified and that Peter Geise

12   stood by -- he said, you know, he supported Rich

13   Fuhrman and that the note will stay in my file and I

14   told -- I remember on the phone and I said to

15   Mr. Geise I said, "that's not right.  A supervisor

16   cannot discipline or write note put on employee's file

17   without letting employee know and also based on how he

18   felt not based on the fact" and --

19        Q.   Excuse me.  Which note are you talking

20   about now?

21        A.   Particularly on the second note, this one

22   on Exhibit 12.

23        Q.   Okay.  I'm sorry, go ahead.

24        A.   And I ask Mr. Geise to look at fact to

25   make a decision and that's why -- and I explain to

1    him, I said, "This is retaliation and if I am written

2    up for doing my job for making sure everything comply

3    with corporate policies and for supporting my staff

4    who Helen was doing everything to make sure all the

5    support documents comply with corporate policies and

6    procedures and I was written up for doing the job,

7    then how could I perform my job responsibilities as a

8    plant controller?"  There were times I had to say no

9    to Mr. Fuhrman and he ask me to do things that do not

10   comply with the corporate policies and so Mr. Geise

11   ask me like what have I be asked to do that and I give

12   him a couple of examples.  I was asked to cut check

13   for a vendor prior to management's approval.  I was

14   asked to give an employee an advance check --

15        Q.  A what?

16        A.   -- without employee.

17        Q.  A what?

18        A.  Advance check.

19        Q.  Advance check?

20        A.  Yeah, without management approval.

21        Q.  When you say without management approval,

22   I thought Mr. Fuhrman was plant manager.

23        A.  That's correct.  But one time I was asked

24   by Mr. Telesca to give an employee an advance check

25   without Rich Fuhrman's approval and when I ask Mr.

1   Telesca I said I need to at least verbal approval from

2   Mr. Fuhrman and I say let's call Mr. Fuhrman and see

3   if he is okay.  If he is okay, we can cut a check and

4   we could get his written approval nd when he gets back

5   to the office and Mr. Telesca just very angry at me

6   and walk out of my office right away, didn't want to

7   call Mr. Fuhrman and saying that I was giving hard

8   time and I didn't want to help him to make an employee

9   happy.

10          Q.  Okay.  You were talking to Mr. Geise when

11   I interrupted you.

12          A.  Yes.  So I say that to Mr. Geise and so

13   Mr. Geise say okay.  He will have the corporate HR and

14   Ray Newhouse to come down to investigate.

15          Q.  And was that done?

16          A.  Yes.

17          Q.  And what was the outcome of that?

18          A.  The outcome of that was to remove these,

19   this one note they found out it's --

20          Q.  Exhibit 12?

21          A.  Yes.  The note was removed from my file

22   and the other, the first note that was the note from

23   January was left in my file, Exhibit 11.

24          Q.  Okay.  Did you suffer any harm or loss of

25   pay or any way were you harmed by the fact that that

1    July Exhibit 12 was placed in your file?

2         A.  I was severely harmed, hurt emotionally.

3    I did not suffered pay loss.

4         Q.  Or other adverse employment effect?

5         A.  No.

6         Q.  Exhibit 14 is an electronic mailgram,

7    e-mail, dated November 3, 2000.

8              (Defendant's Exhibit 14, marked for

9              identification.)

10        Q.  Could you tell me what Exhibit 14 is?  Is

11   that an e-mail you sent to Stuart Redshaw with copies

12   to Mr. Newhouse and Mr. Fuhrman?

13        A.  Yes.  This is -- it's an e-mail I sent to

14   Stuart and on that trip they were coming down to our

15   site.  This was also one of the job we have to

16   discuss.  We were in the process of -- there was a

17   process of rewriting all the employees' job

18   descriptions I remember and also the grade level we

19   are going through and Stuart -- Ray Newhouse -- as a

20   matter of fact, when they first got here, we sit

21   together for about half an hour or one hour to review

22   these first before we get into the investigation of

23   the other issues that they were done here and --

24        Q.  But is this confirming the meeting where

25   they were coming up there to do the investigation as a

88

1    result of your conversation with Mr. Geise?

2         A.    That's true, yes.

3         Q.    Let me ask you this.  On the incident that

4    resulted in Exhibit 12 being put in your file, would

5    you agree that one of the issues between you and

6    Mr. Telesca relating to his expense report was that

7    you were requiring that he submit receipts for

8    expenses under $25?  Was that one of the issues that

9    he complained about?

10        A.    That's right.  That's one of the issues,

11   yes.

12        Q.    And isn't it true that Mr. Fuhrman told

13   you that you don't, that one doesn't need a receipt

14   for expenses under $25 and that you never questioned

15   him about his expense reports on that point?

16        A.    No.

17        Q.    He didn't tell you that?

18        A.    Can you repeat your question again?

19        Q.    I said isn't it true that Mr. Fuhrman told

20   you that you didn't question his expense reports when

21   he didn't have receipts for expenses under $25 and you

22   shouldn't be questioning Mr. Telesca either or words

23   to that effect?

24        A.    Mr. Fuhrman said he was not asked,

25   requested for receipt for under $25 and Mr. Telesca

89

1    was requested for a receipt, because on his report he

2    showed up a line, said it's $53 or $58, something like

3    that.  That's over $25.  So when my staff Helen went

4    to him, ask him say how come no receipt, I don't know

5    exactly the detail through their conversation, because

6    this all happen between Helen and Don Telesca and so

7    when Helen went through, went to him, ask him to

8    provide the support document for his expense on his

9    expense report, then Don Telesca said, oh, it is for

10   two separate meals.  I guess he writes meal related

11   one is for breakfast, one is for lunch and one is $23

12   and one is -- I don't remember exactly the amount

13   there.  So he said, Oh.  The other $23 don't need it.

14   The number could be wrong, okay, the dollar amount and

15   so the other one is under $25, because I need a

16   receipt and so Helen ask him then can you put a note

17   on your expense report saying this 50 something

18   dollars combined it's two meal there, one this and

19   this one and he refuse to do it, to even put a comment

20   on his expense report to explain there why his receipt

21   -- he had only one receipt, if I remember correctly,

22   that shows only, you know, but the receipt did not

23   agree with what he reported on his expense report and

24   so that he refuse to write down explanation what they

25   were for or to just break it down and that's the issue

1    about $25 receipt on there.  All Helen had been trying

2    to ask is for him to put down on his expense report to

3    note what they are.  There was several problems with

4    his expense report on that particular issue there and

5    there were also the wrong airfare amount on it.  The

6    receipt he submitted for air ticket did not agree with

7    the airfare he reported on his report.  There were

8    wrong expense class information.

9         Q.  Expense what?

10        A.  Class and there were many errors on that

11   particular expense report we are talking about and

12   it's not just on this $25.

13        Q.  Okay.

14             (Defendant's Exhibit 15, marked for

15             identification.)

16        Q.  Exhibit 15 I put these together on one

17   exhibit, two pages of handwriting on a calendar, a

18   diary.  These were produced to us by your counsel and

19   I just wanted to ask you can you tell me -- let's look

20   at the first page of Exhibit 15.  That's for a date of

21   November 15, 2000.  What's happening on -- I mean,

22   what's reported on this page that relates to this

23   case?

24        A.  It's a note for about -- it must be about

25   my meeting with Ray Newhouse and Stuart Redshaw about

1    issues, some of the issues we discussed about problem

2    with Don Telesca's expense report, checks without

3    invoice.  That's right.  That's another one.  Problem

4    was Don Telesca had asked Helen to cut checks without

5    an invoice and under our company policy we could not

6    cut a check without an invoice from a vendor.  Then

7    FA, that's related to fixed asset and the company

8    guidelines that you have any asset --

9         Q.  Is it any expenditure?

10         A.  Expenditure, fixed asset, expenditure that

11    over a certain amount had to go through several of

12    management approval and sometimes Rich Fuhrman and the

13    other people that don't want to go through the proper

14    process.  So they were tried to get that through just

15    a regular expense, which you don't need that kind of

16    red tapes within the corporation and they could just

17    use just regular company expense and we having asked

18    numerous of times to avoid, to bypass this as a

19    process, just do it as an expense, which we could not

20    do according to company guidelines, payment without a

21    management approval, vendor payment from, oh, line 9,

22    vendors payment for line nine.  Prior to --

23         Q.  Is that corporate approval?

24         A.  By Germany, is it?  Yeah.  Line nine is

25    one of the biggest capital project that we were

SANDERS, GALE & RUSSELL
(203) 624-4157

1  implementing at that time and Bayer AG in Germany, the

2  management in Bayer AG in Germany rejected the

3  approval of the project several times.  Peter Geise

4  and Rich Fuhrman they have been trying to working on

5  the approval, getting the approval from Germany to

6  setup this production line and they wanted me to cut

7  checks to pay vendors to start producing the equipment

8  for us prior to the approval from Germany so I

9  rejected to do that.

10         Q.  Okay.  I mean, that's the last entry on

11  this page.  These are things that you reported to Ray

12  Newhouse and Stuart Redshaw when they were there to

13  investigate your complaint about the document in your

14  file; is that right?

15         A.  Yeah.

16         Q.  And that's what this is?

17         A.  In this meeting getting to that.

18         Q.  Okay.  Now what's the second page of

19  Exhibit 15?  This is a diary or calendar page for

20  Monday, November 20, 2000.  Would you just tell me

21  what on this page has to do with your claims?

22         A.  I have a difficult time reading this copy

23  it's so unclear.  It looks like the note on this diary

24  here was I had lunch with Cliff on that day and we

25  discuss --

SANDERS, GALE & RUSSELL
(203) 624-4157

1    Q.   With whom?

2    A.   Cliff Chen.

3    Q.   Is he the guy that -- yeah.  He is the

4    person that referred you to Bayer?

5    A.   That's right, and he also recommended Chin

6    Chen to me for this position.

7    Q.   So that's what this note relates to?

8    A.   And we had lunch and at that time I

9    revealed how disappointed I was with Chin's

10   performance and also he came to help our company with

11   an access database problem.  There was a --

12   Q.   Does this have to do with your claim what

13   you're about to tell me?

14   A.   Yes.

15   Q.   Okay.

16   A.   There was a, how do you call that, a

17   consultant who was also Cliff's friend.  He

18   recommended that consultant to us to revise access

19   database for our production records and the consultant

20   -- we had a problem from time to time and that day we

21   had a problem of to get that database up and running.

22   The consultant wasn't able to come over to help out.

23   So Cliff himself is trained in IT field and understand

24   that.  So he came over to help out to solve the

25   problem and so it ended up he helped out with the

1    problem and we went out to lunch.

2        Q.  Let's get back now to the complaint and

3    the investigation.

4                    (Defendant's Exhibit 16, marked for

5                    identification.)

6        Q.  I'm going to show you Defendant's Exhibit

7    16.  It is a memorandum from Stuart Redshaw to Peter

8    Geise dated November 29, 2000.  Is this the report

9    following the investigation of your complaint about

10   the documents in your personnel file?

11       A.  Yeah.

12       Q.  Were you given a copy of this while you

13   worked for Bayer?

14       A.  No.

15       Q.  Were you aware of the conclusions they

16   reached?  It states here with regard to the notes

17   concerning the counseling between Mei Rogus and Rich

18   Fuhrman dated July 27, 2000 is it the view of the

19   parties that such notes should not be placed in your

20   personnel file.  So it's recommended that those notes

21   be withdrawn.  I think you testified that you were

22   aware that they made that recommendation, right?

23       A.  That's correct.

24       Q.  And the notes were withdrawn?

25       A.  That's all I knew.

1      Q.  But this report is something that you,

2   that came to your attention afterwards in connection

3   with your case?

4      A.  Yes.  I only discuss -- I only seen this

5   note after the CHRO's  ...

6                    (Defendant's Exhibit 17, marked for

7                    identification.)

8      Q.  And then Exhibit 17 is an e-mail the

9   second half of this page from Mei Rogus to Ray

10  Newhouse, December 30, 2000.  Is that an e-mail you

11  sent to Ray Newhouse after the completion of the

12  investigation?

13     A.  Yes.

14     Q.  And were you satisfied with the outcome of

15  that investigation, with the way it was handled I

16  should say?

17     A.  Not really.  I was hoping both note would

18  be removed.  Only one note was removed.

19     Q.  The second note -- the other note that was

20  not removed, that goes back to the incident the year

21  before, right?

22     A.  That's correct.

23     Q.  Who is Ray Newhouse?  What's his title

24  again?

25     A.  He was a VP.

1      Q.   Vice president?

2      A.   Yeah, of -- I remember it's like

3 controlling.

4      Q.   He was in the financial side?

5      A.   That's correct.

6      Q.   So he would have been in your indirect

7 reporting chain as opposed to a production guy?

8      A.   Yeah.   It's like a functional supervisor.

9      Q.   I want to ask you now we've talked about

10 two events that are referred to in your complaint or a

11 couple of events with these notes in your file.   Why

12 do you believe that these were, that this was done,

13 because you had complained about Don Telesca?   I mean,

14 what's the basis for your linking those things

15 together?

16      A.   Because of all the hostile environment

17 afterward.   He was very hostile after my complaint

18 about his sexual harassment.

19      Q.   You are talking about Mr. Telesca?

20      A.   Yeah, and Rich Fuhrman had been witch

21 hunting for ridiculous reasons to write me up like

22 this and change the stories around and putting note in

23 my file without letting me know.   That scared me.

24 That appeared to me it's a very underhanded

25 retaliating behavior trying to build on this kind of

SANDERS, GALE & RUSSELL
(203) 624-4157

1    incorrect note in my file so they could fire me

2    someday.

3        Q.  Well, I understand you disagreed with the

4    notes.  You didn't think that -- you thought you were

5    right and he was wrong both times.  Now, my question

6    is what makes you believe that it was, it had anything

7    at all to do, Mr. Fuhrman's notes in your file had

8    anything to do with your having complained to him

9    about Don Telesca's harassment?

10       A.  He was a very -- he respected Don's

11   opinion.  He told me, he told pretty much everyone to

12   go to Don for advice on all the employee issues and

13   everything and through the time Don was there he

14   valued Don's every single opinion very highly and

15   another thing about the reprimand, severe reprimand

16   letter wasn't really his style of writing.

17       Q.  Hostile?

18       A.  Mr. Fuhrman's style.  He usually use plain

19   paper like this for any communications.  He doesn't --

20       Q.  Indicating Exhibit 12?

21       A.  Yeah or handwriting in informal way like

22   Exhibit 11.  But under severe reprimand letter it's a

23   letterhead like this.  It just a typical Don Telesca

24   style and Rich Fuhrman had told me through our

25   meetings and everything it was --

98

1          Q.  Excuse me.  What did he tell you in your

2     meetings, just Mr. Telesca --

3          A.  Mr. Telesca, he had consulted with him.

4     Mr. Telesca recommended such a severe reprimand letter

5     and that's why I believe it's in retaliation and then

6     he later become retaliated to me himself, because he

7     was not happy I have contacted ombudsman to report to

8     complain about this.  So I believe they worked

9     together trying to build up a case to get rid of me.

10          Q.  Other than what you've just described do

11     you have any other factual basis to believe that the

12     reason you were written up on these occasions was

13     because you had complained about sexual harassment?

14          A.  Can you explain again?

15          Q.  I said other than what you've just

16     described for me, other than that are there any other

17     facts in which you base your belief that you were

18     written up because you had complained about sexual

19     harassment?

20          A.  No.

21          Q.  Did Mr. Fuhrman ever criticize you for

22     reporting Don Fuhrman's behavior, I mean -- sorry.

23     Did Mr. Fuhrman ever criticize you for reporting Don

24     Telesca's behavior to him?

25          A.  You mean in front of me has he criticized

1    me for reporting --

2        Q.  Did he ever say anything to you or in your

3    presence critical of you for having reported Don

4    Telesca's harassment?

5        A.  Which harassment?  Sexual harassment or

6    the harassment about giving me hard time and expense

7    report on cutting checks without a proper --

8        Q.  I am talking about for reporting sexual

9    harassment.

10       A.  No.

11       Q.  And I understand that he wrote the file

12   note in response to your interface with Don Telesca

13   and expense reports, right?

14       A.  Repeat please?

15       Q.  I'll withdraw the question.  Don Telesca

16   was at some point discharged while you still worked

17   for Bayer; is that right?

18       A.  That's right.

19       Q.  Were you involved in the discharge

20   decision?

21       A.  No.

22       Q.  Were you informed of why he was

23   discharged?

24       A.  No.

25       Q.  Do you know who discharged him?

100

```
 1          A.  No.

 2          Q.  Do you know when he was discharged?

 3          A.  I remember beginning of May, 2001.

 4          Q.  So it was about a month and a half before

 5   your discharge?

 6          A.  Yes.

 7          Q.  Do you know why he was discharged?

 8          A.  No.

 9          Q.  I might have asked you this.  I think I

10   did.  Do you know who discharged him?

11          A.  I didn't know.

12          Q.  So I take it Mr. Telesca didn't have

13   anything to do with any of the events that led to your

14   discharge; is that correct?

15          A.  That I don't know.

16          Q.  Well, he wasn't a Bayer employee in any

17   event, right, when you were discharged?

18          A.  When I was discharged, he was no longer

19   with Bayer.

20                    (Defendant's Exhibit 18, marked for

21                     identification.)

22          Q.  Exhibit 18 is a letter dated June 11,

23   2001.  Is Exhibit 118 the letter informing you that

24   your employment with Bayer is being terminated?  Is

25   this the letter from Bayer notifying you that you were
```

1    being discharged?

2         A.   Yes.

3         Q.   According to the second paragraph of this

4    letter it states that the reasons for your discharge

5    were that the company concludes that you substantially

6    enhanced the resume of the candidate who was

7    subsequently selected for the position referring to

8    the position of Accountant I.   Under the circumstances

9    your conduct amounts to a falsification of company

10   documents.   Have you ever been given any other reason

11   than that for the discharge, your discharge from

12   Bayer?

13        A.   No.

14        Q.   Do you know who the candidate is for

15   Accountant I that's being referred to in this Exhibit

16   18?

17        A.   It's Chin Chen.

18        Q.   And who is Chin Chen?

19        A.   She was hired to fill the Accountant I

20   position in 1999.

21        Q.   Did she report to you after she was hired?

22        A.   Yes.

23        Q.   So were you the hiring manager?

24        A.   Yes.

25        Q.   Who else was involved in hiring Chin Chen?

SANDERS, GALE & RUSSELL
(203) 624-4157

1      A.   Rich Fuhrman, Don Telesca.

2      Q.   Did they interview her and approve --

3      A.   Yes.

4      Q.   Did they have to approve her hiring?

5      A.   Yes.

6      Q.   And of course you had to approve it as

7  well, right?

8      A.   That's correct.

9      Q.   Is Chin Chen a native Taiwanese?

10      A.   Yes.

11      Q.   Did you know Chin Chen before she applied

12  for a job?

13      A.   I met her at parties several times before

14  she apply for this job.

15      Q.   Did you falsify or -- excuse me.  Did you

16  substantially enhance the resume of Chin Chen?

17      A.   No, I did not.

18      Q.   Would you agree that if you had done what

19  you were accused of doing, that that would be serious

20  misconduct?

21      A.   Can you repeat again?

22      Q.   If you -- if in fact you substantially

23  enhanced the resume of a candidate for whom you were

24  the hiring manager, would you agree that that would be

25  serious misconduct?

103

1          A.   No.   I disagree.   First of all, that

2     resume was the candidate's own resume.   It is the

3     candidate's responsibility to make sure everything on

4     the resume is accurate and correct and if there is any

5     incorrect information on it, the candidate has to

6     correct it to make sure they submit the correct

7     information to the company.

8          Q.   All right.   I want to clarify my question.

9     If an employee, any employee, a manager, participated

10    in falsifying a resume of a candidate, would you agree

11    that the manager should be discharged if they did

12    that?

13         A.   If they knowingly and they told the

14    employee the candidate to do that, then I guess

15    depends on company policy, but it's still up to the

16    candidate's responsibility to submit correct

17    information to the company.

18         Q.   I understand that, but I'm just asking you

19    whether, in your opinion as a manager, do you think

20    that if a manager would help a candidate falsify their

21    resume, that that manager should be discharged if in

22    fact they did that?

23         A.   I don't think so.

24         Q.   What do you think -- do you think any

25    disciplinary action should be taken against a manager

SANDERS, GALE & RUSSELL
(203) 624-4157

1    who assists a candidate --

2             A.    Maybe a warning or something maybe, yes, a

3    reminder.    This is not allowed.

4             Q.    You agree that it's misconduct.    You just

5    disagree about what should be done if a manager does

6    that?

7             A.    Yeah.

8             Q.    Pardon?

9             A.    Could be.    Depends on how you look at

10   that, yeah.

11            Q.    You don't think it's okay for a manager to

12   assist a candidate to submit a false resume, do you?

13            A.    I don't think that's okay.    I don't think

14   that should be allowed.    I wouldn't do that myself if

15   you are asking me about that.    I wouldn't be knowingly

16   to falsify or to enhance incorrect information on

17   applicant's resume.

18                      (Defendant's Exhibit 38, marked for

19                        identification.)

20            Q.    Exhibit 38 is another affidavit or

21   statement.    Is Exhibit 38, which states at the top

22   fact finding report then it has claimant's statement,

23   is this a document that you prepared?

24            A.    No.

25            Q.    Have you seen this before?

SANDERS, GALE & RUSSELL
(203) 624-4157

1     A.   Yes.

2     Q.   What is this?

3     A.   It's for the Unemployment claim.

4     Q.   You filled -- this was filled out when you

5  were applying for Unemployment compensation?

6     A.   Yes. I did not fill this out.  The

7  gentleman there type this up and everything.

8     Q.   Did he base this on information that you

9  gave him?

10     A.   Based on I told him verbally, yes.

11     Q.   Would you quickly look this over?  What I

12  want to know is is this information on this document,

13  is this true to the best of your memory?

14            MR. MUCHINSKY:  I don't think you

15  should write on that.

16     Q.   What are you doing there besides writing

17  on my exhibit?

18     A.   I'm sorry. Pretty much accurate. The only

19  thing on the statement about I did help her put a

20  resume together.  That's incorrect.  I did not help

21  her to put a resume together.  I only proofread and

22  corrected information based on I was taught to reflect

23  what I was taught on her resume.  That's it.

24     Q.   Otherwise this is an accurate recitation

25  of events?

SANDERS, GALE & RUSSELL
(203) 624-4157

1    A.   That's the best I could remember or I knew

2 at that time.

3    Q.   How did -- I'm sorry, is it Chin Chen?

4    A.   Yes.

5    Q.   How did Chin Chen come to your attention

6 as a candidate for employment at Bayer?

7    A.   When this Accountant I position was

8 available and I ask Mr. Telesca, the HR manager, to

9 post it internally to the West Haven site so that we

10 could, I was hoping to have someone from within the

11 corporation has suitable experience and skills and so

12 one day, when I was talking to Cliff Chen on the

13 phone, I asked him to keep an eye out for me, see if

14 he knows anyone who is interested in this position and

15 he -- you know, I told him it was posted internally so

16 he could take a look and he said he couldn't find

17 internal posting at all.  So he ask me if I were faxed

18 or e-mail him the information, the job description,

19 and what's the requirement and everything to him.  I

20 said sure.  So I sent over information to him and he

21 recommended Ms. Chen.  He thought she is an ideal

22 candidate.  He told me that, you know, she had the

23 required experience and education and skills for this

24 position.

25    Q.   Okay.  You say this is Cliff Chen?

107

1      A.   That's right.

2      Q.   Now, is Cliff Chen also, I probably won't

3  pronounce this, but Kuang-Yung Chen?

4      A.   That's correct.

5      Q.   They are the same person?

6      A.   That's correct.

7      Q.   Exhibit --

8      A.   Excuse me.  Cliff Chen recommended two

9  candidates for me at that time.  Other candidate is

10 Betty Ho, H-O, and I knew Betty Ho is in my field,

11 too, and I already contacted her to submit a copy of

12 the resume to me and I interviewed her during the

13 first round, too.  So Cliff Chen recommended both of

14 them to me.

15     Q.   Was Betty Ho a Bayer employee?

16     A.   No.  But she is also a native Taiwanese,

17 but I knew her before.

18     Q.   Is Cliff Chen related to Chin Chen?

19     A.   They were friend.

20     Q.   But I mean were they related, familial

21 relationship, kinship?

22     A.   You mean like family or --

23     Q.   Cousin or brother or sister.

24     A.   No.

25     Q.   Exhibit 19.

SANDERS, GALE & RUSSELL
(203) 624-4157

108

1           (Defendant's Exhibit 19, marked for

2               identification.)

3       Q.   Exhibit 19 is an e-mail dated November 15,

4   1999.  Is this an e-mail that you received from Cliff

5   Chen?

6       A.   Yes.

7       Q.   What is this about?

8       A.   They wanted to apply for that position.

9   Chin was interested in this position and wanted to

10  apply for this position and Cliff had asked me to

11  provide info to prepare the resume.

12      Q.   To prepare Chin Chen's information?

13      A.   Yeah.  For them to prepare not me.

14      Q.   So this is an e-mail from Cliff Chen to

15  Chin Chen and he sent you a copy of it with a note to

16  you asking you to give him some information to prepare

17  a resume?  Is that what this is?

18      A.   I believe so, yes.

19      Q.   Why would he send you a copy of an e-mail

20  to Chin Chen from him do you know?

21      A.   That I don't know.

22      Q.   Okay.  But in any event that was November

23  15, 1999.  Exhibit 20 is a, appears to be -- it's a

24  job description with a bunch of handwriting on it.

25           (Defendant's Exhibit 20, marked for

SANDERS, GALE & RUSSELL
(203) 624-4157

```
 1                     identification.)
 2           Q.  Is Exhibit 20 the job description for the
 3    position that you ended up hiring Chin Chen for?
 4           A.  That's correct.
 5           Q.  Did you send this to Cliff Chen in
 6    response to his e-mail?
 7           A.  That must be.  This is the job posting so,
 8    yeah, this must be the copy I have sent him.
 9           Q.  Now one of the requirements specified for
10    this job, would you agree, is proficiency in computer
11    skills?  It states MS Excel.  That's Microsoft Excel,
12    Word, etc.  Is that correct?
13           A.  That's correct.
14           Q.  Whose handwriting is on here?
15           A.  It's Ms. Chen's handwriting there.
16           Q.  None of this is yours?
17           A.  No.
18           Q.  Some of it is in Chinese, correct?
19           A.  That's correct.
20           Q.  Okay.  Did you also provide at some point
21    Ms. Chin Chen with a list of the standard questions
22    that are asked of employees at interviews, candidates
23    at interviews?
24           A.  I remember during the interview in my
25    office she had a very difficult time to understand
```

1    some of the vocabularies on the question.  So she ask

2    if she could write it down and she also ask me a lot

3    about how to say this in English, how to say that in

4    English and I would translate for her and also how she

5    would tell me in Chinese this is what I want to say

6    and how do I say it in English and I will -- based on

7    what she wanted to say I would explain to her this is

8    proper grammar or proper word would be this word not

9    that word.  For example, she used to say decide.  She

10   used the word design and I would correct her and say

11   it's decide not design when she meant decide to make a

12   decision like that or she will say I ask to

13   Mr. Fuhrman, this is as an example, and then she will

14   say is that correct way to say.  I would say no.  You

15   say I ask Mr. Fuhrman.  So I was helping her out a lot

16   with this kind of proper way to express herself in

17   English during the interview.  We never deny her

18   English was pretty poor at that time.  She had a

19   translator, electronic translator with her all the

20   time and she will be very eagerly looking up the word

21   in English and trying to find out Chinese word for it

22   and that's why you see a lot of Chinese here, because

23   you are using that to help to understand each word.

24        Q.   Okay.  But let's get back to my question.

25   In the context of what you've just described did you

1   give her a list of the questions that are standard

2   questions to be asked at interviews?

3        A.   During the interview I believe I gave her

4   copy, because I remember she was very busy writing

5   down all the answers that she wanted to say and she

6   has ask me how to say it in English and --

7        Q.   Excuse me.  Were you helping her to

8   prepare for her interview with Mr. Telesca and

9   Mr. Fuhrman?

10       A.   No.  You mean during our interview there?

11       Q.   Yes.

12       A.   That was to help her to understand the

13   word how to express herself.  If you consider that

14   helping -- if you consider that helping, yes.

15       Q.   But I mean, otherwise why would you give

16   her a list of the questions if you weren't helping her

17   to get ready for her interviews with the other --

18       A.   Because she was ask me -- she was asked

19   all those questions by me and she wanted to understand

20   every single question clearly and completely and she

21   wanted to make sure that her answers are grammatically

22   correct and there were words she didn't know in

23   English how to say those like diligent and she would

24   tell me in Chinese she is hard working in Chinese and

25   ask me how to say hard working in English.  Then I

112

1    will give her the translation.  You could say

2    diligent.  You could say hard working and so I was

3    really helping her to get proper word and a proper

4    grammar, but all the answer how to answer each

5    question it's all her own idea.  I did not give her

6    the answer myself let's put it that way.

7                          (Defendant's Exhibit 21, marked for

8                          identification.)

9          Q.  Exhibit 21, are they the interviewers

10   standard questions that you gave to Ms. Chen, the

11   first page?

12         A.  Yes.

13         Q.  And the second page and I understand this

14   is not a very good copy.  I haven't been able to get a

15   good copy of page two.

16              MR. MUCHINSKY:  You have another

17   copy?

18         Q.  Whose handwriting is on page two?  This is

19   the same list of questions, but there's handwriting on

20   this.

21         A.  This is all Ms. Chen's handwriting.

22         Q.  Are you saying that she wrote these things

23   in her meeting with you?

24         A.  That's correct, yeah.

25                          (Defendant's Exhibit 22, marked for

113

```
1              identification.)
2         Q.  Exhibit 22 is a resume for Hsiu-Chin Chen.
3    Can you identify what this?
4         A.  This is Ms. Chen's resume.
5         Q.  Is this the first resume that you saw of
6    hers?
7         A.  Yes.
8         Q.  And this was sent to you by whom? How did
9    you get this?
10         A.  By Ms. Chen.
11         Q.  And did she e-mail it to you?
12         A.  Yes.
13         Q.  Then what did you do with this Exhibit 22?
14         A.  I made a few corrections to reflect what
15    they have told me about her skills and I rearrange the
16    sequence of her job to be from the beginning of her
17    career to the end of her career instead of on the end
18    of her career to the beginning of her career. So I
19    just move it, the sequence up.
20         Q.  And -- okay.  So you've made some changes
21    in the resume and what did you do with it?
22         A.  Send back to her.
23         Q.  Exhibit 23.
24              (Defendant's Exhibit 23, marked for
25              identification.)
```