1          A.    We sit-down together to discuss and I give

2     her this copies.   So we went over the whole list on

3     this copy, just on this page only.

4          Q.    Okay.   Now -- so the only thing you gave

5     her was the first page of the exhibit?

6          A.    That's correct.

7          Q.    What are the second two pages?

8          A.    The second two pages were Rich Fuhrman

9     came to me the following Monday, because Chin, Ms.

10    Chen went to him and ask him to lay her off.   Ms. Chen

11    --

12         Q.    I'm sorry --

13         A.    Ms. Chen at this meeting here, she realize

14    she just couldn't do the job.   She wasn't able to --

15    she just couldn't understand the work she told me and

16    she say, you know, I just couldn't understand the

17    work.   "Why don't you lay me off?"

18         Q.    Did she say that to you?

19         A.    Yes.

20         Q.    She ask you to lay her off?

21         A.    That's right.

22         Q.    Then what happened with Mr. Fuhrman?

23         A.    And then on Monday she went to Mr. Fuhrman

24    and she ask Mr. Fuhrman to lay her off, too, and

25    Mr. Fuhrman came to me and ask me to give him more

146

1    detail on all those issues, more detail of each job

2    and all those problems and so I prepare this one for

3    Mr. Fuhrman to understand more detail about all the

4    errors.

5            Q.   Pages two and three -- page one is what

6    you gave to Chin Chen.  Pages two and three is

7    something that you later prepared for Mr. Fuhrman

8    after she approached him?

9            A.   That's correct.  But pretty much in our

10   meeting this are the issues we have been discuss over

11   and over and over for the past year and a half.  There

12   were almost all the same problems had been repeated

13   over the time of a year and a half time period and I

14   have reviewed this kind of problems with Ms. Chen on a

15   regular basis.

16           Q.   Now, in item eight you tell Rich Fuhrman

17   that Chin Chen admitted that she misled you on her

18   resume about her computer skills, correct?

19           A.   That's right, yeah.

20           Q.   Did you tell Mr. Fuhrman that you had

21   helped her prepare the resume?

22           A.   At the last time, no.

23           Q.   Now this is May 11 and you say that it's

24   your understanding that Chin Chen, she asked you to

25   lay her off and then she went to Rich Fuhrman and

SANDERS, GALE & RUSSELL
(203) 624-4157

1    asked him to lay her off?

2            A.   Yes.

3            Q.   Why didn't you lay her off?  She lied to

4    you.

5            A.   I was discussing with her that she worked

6    so hard.  She tried so hard at this job and she has

7    other strengths and skills that she could utilize in

8    other capacities and I just felt this wasn't the

9    position for her.  It's just not the right position

10   for her.  I suggested her to look for other

11   opportunities within Bayer Corporation if she want to

12   that will be better suited her skills and abilities

13   that she can, you know -- she is a very hard working

14   person.  That's no doubt about it and she tried so

15   hard.  She just need to be put into the right

16   capacity.  So on that day on Friday that's what I

17   suggested.  We were start looking for other

18   opportunities if she wants to transfer to other

19   function or other department or even to West Haven

20   site and she say, no, she didn't think any other

21   supervisor would give her so much, will be so patient

22   with her and give her so much opportunity to improve

23   and she didn't want to go anywhere else.

24                  (Defendant's Exhibit 29, marked for

25                  identification.)

SANDERS, GALE & RUSSELL
(203) 624-4157

1    Q.    Exhibit 29 is a memorandum, a typed
2    document dated May 25, 2001.  This is it looks like
3    minutes or notes of a meeting on May 25, 2001
4    involving you, Mr. Fuhrman, Chin Chen and Denise
5    Church-Ball.  First of all, do you remember this
6    meeting?

7    A.    Yes.

8    Q.    Are you familiar with these notes, this
9    typewritten document?

10   A.    I have seen this one at the CHRO fact
11   finding conference.

12   Q.    Would you look through this and would you
13   tell me whether this is an accurate summary of what
14   occurred?

15   A.    There were some statement were not correct
16   here on the third paragraph.  The last sentence did
17   says she told me that she put walls up around her so
18   that Chin felt she could not go to her with any
19   problems.  Ms. Chen had never told me that.  Every
20   time I went over things with her she always thanked me
21   and she said, "Thank you very much for teaching me"
22   and, you know, she always been very grateful and
23   thankful and very happy that I told her.  It's to the
24   point that she always say --

25   Q.    Okay.  But did Chin say this in the

1    meeting?

2              A.   No.   I don't remember this, no.

3              Q.   Anything else in here that's not accurate?

4              A.   And then on the fourth paragraph here I

5    ask Chin to explain when she --

6              Q.   "Mei then asked Chin to explain," is that

7    what you're saying?

8              A.   Yes.   Had poked --

9              Q.   What's inaccurate there?

10             A.   First of all, Ms. Chen did not understand

11   the word poked until the CHRO fact finding so how did

12   that poked come up?   That's weird there.   Second, Chin

13   said it was after -- in this sentence here it said

14   Chin said it was after everybody had gone home she

15   came over to her and poked her and told her that she

16   was the inventory clerk and she needed to fix the

17   problems.   During the meeting Ms. Chen said it was at

18   a discussion with the warehouse supervisor, Ronnie

19   Good was there, and I poked her and told her she was

20   inventory clerk and she need to fix the problem.   So

21   this is different to what she was, she told us in the

22   meeting there.

23             Q.   In the meeting of May 25 where Chin was

24   present and the others, did she say that you poked

25   her?

150

1      A.  I don't remember she said poked or point

2   at her.  I don't remember that.

3      Q.  Let's put on --

4           MR. MUCHINSKY:  Can we take a

5   two-minute break?

6           MR. MYERS:  Just so when we come

7   back and I'm ready for a break the question on the

8   table is I'm trying to figure out if there's anything

9   in this that inaccurately summarizes what was said at

10  the meeting.  That's where we're stopping.  We're in

11  the middle of this.

12              (Whereupon, there was a brief

13              recess.)

14          MR. MYERS:  We were discussing the

15  meeting of May 25, 2001.  Specifically I had asked you

16  if the Defendant's Exhibit 29 was an accurate summary

17  of the meeting and you had identified one issue you

18  had with this and then we were talking about the

19  sentence involving whether or not you had poked Chin

20  before the break.

21          MR. MUCHINSKY:  Excuse me.  Who is

22  the author of this?

23          MR. MYERS:  You're asking me?

24          MR. MUCHINSKY:  Do you know?

25      Q.  Do you know who the author is?

SANDERS, GALE & RUSSELL
(203) 624-4157

1    A.  No, I don't know.

2    Q.  My question I think before the break was

3  did Chin say at this meeting that you had poked her?

4    A.  I don't remember the word poked she use,

5  but it's more like pointed her.  She said it was with

6  Ronnie Good, the warehouse supervisor.  She and I and

7  Ronnie were discussing about some of the problems that

8  occurred that Ms. Chen should have fixed on the

9  computer and she did not.  So in front of her that I

10  pointed at her and then I said let's bring Ronnie Good

11  to come in, because I don't remember anything like

12  that.

13    Q.  Excuse me.  I'm just asking you what did

14  Chin say?  Did Chin say that you called her an

15  inventory clerk?

16    A.  I don't remember whether Ms. Chen said --

17  all I remember she said it was in front of Ronnie and

18  we are discussing about that and I told her she need

19  to fix the problem, because she -- an inventory clerk?

20  I don't remember the word.

21    Q.  You don't remember if Chin said that?

22    A.  She is responsible for inventory control

23  and she should know the problem and fix it.  But if

24  she didn't knew the problem, she didn't know how to

25  fix it and she said that was in front of Ronnie Good

152

1    and I ask them to bring Ronnie in to confirm, because

2    I don't remember.  I didn't remember anything about

3    that and they say, no, they didn't want to get Ronnie

4    involved in this.

5          Q.  Okay.  Why did you want Ronnie to come in,

6    to confirm or deny what?

7          A.  To confirm if I did poked, the word it was

8    put here, but I believe it could be probably point at

9    Chin --

10         Q.  Why would you care --

11         A.    -- at our meeting there.

12         Q.  Why would you care whether you had pointed

13   at her or not?

14         A.  Because she said that that what hurt her

15   feeling.

16         Q.  That you pointed at her?

17         A.  Yeah, and that's what made her so upset

18   and that's her complaint to Mr. Fuhrman.

19         Q.  Okay.  Now, in the next paragraph it

20   refers to a discussion about Chin not having computer

21   skills when she was hired.  Do you remember this

22   subject being brought up in the meeting?

23         A.  Yeah.  I remember that and it was in a

24   kind of conversation back and forth when she mention

25   about that she was -- because I give her all those

1   problems, this list of problems hurt her feeling.  So

2   I ask her, I said, "Then why did you thank me on

3   Friday for giving you this list of all the areas that

4   need to be improved?  Why did you tell me I was the

5   best supervisor you have ever had and you really

6   appreciate?  If it hurt your feeling and you were not

7   happy with it, why didn't you tell me honestly right

8   away or to me directly let me know?  Why did you lie

9   to me?" and so that's how the whole thing brought up

10  again that she started crying saying she did not lie

11  to me and that she never lied.

12          Q.   Did you bring up the subject of Chin not

13  having any computer skills at the meeting of May 25?

14  Did you mention that?

15          A.   Yeah.  It must have been mentioned

16  together with all the other problem, because the

17  discussion --

18          Q.   But I'm asking about this one thing.  Did

19  you mention at the meeting that Chin did not have any

20  computer skills when she was hired and that she was

21  not honest with you?

22          A.   Yeah.  We discuss about that on this

23  meeting, too, yeah.

24          Q.   Did Chin claim at the meeting, did she

25  claim that she told you everything about her skills

1    before she was hired?

2         A.  No.  Again, she was crying very -- I can't

3    remember.  She was crying so hard and she kept saying,

4    "I told you everything" and I said, "Yes, you just

5    told me last month.  You did not tell me from the very

6    beginning" and she kept saying, "Yes, I told you

7    everything, I told you everything" and then she walk

8    out with Denise.

9         Q.  Okay.  So Chin -- in front of Mr. Fuhrman

10   in front of Denise Church-Ball and you Chin said to

11   you that she had told you everything about her

12   computer skills?

13        A.  Yeah, and I remember she also say

14   something about it wasn't my idea to lie to you, you

15   know.  It was -- I don't remember if she said it was

16   Cliff or it was, you know, his idea.  I can't remember

17   or not.

18        Q.  Okay.  Now before you had this meeting

19   with Chin and Mr. Fuhrman and Denise Church-Ball,

20   before that meeting do you remember having another

21   meeting with just Mr. Fuhrman and Denise Church-Ball

22   before Chin was brought in?

23        A.  You mean on the same day or prior to this

24   date?

25        Q.  On the same day.

1    A.   Yes.   We were supposed to discuss Chin's

2    performance and the list and when I walk in there, was

3    only Mr. Fuhrman and Ms. Church-Ball and instead of

4    talking about her problems they started with about

5    accusation about Chin complain by poked her and I hurt

6    her feeling and so I said I was shocked to hear that

7    and that's very serious and that we need to bring Chin

8    in to discuss about this and so they ask Chin to come

9    in and that's why we had all of us together to discuss

10   this face to face.

11                    (Defendant's Exhibit 30, marked for

12                    identification.)

13        Q.   I am going to show you Defendant's Exhibit

14   30 and it is another similar typed memo that purports

15   to be a summary of that meeting.   Are you familiar

16   with Exhibit 30?

17        A.   I've seen this at the CHRO fact finding

18   conference.

19        Q.   That was the first you had seen it?

20        A.   That's correct.

21        Q.   At the meeting before Chin was brought in

22   did Mr. Fuhrman inform you that Chin had come to him

23   and complained about you?

24        A.   Prior to this meeting?

25        Q.   At this meeting.

1          A.   Yes.   It's at this meeting that he told me

2     that.

3          Q.   And her complaint was, among other things,

4     that you had poked her?  Did he tell you that that

5     Chin had complained that you poked her?

6          A.   Yes.

7          Q.   And did he also say that Chin had felt

8     that, had complained about the letter you had given

9     her?  Was that also discussed?

10         A.   I don't remember what he said, but I

11    remember he was upset that I give Chin the corrective

12    action plan without letting him review first.

13         Q.   Okay.  Do you remember discussing in this

14    meeting your problems with Chin's performance?

15         A.   We discuss about it during the performance

16    review.

17         Q.   No.  I am talking about the meeting with

18    Rich Fuhrman, Mei Rogus and Denise Church-Ball on May

19    25.  Do you remember in that meeting talking to Rich

20    and Denise about the problems you were having with

21    Chin's performance?

22         A.   Yeah.  I believe we also went through a

23    brief outline of all the major areas, but it was very

24    short.  They were not interest in hearing areas that

25    she really had problem with.  They just didn't want to

1   really discuss about that at all and I tried to went

2   to their attention.

3          Q.   Now, in that meeting why didn't you tell

4   them that Chin had lied to you on her resume?

5          A.   This is -- I thought I was mention.   Rich

6   Fuhrman knew that even before this meeting, too.

7          Q.   It appears to me from what happened in the

8   next meeting when Chin was brought in that that's

9   where the subject came up.   Are you saying that you

10  had discussed that with Rich earlier?

11         A.   Yeah.   I remember the Monday following May

12  11 when Rich Fuhrman came to me and told me that Chin

13  went to him to ask him to lay her off and because she

14  had lied on her resume she did not have the skills and

15  she cannot do the job.

16         Q.   Are you saying that she told Rich that?

17         A.   I remember that Rich Fuhrman came to me

18  and ask me.

19         Q.   Are you sure about that?

20         A.   I remember something.   He said -- I said

21  to Mr. Fuhrman I said, "Chin ask me to lay her off.

22  She admitted to me that she did not have the computer

23  skills and she had lie on her resume" and I remember

24  Mr. Fuhrman say something that, yeah, Chin told him

25  the same thing, too, and ask to be laid off.   That's

1    the best I can remember something, a conversation like

2    that going on and then I remember Mr. Fuhrman ask me

3    that with all the problems that -- it was

4    communication, her inability to communicate with

5    people and to make sure the report was done properly

6    and she just afraid to communicate with people to get

7    the job done and I mention that to Mr. Fuhrman that

8    was her biggest problem, among many problems she had.

9    The computer skills, that's one of the problem and

10   Mr. Fuhrman ask me about her ability to communicate

11   was even more language related or more culture

12   related.  I remember this kind of conversation going

13   on there on Monday when Mr. Fuhrman came to me and so

14   we discuss about it could be the culture reason.  It

15   could be just her individually.  She is not

16   comfortable communicating with people.

17          Q.  So it's your testimony that on the Monday

18   after May 11 and before this meeting, these meetings

19   on May 25, you had already talked to Mr. Fuhrman about

20   her lying on her resume or she had talked to him about

21   it and then he talked to you about it?  That's your

22   testimony?

23          A.  That's the best I remember some kind of

24   conversation.  That's when he came to me and when I

25   mention about that and he said, yes --

159

1          Q.   I don't want you to relate the whole story

2     again.   I want to ask are you very sure about that or

3     could that have occurred later, the discussion about

4     her lying on her resume?

5          A.   That's the best I could remember.  It

6     could occur later before the May 25 or --

7          Q.   Or after it?

8          A.   It couldn't be after, because it was

9     already in the document here and that's what causing

10    her to cry and walk out.  So it had to be -- before.

11         Q.   I'm sorry --

12         A.   The end of this meeting.

13         Q.   It could have been on May, at the May 25

14    meeting that it was first brought up or it could have

15    been before?  That's what I'm asking you.

16         A.   It could have been before, but again,

17    Mr. Fuhrman's focus and attention wasn't never really

18    been on her performance issues.  It was trying to find

19    out to blame on me why I did not, you know, discuss

20    with him about this on this corrective action plan if

21    I give to Chin.  He was more focused on trying to find

22    everything to blame on me.

23         Q.   Well, what happened after May 25?  What

24    was the next event that occurred so far as you can

25    remember leading up to your discharge?

1          A.   Nothing really happened until June 8

2   meeting that I was working on, you know, getting all

3   the document, all the detail about Ms. Chen's

4   performance and every mistake she had made during that

5   period and prepared for the next meeting.

6          Q.   Okay.   Then what happened at the meeting

7   on June 8?  Who was at the meeting?

8          A.   Mr. Fuhrman and Ms. Church-Ball.

9          Q.   What happened?

10          A.   And I had two folders of all the mistakes

11   and the areas of the performance issues before Ms.

12   Chen walk into the meeting, because that's what I was

13   told for.   That's what we're going to discuss.   But

14   then never even discuss anything about that.   They

15   just informed me that they had evidence that I had

16   falsified company documentation that they suspended

17   me.

18          Q.   Okay.   Did they show you the evidence?

19          A.   No.

20          Q.   It's your testimony they didn't tell you

21   what evidence they had?

22          A.   No.

23          Q.   You don't recall being shown the e-mail

24   that you sent to Chin with her resume attached?

25          A.   No.   They have never shown it to me.

1       Q.   Did they tell you that they had an e-mail?

2       A.   No.

3       Q.   Your testimony is they didn't tell you

4   anything about what evidence they had?

5       A.   That's correct.

6       Q.   Did you tell -- was there any discussion

7   about whether or not you had assisted or made changes

8   in Chin Chen's resume?

9       A.   Yes.

10      Q.   So that subject was discussed?

11      A.   Yes.

12      Q.   What did you tell -- did you tell them

13  that you had assisted her with her resume?

14      A.   I told them I have helped to proofread her

15  resume, to correct it based on what she had told me or

16  Cliff Chen had told me.

17      Q.   Did you tell Rich and Ms. Church-Ball that

18  someone in West Haven had worked with Chin on putting

19  together her resume?

20      A.   Yes.   They were aware of that.

21      Q.   And again, it's your testimony that based

22  on your recollection today you did not refuse to give

23  them the name of that person; is that correct?

24      A.   That's correct.

25      Q.   How did the meeting end?

1      A.   Ms. Church-Ball told me to get my

2   pocketbook and don't touch anything else and I say,

3   "How about my personal belongings?" and she said, "Oh.

4   We will bring you back sometime hopefully next week.

5   Depends on company HR's schedule for investigation and

6   if, you know, the investigation find out, you know,

7   you are -- you will have an opportunity to cleanup

8   your personal belongings at that time" and she -- I

9   told her that please be very unbiased looking

10  reviewing this case here.  I close the door with her

11  in my office and I explain to her briefly about

12  history of sexual harassment complaint against Don

13  Telesca and then subsequent retaliate behaviors during

14  the years, two years, nonstop retaliation going on and

15  Rich Fuhrman had been witch hunting to get rid of me

16  to find anything and I ask her to review very

17  carefully and please make sure it's unbias

18  investigation and she said, "Don't worry.  Corporate

19  HR come down to investigate and we will bring you back

20  and you will have a chance to explain yourself" and

21  they never did.

22                    (Defendant's Exhibit 31, marked for

23                    identification.)

24      Q.   Exhibit 31 is a memorandum dated June 8,

25  2001 that purports to summarize the meeting with

1    Mr. Fuhrman, you and Denise Church-Ball.  Are you

2    familiar with that exhibit?

3          A.  This also something I saw it at CHRO's

4    fact finding conference.

5          Q.  You saw that for the first time at the

6    fact finding conference?

7          A.  That's correct.

8                    (Defendant's Exhibit  34, marked for

9                    identification.)

10          Q.  I'm going to show you Exhibit 34.  I'm a

11    little out of order in the number, and it's one page

12    of that memorandum and my question to you is is that

13    your handwriting on Exhibit 34?

14          A.  Yes.

15          Q.  When did you write on that document?

16                    MR. MUCHINSKY:  Can I have one of

17    those, 34?

18          A.  This I put -- at the CHRO fact finding

19    conference when I saw this, I tried to write down what

20    I remember at that time.

21          Q.  Okay.  I'm going to have to break for a

22    few minutes to do this call but go ahead.  You made

23    these notes and you think you made it at the fact

24    finding conference?

25          A.  Yeah.

164

1          Q.   Are you able to read the writing down on

2     the left-hand margin?

3          A.   No.

4          Q.   I have to ask to see the original or get a

5     better copy.

6               MR. MUCHINSKY:   Okay.

7               MR. MYERS:   Document 3401 of the

8     things you did on here was circled, the statement Chin

9     stated emphatically that she told Mei she was not good

10    with a computer and Mei said don't worry about it.

11    You've circled that and you've written the words

12    versus never touched a computer.   What does that mean.

13         A.   This is a point I would like to point out

14    that when I was told her computer was horse horse

15    tiger tiger so that was true that Chin told apparently

16    at the meeting that she did tell me she had a computer

17    skills and that she had never told me the fact she had

18    never touched a computer.

19         Q.   So when did Chin say she had never touched

20    a computer?

21         A.   In April of 2001.

22         Q.   When she met with you?

23         A.   Yes.

24         Q.   All right.

25               (Whereupon, there was a brief

SANDERS, GALE & RUSSELL
(203) 624-4157

```
 1                        .recess.)

 2           Q.  On Exhibit 34 had you finished explaining

 3    to me what you meant by versus never touched a

 4    computer?  I don't remember if you did or not, but

 5    were you finished answering that?

 6           A.  Yeah.  The difference between not very

 7    good and never touched a computer.  If she had told me

 8    she had never touched a computer before, then I would

 9    understand, there was no question about it that she

10    had no computer skills at all and then she would never

11    have being interviewed.  But the fact she has told me

12    her computer was not very good like me, that means she

13    told me she has computer skills and that's why I

14    believe she had computer skills.

15           Q.  Back when you were first  -- before she

16    was hired?

17           A.  That's correct.

18           Q.  Do you now remember her telling you that

19    or was that Cliff Chen that told you that?

20           A.  Both of them have told me that the same.

21           Q.  I'm going to show you -- oh.  I take it

22    then the next thing you heard after the June 8 meeting

23    when you left was you got a letter or you got a

24    telephone call?  You were informed you were

25    discharged; is that right?
```

SANDERS, GALE & RUSSELL
(203) 624-4157

1    A.   That's correct.

2    Q.   And how did you first hear that news?

3    A.   Rich Fuhrman told me on the phone.

4    Q.   And you received then the termination

5 letter that we looked at before later?

6    A.   That's correct.

7    Q.   And what did Mr. Fuhrman tell you?

8    A.   That my employment with the company was

9 terminated.

10    Q.   Did he tell you why?

11    A.   Based on falsification of document,

12 company documentation.

13    Q.   Now, did Chin, in your presence, tell Rich

14 Fuhrman that she had informed you that she did not

15 have computer skills before she was hired?

16    A.   Can you repeat again?

17    Q.   Did you -- have you heard Chin say that

18 she told you she didn't have computer skills before

19 you were, she was hired?

20    A.   I remember when she was walking out our

21 meeting crying so hard and she kept saying, "I have

22 told you, I have told you" and I said, "Yes.  You just

23 told me in April, last month, and you should have told

24 me from the very beginning.  You should have been

25 honest with me from the very beginning before you were

1    hired."

2              Q.  Do you have any reason to doubt that Chin

3    told Mr. Fuhrman that you knew that she didn't have

4    any computer skills and that you're the one that

5    changed her resume?

6              A.  Can you repeat again?

7              Q.  Do you have any reason to doubt that Chin

8    told Mr. Fuhrman that she had told you that she didn't

9    have any computer skills before she was hired?

10             A.  I cannot understand.  This is too

11   complicated.

12             Q.  Do you believe that Chin told Mark Fuhrman

13   that she had told you that she had no computer skills

14   before she was hired?

15             A.  That I don't know.

16             Q.  But she did indicate that when you were

17   present at the meeting, correct?

18             A.  That could be correct, yeah.

19             Q.  Do you have any reason to doubt that the,

20   that Chin told Mark Fuhrman that you had altered her

21   resume?

22             MR. MUCHINSKY:  Rich.

23             Q.  Rich Fuhrman that you had changed her

24   resume?  Do you have any reason to doubt that she told

25   him that?

1           A.   I don't know.

2           Q.   You don't have any reason to doubt that

3     one way or the other?

4           A.   I don't know at this moment.

5           Q.   Have you talked to Chin since the meeting

6     on June 8?

7           A.   No.

8           Q.   You have had no communications with her?

9           A.   No.

10          Q.   Exhibit 33 is another calendar page.

11                    (Defendant's Exhibit 33, marked for

12                    identification.)

13          Q.   This one is from May 28 to June 3.   It

14    appears to be 2001 and it has handwritten notes on

15    which I can read.   I'm going to ask you if that's a

16    page from your calendar and if those are your notes.

17          A.   Yeah.

18          Q.   What are you noting here in connection

19    with this case?

20          A.   This was my note about the raw material

21    variance at month ends and a couple employees that I

22    have spoken with about the inventory problems.

23          Q.   Would you circle in this blue ink what

24    part of this exhibit deals with your discussion of the

25    inventory shortages?   Okay.   Again, if I can get

1     either the original or a better copy of this page

2     number 339?

3                     MR. MUCHINSKY:   Sure.

4             Q.   I just can't read what it says here.   But

5     that's what this deals with?

6             A.   Yes.

7             Q.   Was this something that happened on that

8     day?

9             A.   Oh no.   It was throughout probably the

10    whole week.

11            Q.   Do you know when you made these notes?

12            A.   May 31 is the month end and the beginning

13    of the month usually I summarize all my, what I, all

14    the closing activities and I try to -- I had another

15    detailed list of all the information on a piece of

16    paper.   This a very brief note when I talk to the

17    employees, who I talk to and I discuss with Chris

18    Hamilton also after my findings and I know this is

19    pretty much our discussions there.   I told him what's

20    my findings are and the real reason of the variance,

21    how it occurred and everything.

22            Q.   When did you make these notes?

23            A.   Probably sometime that period there.   End

24    of month is closing time.   It is very busy so I don't

25    have time to write down all the detailed information,

                    SANDERS, GALE & RUSSELL
                      (203) 624-4157

170

1    just brief information.  That's usually what happens.

2           Q.  Let me ask your attorney this.  When you

3    get -- in addition to giving me a clear page could you

4    ask Ms. Rogus so we don't have, I don't have to ask

5    her this or ask to adjourn this or something, if she

6    could simply type up what this says and we'll call it,

7    we'll submit it as Exhibit 33-A, because it's not

8    legible here and I'm afraid I might not --

9                   MR. MUCHINSKY:  You have the

10   original at home, correct?

11          A.  I do and the things that -- I used to put

12   down employees initials only.

13                  MR. MYERS:  This is off the record.

14                  (Whereupon, there was a discussion

15                  off the record.)

16                  (Defendant's Exhibit 32, marked for

17                  identification.)

18          Q.  Defendant's Exhibit 32 is a page from

19   calendar March, 2001.  Is this another page from your

20   calendar with your notes on it?

21          A.  Yes.

22          Q.  What on this page -- again, I can't read

23   the writing, but what on this page has to do with this

24   claim?

25          A.  On the bottom of it here I had a note that

171

1    Tim Romps --

2           Q.   Tim R.   Is that Tim Romps?

3           A.   Yes.   Employees something so it must be

4    the time that Tim Romps is the ombudsman.   He

5    contacted me, ask me about an employee called him to

6    complain so it's -- one of our production employees

7    called him to report the suspicion of management

8    hiding numbers or massaging numbers, fudging numbers.

9           Q.   Okay.   And that's -- again, I would like a

10   legible copy of that page of Exhibit 32.

11          A.   And that could have been something I got

12   back to him or he called me or I put a note for myself

13   to respond to him, something like that.

14          Q.   Are you aware of any facts that you

15   haven't testified here to that support your contention

16   or your claim that you were discharged, because you

17   had made a complaint of sexual harassment or

18   complained to the ombudsman about Mr. Fuhrman as

19   opposed to because they felt you had falsified

20   documents?   Why do you believe that?

21          A.   Because if they do consider it such a

22   serious misconduct about Chin's lying on the resume,

23   then both of us should have been punished the same way

24   at least if she severe than me, because she is the one

25   that was lied and I was innocent. I was lied to and I

SANDERS, GALE & RUSSELL
(203) 624-4157

172

```
 1    was a management member who produced productive and
 2    contributed a lot to the company.  She had performance
 3    problem.  She admitted she did not understand the job.
 4    She did not have the skills and she had lied to the
 5    company to get a job and she ask to be terminated and
 6    why would the company keep her there still to this
 7    day?  What's the reason?  The company, if they thought
 8    it is serious, she should be the first one to be gone
 9    and then another reason is why Rich Fuhrman was afraid
10    to show me those documents at that time for me to
11    review and then I would have the opportunity to show,
12    to tell him, to show to him that wasn't final resume.
13    I did not enhance all those qualifications there.  She
14    herself or someone else did.  That could have been
15    clarified if they had given me an opportunity to
16    explain myself or there was no investigation.  I was
17    never been questioned by HR or shown what it is.  So
18    it's apparently it's retaliation.
19               Q.  Denise Church-Ball is HR, isn't she?
20               A.  She was HR.  She was just sitting there.
21    She wasn't investigated at all.  She was sitting
22    there.
23               Q.  They did ask you questions, right?
24               A.  It was more like they inform me they had
25    something, some document against me.
```

1    Q.   Okay.   Let me ask you something.   Do you

2    know whether or not Chin Chen was disciplined in any

3    way for --

4    A.   No, I did not.

5    Q.   Pardon me?

6    A.   No, I did not.

7    Q.   You don't know?

8    A.   No.

9    Q.   You agree that it was a very serious

10    matter, don't you?

11    A.   Yes, I agree.

12    Q.   But you chose not to discipline Chin Chen

13    for whatever it is you believe she did wrong?

14    A.   I started a discipline.

15    Q.   Excuse me.   Is that true?

16    A.   Disciplining her, I start putting it down

17    in writing and so I could after -- I was trying to

18    follow Bayer Corporation's disciplinary guidelines.

19    According to Bayer's disciplinary guidelines you

20    verbally advise the employee the areas they need to

21    improve and then after that, you know, putting it in

22    writing and if the employee still don't improve, then

23    you   ...

24    Q.   That's for poor performance, right?

25    A.   Huh?

SANDERS, GALE & RUSSELL
(203) 624-4157

174

1          Q.   Those are the guidelines for poor

2   performance, right, not for misconduct?

3          A.   That I don't remember exactly.  All I

4   remember it was disciplinary guidelines.

5          Q.   Your memo of May is 11, 2001 where you

6   documented the performance problems doesn't say

7   anything about falsifying a resume, does it?

8          A.   No.

9          Q.   So you weren't beginning to document that,

10  correct?

11         A.   Poor computer skills was on it.

12         Q.   But nothing about falsifying her resume,

13  correct?

14         A.   No.

15         Q.   Even though you had known for close to a

16  month that she had lied to you according to your

17  testimony, correct?

18         A.   Yes.

19         Q.   Pardon me?

20         A.   Yes.

21         Q.   So is it fair to say you chose at least at

22  that time not to impose any disciplinary action on

23  Chin Chen at least not up to that point in time?

24         A.   Not up to that point.

25         Q.   Now in-between -- between May 11 and June

SANDERS, GALE & RUSSELL
(203) 624-4157

1  8 you did not impose any discipline on Chin Chen, is

2  that correct, for lying?

3       A.  That's correct.

4       Q.  Any other -- are there any other facts

5  that you are aware of that contribute to your belief

6  that you were discharged in retaliation for complaints

7  you made rather than for the reason that you were

8  given other than what you've just, you know, you've

9  already told me?

10      A.  The real reason of the raw material

11  variance was one of the biggest contributor to

12  Mr. Fuhrman's get rid of me right away, because --

13      Q.  I'm going to ask you about that.  I'm

14  going to ask you about that in a minute.  You believe

15  that he was motivated at least in part by the raw

16  material variance issue, correct?

17      A.  That's correct.

18      Q.  I'm asking you are there any other facts

19  to suggest that his motivation was at least partially

20  based upon retaliation for the complaints that you

21  made of sexual harassment and to the ombudsman besides

22  what you've already related to me?

23      A.  That's right.  That's all I could think of

24  now.

25      Q.  Okay.  Now I want to ask you about this,

SANDERS, GALE & RUSSELL
(203) 624-4157