1   because in your complaint you also claim that you were

2   discharged because of on June 1 you met with

3   Mr. Fuhrman and made a certain report to him about

4   consumption of inventory.  I'll put it that way.

5   Would you tell me what happened on or about June 1?

6          A.  There was an accounting procedure to

7   properly record all the raw materials that had been

8   consumed to produce the finished goods.  In the past

9   couple of years every month we were not able to

10  identify the real reason why there was always a good

11  30,000 pound to 50,000 pound of raw materials were

12  missing and we couldn't identify where they went and

13  then by end of May, after talking with all the, not

14  all, many production employees, production

15  supervisors, warehouse employees and different people

16  in various department and I confirmed that employees

17  were not reporting all the scrap materials on their

18  daily production report.  We call it a crew report and

19  the reason for that was if you report everything into

20  the production crew report in accounting procedure, we

21  have to take those scrap, go against finished goods so

22  that will lower the productivity efficiency

23  significantly.  In the past, because we weren't able

24  to confirm what was the problem, we didn't want to do

25  that to punish, to jeopardize the productivity past

1    bonus payout program, because that's one of the

2    biggest weight, major there to get the bonus payout.

3    And so it was a, to everyone's benefit from the

4    management to production employees, everyone's benefit

5    not to report that on the daily production report.  So

6    on June 1 or about, you know, after the month closing

7    I went to Mr. Fuhrman.  I said now I show him all the

8    numbers and the real reason was employee did not

9    report everything on the report and we have to start

10   recording it properly now.  We cannot just write off

11   the material without applying it against the yield,

12   production yield, and even though that could lower our

13   performance significantly, but that should be the

14   proper way to handle and he didn't want me to do

15   anything at that time.  So I didn't do anything for

16   that month.

17        Q.  What did he say?

18        A.  He said, "Are you sure that's the reason?

19   I say, "Yes.  I'm very sure" and I show him the

20   information, all my findings and where all the

21   materials went and everything and I said, "Here are

22   all the detailed information" and I make all the

23   numbers correctly if we do that and that's the proof

24   there and he say he will think about it and he will

25   get back to me.

1        Q.   Now let me ask you something.  Mr. Fuhrman

2    directed you -- it was part of your job, he instructed

3    you to do an investigation and find out why there was

4    a variance between the actual inventory and the book

5    inventory, right?

6        A.   That's right.

7        Q.   He was the one that told you to do that?

8        A.   That's correct.

9        Q.   In fact, that was one of the objectives in

10   your performance evaluation, correct?

11       A.   Yes.  And that's another reason during my

12   conversation and the discussion with various employees

13   about to find the problem that some employee told me

14   that those, they didn't want to report, you know.

15   They blame on the other shift.  They basically say,

16   oh, you know, the other shift don't want to report

17   that, because that would lower the production yield

18   and what the situation each shift was competing with

19   each shift.  So that's another reason the employee

20   were trying to hide the numbers, too, and a couple of

21   employees mention to me, production manager and, you

22   know, plant manager were aware of all those problems,

23   too.  They were -- you know, they knew that employees

24   did not want to report complete.  So they were all

25   aware of those problems, too.  So before I went to

1    Mr. Fuhrman I relate my concern with Mr. Hamilton,

2    Chris Hamilton, that apparently they all knew about

3    the real problem prior to me, but Mr. Fuhrman gave me

4    such pressure to find the reason, but he did not want

5    to support me when I propose several actions to take

6    and to have the production employees to implement on

7    the production floor so we could identify the problem

8    and Mr. Fuhrman told me he didn't think his support

9    would help at all.  I should work with the production

10   manager, Tim Conway, directly to identify the problem,

11   but Mr. Conway did not want to implement a lot of

12   proposals I made and he even told one of his

13   production employees who was trying to help me to

14   identify the problem not to discuss with me anymore

15   about.

16        Q.  Tim Conway told him that?

17        A.  Yeah.  And so I discuss that, I relay that

18   to Mr. Hamilton that I was afraid that there were

19   problems, but they didn't want me to find out, because

20   they didn't want the real yield number to be lower.

21        Q.  Who is they?

22        A.  Mr. Fuhrman.

23        Q.  Well, how does Mr. Fuhrman get in this?

24        A.  And the team, Mr. Conway.

25        Q.  Well, okay.  Excuse me.  Wait.  Let me ask

180

1    you a question.  What you were told -- Mr. Conway told

2    you he didn't want the employees to talk to you?

3              A.  No, no.  I was told --

4              Q.  Somebody told you that Mr. Conway said the

5    employees weren't supposed to talk to you; is that

6    right?

7              A.  That's right.

8              Q.  And Mr. Conway refused to implement some

9    of your suggestions, right?

10             A.  That's right.

11             Q.  How do you get from that, that Mr. Fuhrman

12   didn't want you doing anything about it?

13             A.  Because I couldn't get Mr. Conway to help

14   me to implement those proposals.  So I went to

15   Mr. Fuhrman for support to implement those proposals

16   and he didn't want to support me either.

17             Q.  What did he say?  He told you to work with

18   Mr. Conway, right?

19             A.  That's right.

20             Q.  Isn't that a reasonable response?  I mean,

21   isn't it your job to work with Mr. Conway to get

22   whatever you needed to get done to identify the

23   problem?

24             A.  Yes.  I did and I expect my supervisor to

25   say, yes, if he really wanted to find out a reason, he

1    would try to help me to support my proposal to say,

2    okay, let's implement those proposals to try and find

3    out what the real problem.

4         Q.   I want to make sure I understand something

5    here.  You say that they were underreporting waste

6    material?

7         A.   Yes.

8         Q.   So that there's a difference between the

9    raw material that Bayer purchased and the raw material

10   that the records show had been consumed in production.

11   Is that what you're talking about?

12        A.   That's right.

13        Q.   And so that there's a difference there.

14   There's material that's not accounted for, correct?

15        A.   That's correct.

16        Q.   Now, the practice in the past had been

17   that that would be charged as an expense, that

18   difference, right?

19        A.   That would be write-off.

20        Q.   Right.   In accounting terminology that

21   would be expensed?

22        A.   That's right, yeah.

23        Q.   It would still reduce profitability for

24   the plan?

25        A.   Because those --

1       Q.   Just answer that part of my question.

2   Isn't it true that when you expense that amount, the

3   cost of the missing raw materials, if you will, when

4   you expense that, that still reduces profitability?

5       A.   Yes.   It's very insignificant in that

6   situation, because it's an intercompany transfer of

7   raw material.   The expense very small.   It doesn't

8   make much difference to them and the profit.

9       Q.   The expense -- whatever it is you were

10  charged for the materials per pound that was what was

11  written off or expensed against profits, right?

12      A.   Yes.

13      Q.   Okay.   So you weren't -- this practice

14  wasn't overstating the profitability of the company

15  only the productivity, correct?

16      A.   It'll be overstating the first profit

17  margin, because instead of become a cost of production

18  it went to just an expense mixed with other, you know,

19  expenses.   So at that time production yield was number

20  one of the forecasting film business performance and

21  that's why everyone know and that's how the bonus paid

22  out based on that big portion and that performance

23  there.

24      Q.   Your recommendation was what?   First of

25  all, is it your testimony that you are the person that

1   came up with the idea that the reason there's a

2   variance is because the employees aren't writing down

3   the waste?

4           A.  No.  That's based on what other employees,

5   various employees told me and showed me where all the

6   waste, the scrap are and show me it's not on the crew

7   report and after adding up all those scraps in

8   different places and accounted for and add all those

9   numbers up.

10          Q.  So what difference does it make to

11  Mr. Fuhrman?  I mean, why would he be angry because

12  you identified that the reason for the variance is

13  employees were not writing down waste?

14          A.  Because I recommended him we need to do it

15  properly.  We need to consume those waste against

16  production and that would lower yield tremendously and

17  that will make his performance look even worse,

18  because he had been going through a lot of employee

19  relations problems.

20          Q.  I don't want to talk about that.

21          A.  And this was the only thing that looks

22  good on him.

23          Q.  You're saying it would affect the

24  productivity if you account for the variance by

25  charging it against consumed goods; is that right?

SANDERS, GALE & RUSSELL
(203) 624-4157

1          A.   Yes.

2          Q.   Okay.  Whereas in the past it had been

3    what?

4          A.   Just written off.

5          Q.   Expensed?  Charged as an expense, the

6    variance, right?  Isn't that the right terminology?

7    It had been expensed in the past?

8          A.   Probably, yeah.  I don't remember exactly

9    all the terms we use there.

10         Q.   Okay.  That would reduce your bonus, too,

11   right?

12         A.   That's correct.

13         Q.   It would reduce the bonuses for all the

14   production employees; is that correct?

15         A.   That's correct.

16         Q.   Anybody who was participant in the

17   productivity plus program, right?

18         A.   That's correct.

19                   (Defendant's Exhibit 36, marked for

20                   identification.)

21         Q.   Now the -- let me -- Exhibit 36 is a memo,

22   an e-mail to Tim Romps dated June 28, 2001.  Is this

23   an e-mail that you authored and sent to Mr. Romps on

24   June 28?

25         A.   That's right.

SANDERS, GALE & RUSSELL
(203) 624-4157

185

1          Q.   Now in this e-mail are you reporting to --

2    this is after you've been discharged, a couple weeks

3    later, right?

4          A.   That's correct.

5          Q.   In this e-mail is it a fair summary that

6    you're telling Mr. Romps you think that you were

7    discharged because you, because of your work on

8    identifying the reason for the variances?

9          A.   Yes.

10          Q.   Now why do you think that's why you were

11    discharged or that's a reason why you were discharged?

12    What do you base that on?

13          A.   Because with the order retaliation going

14    on Mr. Fuhrman was already unhappy with me and now I

15    have ask him to let me apply the appropriate

16    accounting procedures, which will totally brought his

17    performance down.  It look pretty bad, because at that

18    time the only thing that he did well was the

19    productivity yield numbers that has been stay so high

20    because of the missing waste never being applied to it

21    directly and that's what really made him look good.

22    But now if I apply that against the production

23    numbers, his performance will become completely almost

24    like, you know, destroyed, because then now production

25    yield was so terrible if we have done it properly and

1    he had all the complaints, employee complaints to

2    Mr. Tim Romps about, you know, all this. So he was

3    going through I would describe a leadership crisis at

4    that site and also in one of the -- I remember in one

5    of the major thing is for the productivity plus payout

6    was safety record and that year we had a very bad

7    safety record and also the sales numbers weren't good

8    at all. So there was really a lot of other areas that

9    were not going too well. This is the only thing that

10    made him look good in his management here for this

11    business group.

12           Q.  So you're saying because it impacted him

13    -- you believe, therefore, because it negatively

14    impacted him that's one reason why you believe that

15    was a factor in your discharge?

16           A.  That's right.

17           Q.  Anything else that leads you to believe

18    that?

19           A.  He might have lost his management bonus

20    payout, too.

21           Q.  Okay.  I mean, isn't that the same thing?

22           A.  Yeah.

23           Q.  Okay.  Well, do you have any other factual

24    facts to support your belief that you were discharged,

25    because you told Rich Fuhrman that you should account

1    for the variance this way rather than a different way?

2        A.  Yeah.  There's some other possible

3    retaliation from him, too, because when I was

4    interviewing candidates to fill that Accounting I

5    position, when I thought Ms. Chin's qualifications

6    were the best match among the other candidates for

7    that position, Mr. Fuhrman and Mr. Telesca wanted me

8    to hire another candidate, which was someone they

9    knew, but I -- that individual did not have the

10   accounting education, has never done inventory

11   control.  I did not feel she was qualified, suitable

12   for this job.  So I insisted hiring Ms. Chen and

13   Mr. Fuhrman never, never forgive me for that, for

14   doing that, for not hiring the other candidate that he

15   wanted instead, you know.  I insisted on hiring Ms.

16   Chen.

17       Q.  Okay.  And somehow you connect that with

18   him firing you, because you, on June 1, informed him

19   that you thought they should account for the variance

20   by charging it to finished goods?

21       A.  These are all the -- I believe these are

22   all the different motivations or drivers made him to

23   retaliate to get rid of me.

24       Q.  Okay.  Do you have any other facts that

25   substantiate or support or lead you to believe that he

SANDERS, GALE & RUSSELL
(203) 624-4157

188

1    fired you, because you informed him that you thought

2    he should change the way you accounted?

3         A.   I think that's all at this moment.

4         Q.   Exhibit 37 is a two-page document.

5              (Defendant's Exhibit 37, marked for

6              identification.)

7         Q.   This was produced to me by your attorney.

8    I'm only going to ask you about page one.   I already

9    asked you about the second page.   What is Exhibit 37?

10        A.   This is May month, the May production and

11   consumption, the raw materials final numbers.

12        Q.   Okay.

13        A.   On the return one there is a 55K reason

14   variance, which mean a 55,000 pounds of the Reisen

15   variance that was missing.   That was how bad that

16   month was.   55,000 pound of the material was missing.

17   That's not reported on --

18        Q.   When you say it was missing, you're saying

19   that it wasn't, that it wasn't accounted -- there was

20   a difference between book inventory and actual

21   inventory, correct?

22        A.   That's correct.

23        Q.   Not that it was stolen or disappeared.

24   Just a variance between book and actual --

25        A.   That's correct, yes.

189

1        Q.   Is that what this --

2        A.   So this is what I -- after talking about

3    production employees, supervisors and we were able to

4    identify a lot of the waste scraps laying on the floor

5    or being put in the dump and after I put all the

6    numbers together I made that 50,000, close to that

7    50,000 pound of the material there that we could

8    identify that was not reported on the crew report and

9    I went to him and I said I need to apply that 50,000

10   pound against the production and which were 64 percent

11   down to -- I don't have the number here -- probably

12   somewhere around 50 something percent that we reduce.

13   That would look really bad.

14       Q.   Okay.  In your complaint in this case

15   you've alleged that you were defamed before you were

16   discharged, that the defendant made statements

17   alleging wrongful behavior on your part and falsely

18   accusing you of battering another employee and of

19   lying.  Were you aware that you had made that claim?

20       A.   Yes.

21       Q.   Let me ask you, first of all, when you say

22   the company had or the defendant had published

23   statements alleging that you had falsified company

24   documents, does that relate to changing the resume,

25   that subject?

SANDERS, GALE & RUSSELL
(203) 624-4157

1          A.    Yes.

2          Q.    Was there any other statements made about

3    you falsifying documents other than with respect to

4    Chin Chen's resume?

5          A.    No.

6          Q.    Do you have any information that that

7    accusation was made by any member of management about

8    you other than within the group of people who were

9    involved in deciding to discharge you?

10         A.    No.

11         Q.    So far as you are aware, only the human

12    resources people and your boss, Rich Fuhrman, knew

13    about that accusation and Chin Chen who was involved

14    in the investigation; is that correct?

15         A.    Yes.

16         Q.    You also state that you were falsely

17    accused of battering another employee.  What does that

18    mean?

19         A.    Of the false accusation of Chin's

20    complaint by poked her.

21         Q.    This says that before you were discharged

22    the defendant falsely accused you of poking Chin Chen.

23    Is that what that means?

24         A.    That's right.

25         Q.    Who accused you of doing that?

```
 1          A.   Because --

 2          Q.   Excuse me.   Who accused you of doing that?

 3          A.   Mr. Fuhrman.

 4          Q.   Did Mr. Fuhrman say you did that or did

 5   Chin Chen say you did that?

 6          A.   I was told first by Mr. Fuhrman.

 7          Q.   What did Mr. Fuhrman tell you?

 8          A.   Say that Chin complain to him that I poked

 9   her.

10          Q.   Now, do you know whether -- Mr. Fuhrman

11   never said to you that I accuse you of poking Chin

12   Chen; is that correct?

13          A.   No.

14          Q.   He just told you that Chin Chen accused

15   you, right?

16          A.   Chin Chen told him, yeah.

17          Q.   Now, do you have any information or basis

18   to believe that Mr. Fuhrman told anyone or that

19   Mr. Fuhrman told anyone else that you had poked Chin

20   Chen?

21          A.   Yes.

22          Q.   Who else did he tell?

23          A.   I don't know.

24          Q.   You don't know if he told anybody else?

25          A.   I don't know who he told to, but I had one
```

192

1    production employee ask me about they learned that

2    Chin and I had an argument after I was discharged.

3    Production employee tried to ask me what's going on

4    and honestly I don't know.

5            Q.   You don't know what? Did the production

6    employees ask you whether you poked Chin Chen?

7            A.   Had a fight.  That's the word he used.

8            Q.   Did he ask you did you have a fight with

9    Chin Chen?

10           A.   Something similar to that kind of -- he

11   said he heard that we had a fight and is that true.

12           Q.   Okay.  Did he tell you who he heard it

13   from?

14           A.   No.  But he was the one that had a lot

15   communication with Mr. Fuhrman.

16           Q.   Well, who was the employee?

17           A.   Dean, D-E-A-N, Spring, S-P-R-I-N-G.

18           Q.   All right.  Now it says that you were

19   falsely accused of lying.  Do you have any basis --

20   other than that, that some employee told you he heard

21   that you had a fight with Chin Chen, do you have any

22   information to suggest that anyone acting on behalf of

23   Bayer Corporation, any person in management or human

24   resources, accused you of battering another employee

25   other than the fact that some production worker told

193

1    you he heard that you had had a fight with Chin Chen?

2            A.    No.   I did not have any contact with

3    anyone from Bayer.

4            Q.    Is the answer no, you have no other,

5    you're not aware of any other, of anybody in a

6    position of authority or human resources accusing you

7    of battering another employee?

8            A.    No.

9            Q.    Okay.   What information do you have that

10   any member of management or someone acting on behalf

11   of Bayer accused you of lying other than statements

12   they made to you?

13           A.    Can you repeat again?

14           Q.    Are you aware of any statements by members

15   of management or people in authority, okay, accusing

16   you of lying that were made other than to you?

17           A.    No.

18           Q.    So you're not aware of anybody telling

19   someone outside of the management chain that you had

20   lied?

21           A.    No.

22           Q.    You have a claim in this case that the

23   defendant, Bayer Corporation, took action with the

24   intent to cause you severe emotional distress.   Are

25   you aware of that?

1        A.   Yes.

2        Q.   Now what -- is there any extreme or

3    outrageous behavior that any employee of Bayer

4    Corporation engaged in with respect to you that you

5    haven't described previously in this deposition today?

6        A.   Not at this moment, no.

7        Q.   Pardon me?

8        A.   Not at this moment.

9        Q.   Well, I need to know.  If something was

10   extreme, outrageous and atrocious that someone did to

11   you, wouldn't you remember it sitting here today?

12       A.   That's the best I can remember now.

13       Q.   You're talking about the things that you

14   have described previously in your testimony?

15       A.   Yes.

16       Q.   What's the basis -- first of all, who do

17   you believe wanted to cause you severe emotional

18   distress?  What persons?

19       A.   Mr. Fuhrman, Mr. Telesca.

20       Q.   And just those two?

21       A.   I believe the corporate HR, Stuart

22   Redshaw.

23       Q.   Stuart Redshaw?

24       A.   Yeah.

25       Q.   Anyone else?

195

```
 1          A.   No.

 2          Q.   Now, Mr. Fuhrman discharged you, right?

 3          A.   That's right.

 4          Q.   And he put some personnel notes in your

 5   file, right?

 6          A.   Right.

 7          Q.   Did he do anything else extreme and

 8   outrageous to cause you emotional distress besides

 9   those things?

10          A.   Yes.  All the comments here and Mr.

11   Telesca made during the meetings that only three of us

12   understood that just upset me so much.

13          Q.   I understand that.

14          A.   I went back to my office, closed door and

15   started crying.  I didn't know what to do.

16          Q.   I didn't hear any testimony about comments

17   Mr. Fuhrman made.  I heard testimony about comments

18   Mr. Telesca made.

19          A.   That's right.  Okay.

20          Q.   Now my question is is there anything else

21   that Mr. Fuhrman did extreme, outrageous, atrocious

22   that you believe was intended to cause you emotional

23   distress besides those things?

24          A.   I can't -- that's the best I can remember

25   now.  That's all I remember now.
```

SANDERS, GALE & RUSSELL
(203) 624-4157

1    Q.  Okay.  Is there anything Mr. Telesca did

2    that you believe was intended to cause you emotional

3    distress other than the sexual harassment incidents

4    that we talked about in the beginning, the remarks he

5    made in the meetings that you've already described and

6    whatever involvement he might have had in putting that

7    disciplinary note in your file?

8        A.  He was making my job so difficult there

9    that I was so worry and fear everyday about everything

10   I do and he also used his power to not, to force me to

11   hire people he wanted to work under me.

12       Q.  How many people did you hire?

13       A.  For example, the opening --

14       Q.  Just give me a number, please.  How many

15   people did you --

16       A.  I hired two.

17       Q.  You hired two people.  One was Chin Chen,

18   right?

19       A.  Yes.

20       Q.  Don Telesca didn't force you to hire Chin

21   Chen?

22       A.  He did force me to hire another employee.

23       Q.  Excuse me.  Did he force you to hire Chin

24   Chen?

25       A.  No.

SANDERS, GALE & RUSSELL
(203) 624-4157

197

1    Q. He opposed your hiring Chin Chen?

2    A. That's correct.

3    Q. And you hired her anyway?

4    A. That's correct.  That's why we have been

5 going through so much retaliation.

6    Q. Excuse me.  Who was the other employee

7 that you contend he forced you to hire?

8    A. Tammy Erickson.  I believe that's the last

9 name.  I am not sure of the spelling.

10    Q. And when did she start working there?

11    A. She started working in early 2001 and I

12 met already four more.  April, May I finally had no

13 choice, because I wasn't giving any opportunity to

14 interview any other employees --

15    Q. So you hired --

16    A. -- or other candidates.

17    Q. You hired two people one of whom you say

18 he forced you to hire.  Anything else extreme and

19 outrageous that Mr. Telesca did that you believe was

20 intended to cause you emotional distress besides what

21 you've described already?

22    A. That's all I can think of now.

23    Q. What did Stuart Redshaw do that was

24 outrageous and extreme that intended to cause you

25 emotional distress?

198

1          A.    After he talk with Rich Fuhrman in October
2     when I walk out Mr. Fuhrman's office and talk to
3     Mr. Geise on my way back to my office, after that he
4     -- after he talk to Mr. Fuhrman he call me,
5     Mr. Redshaw call me and said, told me that I should do
6     whatever the management ask me to do.  I should never
7     question again and the note I file, that's the
8     management's decision and that's it.  The note should
9     stay in my file and I should never question
10    management's decision again and I should do what
11    management ask me to do.  I should never question and
12    in November when he had to come down to our site with
13    Mr. Newhouse to investigate, he was very hostile and
14    unhappy toward me.
15         Q.    No, no.  Tell me what he did or observable
16    conduct.  Don't characterize it.  Did he pull a weapon
17    out?  Did he menace you with his fist?
18         A.    No.  He was very mean instead of his
19    normal cordial smile, courteous.
20         Q.    You are talking about the tone of his
21    voice?
22         A.    Tones of his voice, his attitude.
23         Q.    What did he say that was outrageous and
24    extreme?
25         A.    He kept using the word that I accused the

199

1    management of this and that and I told him I have

2    never accused the management of anything and he use

3    the word and it's so different and just very hostile

4    tone and unfriendly thing throughout the whole

5    investigation.

6        Q.  So he used the word accused.  What else

7    did he do?  I'm not asking for every little petty

8    gripe you have.

9        A.  You are to me.

10       Q.  No.  I'm asking you what extreme,

11   atrocious, outrageous things did Stuart Redshaw do to

12   you that you believe were intended to cause you

13   emotional distress, okay?  That's my question.  Any

14   others besides what you've already discussed in this

15   deposition?

16       A.  He should have investigated before Rich

17   Fuhrman discharged me and giving me a fair opportunity

18   to explain myself or let me see those evidence.  If

19   Rich Fuhrman refused to show me what he had against

20   me, I expected corporate HR to be fair and to be

21   unbiased --

22       Q.  How do you know --

23       A.   -- to give me an opportunity to explain

24   myself --

25       Q.  Do you know --

1        A.    -- to verify my name.

2        Q.    Do you know whether Stuart Redshaw was

3   aware you were going to be fired?

4        A.    According to CHRO fact finding that he was

5   consulted.  Corporate HR -- I guess he say corporate

6   HR was reviewed, has reviewed the information or based

7   on Mr. Fuhrman's information without even --

8        Q.    Anything else extreme and outrageous that

9   he did?

10       A.    That wasn't Bayer's procedure either.

11   Normally from what I have seen while I worked there

12   and from what Bayer's discipline action plan employees

13   are allowed the opportunity to explain themselves and

14   proper investigations to be conducted.  That was a

15   serious, serious, serious -- that's the worst

16   punishment to employees, the termination of the

17   employment opportunity and they did not give me an

18   opportunity.

19       Q.    All right.  I mean you've said that.  I'm

20   asking is there anything else extreme and outrageous

21   that Stuart Redshaw did that you believe was designed

22   to cause you or intended to cause you emotional

23   distress?

24       A.    No.  I can't remember.

25       Q.    Let me look at my notes.  That's all the

201

1  questions I have.

2  CROSS-EXAMINATION

3  BY MR. MUCHINSKY:

4      Q.  I just have one thing to clear up.  Could
5  you look at Exhibit 28, Mei?  On the second and third
6  page of that exhibit when did you prepare that?

7      A.  I prepare this after Monday's conversation
8  with Mr. Fuhrman when we briefly verbally went through
9  the problems of Chin's performance issues and this
10 corrective action plan on May 11.

11     Q.  That was Monday, May 14?

12     A.  May 14.

13     Q.  And in this --

14         MR. MYERS:  I'm sorry, Exhibit 28?

15         MR. MUCHINSKY:  28.

16         MR. MYERS:  Are you talking about

17 the first page or second and third?

18     Q.  Second and third.  When did you discuss
19 the second and third pages with Mr. Fuhrman?

20     A.  We discuss that briefly on Monday morning
21 when he came to me and talk about Chin had gone to him
22 and ask to be laid off because of this issue here.

23     Q.  Monday the 14th?

24     A.  Yes.

25     Q.  Now in number eight, Section 8, in that

SANDERS, GALE & RUSSELL
(203) 624-4157

1    section you state that, you wrote that, "I told her

2    that I was very disappointed how little computer

3    knowledge she has and how slow her computer skill has

4    improved during the past years.  She admitted that she

5    had misled me on her resume and during the interview

6    about her computer skills.  She never had experience

7    with computers before."  Did you tell that to

8    Mr. Fuhrman?

9            A.    I believe so.

10           Q.    And then --

11           A.    Or I --

12           Q.    Did you give him this document?

13           A.    I gave it to him, yes, after I finish this

14   and he wanted this information prior to the next

15   meeting.  So I gave to him prior to the next meeting.

16           Q.    So you did tell Mr. Fuhrman that she lied

17   on her resume or misled you on her resume?

18           A.    Yeah, at one time.  Yeah.  Prior to that

19   meeting he was aware of that and I was just surprised

20   that he wasn't, he didn't really care about that at

21   that time at all.

22           Q.    And on Exhibit 31, six paragraphs, it says

23   Chin stated emphatically?

24           A.    Yeah.

25           Q.    Chin stated that she told you she was not

203

1  good with the computer.  That's what it says here,

2  correct?

3          A.  That's correct, yes.

4          Q.  She didn't say that -- okay.  Not that she

5  didn't -- it doesn't say she never used a computer.

6          A.  That's correct.

7          Q.  That's all I have.

8                  (Whereupon, this deposition was

9                  concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

204

1

2

3

4

5

6

7

8                        _____
                                    MEI ROGUS
9

10                       SUBSCRIBED AND SWORN TO BEFORE ME,

11    the undersigned authority, on this

12    the  _____ day  of  _____, 2003.

13

14                        _____

15

16    My commission expires: May 31, 2005

17

18

19

20

21

22

23

24

25

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to print under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____ day of _____ , 2003

_____
NOTARY PUBLIC

My Commission Expires:
5/2005