COPY                                    1

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2

3    MEI ROGUS                    CIVIL ACTION NO.

4                                 3:02CV1778(JCH)

5         VS.                     SEPTEMBER 19, 2003

6

7    BAYER CORPORATION

8

9            DEPOSITION OF: RICHARD FUHRMAN

10

11   APPEARANCES:

12

13     ROBERT B. MUCHINSKY, ATTORNEY AT LAW
          39 Russ Street
14        Hartford, Connecticut 06106
          (860) 297-0037
15     BY: ROBERT B. MUCHINSKY, ESQUIRE

16

17     ECKERT, SEAMANS, CHERIN & MELLOTT
          600 Grand Street - 44th Floor
18        Pittsburgh, Pennsylvania 15222
          (412) 566-5900
19     BY: JOHN J. MYERS, ESQUIRE

20   Also Present:

21       Mei Rogus

22                   Wendy J. Leard
               Registered Merit Reporter
23                   CSR # 00039

24   NIZIANKIEWICZ & MILLER REPORTING SERVICES
                 972 Tolland Street
25       East Hartford, Connecticut 06108-1533
                   (860) 291-9191

2

1          . . . Deposition of RICHARD FUHRMAN,

2    taken on behalf of the plaintiff in the

3    hereinbefore entitled action, pursuant to the

4    Federal Rules of Civil Procedure, before Wendy J.

5    Leard, RMR, duly qualified Notary Public in and

6    for the State of Connecticut, held at the law

7    offices of Updike, Kelly & Spellacy, P.C., One

8    State Street, Hartford, Connecticut commencing at

9    1:52 p.m., on Friday, September 19, 2003.

10              S T I P U L A T I O N S

11       It is hereby stipulated and agreed by and

12    among counsel for the respective parties that all

13    formalities in connection with the taking of this

14    deposition, including time, place, sufficiency of

15    notice and the authority of the officer before

16    whom it is being taken may be and are hereby

17    waived.

18       It is further stipulated and agreed that

19    objections, other than as to form, are reserved to

20    the time of trial and that the reading and signing

21    of the deposition is not waived.

22       It is further stipulated and agreed

23     that the proof of the qualifications of the

24    notary public before whom the deposition is being

25    taken is hereby waived.

3

1    RICHARD FUHRMAN, Deponent, having first been

2    duly sworn, deposes and states as follows:

3

4    DIRECT EXAMINATION

5    BY MR. MUCHINSKY:

6    Q    As I introduced to you, I'm Robert

7    Muchinsky, Mei's attorney in this matter.

8    Could you state your full name and address

9    for the record, please?

10    A    Richard W. Fuhrman.  76 Westview Terrace,

11    Unionville, Connecticut.

12    Q    And have you ever had your deposition

13    taken before?

14    A    Not in this matter.

15    Q    In any matter?

16    A    Yeah.

17    Q    What was that for?

18    A    That was a former Bayer employee.

19    Q    What was that about?

20    A    He had filed a complaint with -- first

21    EEOC and then with the Department of Labor, I

22    guess, on a wrongful termination.

23    Q    And when was that?

24    A    That happened in -- you're testing my

25    memory.

4

1   Q   That's what we intend to do today.

2   A   I think it was like '98, 1998.

3   Q   Did it go to court?

4   A   No.

5   Q   What happened with the case?

6   A   Well, the EEOC ruled against Mr. Zarabozo,

7   and it was the -- was it workers' comp?  He

8   claimed he was due -- I don't even remember.  But

9   that never went past a couple of hearings.

10   Q   So it was a civil rights complaint in the

11   EEOC?

12   A   Mm-hmm.  Initially, yeah.

13   Q   And then it was workers' comp?

14   A   And then he tried to get into saying he

15   was on disability and we had denied him his

16   disability.

17   Q   Did you take any medication today?

18   A   Yeah.

19   Q   Is it anything that would inhibit your

20   ability to remember?

21   A   No.

22   Q   If you don't understand a question I ask,

23   just tell me; I'll repeat it or rephrase it, try

24   and get it right.  If you answer the question,

25   I'll assume you understood the question.

1          Are you currently employed?

2      A    No, I'm not.

3      Q    When did you leave Bayer?

4      A    January of this year.

5      Q    What was the reason for your leaving

6  Bayer?

7      A    My position was eliminated.

8      Q    And what was your position?

9      A    I was operational excellence coordinator,

10  which was like an internal consulting position.

11      Q    What's your date of birth?

12      A    June 8, 1953.

13      Q    When -- in 2001, when Mei was employed at

14  Bayer, what was your position then?

15      A    I was plant manager.

16      Q    And when did you become operation

17  excellence -- when did you stop being plant

18  manager?

19      A    In May of 2002.

20      Q    And why did you stop being plant manager?

21      A    There was a restructuring, reorganization

22  going on and at the same time this operational

23  excellence initiative was being kicked off.  My

24  reporting relationship changed as plant manager

25  and my new supervisor wanted someone else in that

6

1   position and also saw the operational excellence

2   position as a good fit for me.

3       Q    Who was your supervisor when you were

4   plant manager?

5       A    Initially or when the change occurred?

6       Q    When the change took place.

7       A    Bill Forester.

8       Q    Who was your supervisor before Bill

9   Forester?

10      A    Peter Geise.

11      Q    What happened to Peter Geise?

12      A    I don't know what happened to him.

13      Q    Did he leave or get promoted?

14      A    I heard he left.  I don't -- I know he was

15  still working there when I left.

16      Q    In a different position, though, than he

17  was when you were plant manager?

18      A    He retained his commercial

19  responsibilities.  He was not -- initially he was

20  responsible for the general manager for the film

21  business.  He had both commercial responsibility

22  and manufacturing.  The organization where I

23  started reporting to Forester meant that he only

24  had the commercial responsibilities.

25      Q    Did Tim Conway report to you?

7

1      A    Yes, he did.

2      Q    Is he still at Bayer?

3      A    No, he's not.

4      Q    When did he leave Bayer?

5      A    It was in the spring of this year.  I

6   don't know if it was March or April.

7      Q    Was he restructured or did he go out

8   voluntarily or terminated?

9      A    His position was eliminated.  That's --

10  you know, that's what he told me.

11     Q    Is the workforce down a great deal at

12  Bayer in Berlin?

13     A    Yes.

14            (Plaintiff's Exhibit 1, marked for

15            identification-described in index)

16  BY MR. MUCHINSKY:

17     Q    Let me hand you Plaintiff's Exhibit 1.

18  Can you identify Plaintiff's Exhibit 1, please.

19     A    This is the performance appraisal for the

20  calendar year 1999, Mei's first year.

21     Q    Okay.  Could you turn to the last page,

22  please.

23           How did you -- did you give her this

24  rating?

25     A    Yes.

8

1     Q    The performance appraisal?

2     A    Yes.

3     Q    How did you rate her overall?

4     A    Meets expectations.

5     Q    And you described her as a very dedicated

6 and highly motivated employee?

7     A    Yes.

8          (Plaintiff's Exhibit 2, marked for

9          identification-described in index)

10 BY MR. MUCHINSKY:

11    Q    Plaintiff's Exhibit 2.  Would you identify

12 Plaintiff's Exhibit 2, please.

13    A    This is Mei's performance review for 2000.

14    Q    And this was also done by you?

15    A    Yes, it was.

16    Q    And how did you rate her overall in 2000?

17    A    Meets expectations.

18    Q    And did you also describe her as an

19 extremely dedicated and reliable employee?

20    A    Yes, I did.  I also talk about some of her

21 areas requiring development.

22    Q    We'll get into that.

23    A    Okay.

24        MR. MYERS:  Let me ask, can we call this

25     like 1 Fuhrman, Fuhrman 2, the exhibit

1    numbers, so that we don't get confused?  Just

2    put the name on the bottom of it.  Because

3    we've got three.  We now have three

4    Exhibit 1s, one defendant and two

5    plaintiff's.  If we can just call it

6    Plaintiff's 1 and then write his name.

7            MR. MUCHINSKY:  Why don't we call it 2F,

8    1F, 3F?  No, we'll do Fuhrman.

9            MR. MYERS:  We just need to write it

10    underneath there.

11            (Plaintiff's Exhibit 3, marked for

12            identification-described in index)

13    BY MR. MUCHINSKY:

14    Q    Plaintiff's Exhibit 3 Fuhrman.  Can you

15    identify Exhibit 3 Fuhrman.

16    A    This was a letter of reprimand that I

17    issued to Mei.

18    Q    What was this about?

19    A    Mei had wanted to -- herself and her

20    accounting clerk, to attend a training session in

21    Pittsburgh, and she had asked me about it.  And I

22    told her that "One of you could go but not both.

23    I didn't want to spend the money for both of you

24    to attend."

25            And she came back several times and tried

10

1    to make the pitch for both of them to go, and I

2    said no.

3           And I came in one morning and she told me

4    that she had made nonrefundable plane reservations

5    for both herself and Helen to attend, and I

6    considered that insubordination.

7           As it turns out, from my checking with the

8    travel agent, the reservations were refundable so

9    I not only had insubordination, I had a case where

10   she lied to me.

11   Q    This was investigated by corporate, right?

12   A    No, not -- subsequent to my letter being

13   issued and Mei complained about it, corporate came

14   in and investigated it.

15   Q    And what did they find out?  Or what did

16   they determine?

17   A    Well, they found a technicality.

18   Basically they wanted -- since Mei was so upset

19   about it, they wanted to find a way to take it out

20   of her file.  So if I remember right -- because at

21   one point Mei asked me if it would be okay if she

22   attended while on vacation, I said that, you know,

23   "You can do whatever you want on your own time."

24              (Plaintiff's Exhibit 4, marked for

25              identification-described in index)

11

1    BY MR. MUCHINSKY:

2        Q    Let me hand you Exhibit 4, which is

3    Fuhrman 4.  Let me call your attention to page 3.

4        A    (Reviewing document)

5            MR. MYERS:  First of all, could you ask

6        him to identify it.

7    BY MR. MUCHINSKY:

8        Q    Why don't you identify that, sir.

9            Would you identify it --

10       A    Oh, I'm sorry.

11       Q    -- Fuhrman 4.

12       A    This is the writeup of the investigation

13   of Mei's complaint.

14       Q    Now, weren't the investigators surprised

15   at a disciplinary action?

16           MR. MYERS:  Objection.  He would have no

17       way of knowing what's in their mind.

18   BY MR. MUCHINSKY:

19       Q    Well, look on page 3.

20       A    (Reviewing document)

21           Again, my conversations with Stuart

22   Redshaw after this was all over was he told me

23   that he did this -- he felt the same as I did but

24   in order to put the thing to bed and to not -- to

25   try to satisfy everyone, that he would write this

12

1    up and take this action.

2        Q    Did you see this report of February 10?

3        A    Yes.

4        Q    Fuhrman 4?

5        A    Mm-hmm.

6        Q    When did you see it?

7        A    I probably saw it within a couple of days

8    of February 10.

9        Q    And did you -- what did you do after you

10   got this report?

11       A    I did what the recommendations were.  I

12   took this letter out of her file and put a

13   handwritten note basically counseling her as

14   stated in point number 1 of the recommendations.

15               (Plaintiff's Exhibit 5, marked for

16                identification-described in index)

17   BY MR. MUCHINSKY:

18       Q    Let me hand you Fuhrman 5.  Is that the

19   handwritten note?

20       A    Yes, it is.

21       Q    Now, the date on the note is January 26,

22   2000.

23       A    Right.

24       Q    The order is February 10.

25       A    Probably what happened is Stuart talked to

13

1    me and he, you know, gave me this verbally before

2    he wrote up the report.

3        Q    Did Mei come to object to your letter of

4    January 26, 2000, at some time?

5        A    I think so, but I don't remember details

6    about that.

7        Q    What is this notation in the middle of

8    Plaintiff's Exhibit 5, Fuhrman 5?

9        A    That is a Post-it note that I put on

10   the -- her original handwritten document and put

11   it on Don's desk, on Don Telesca's desk, to put in

12   her file.

13       Q    And it was put in the file with the

14   Post-it note on it?

15       A    Evidently.

16       Q    Was that your intention?

17       A    Not necessarily.

18       Q    Did you ever discuss that with

19   Mr. Telesca?

20       A    Why the Post-it note was left on?

21       Q    Yes, because it mentions insubordination.

22       A    No, I didn't.

23       Q    Is there a -- or was there a policy at

24   Bayer for different kinds of rep -- different

25   levels of reprimands?

14

1        A    There is a policy.

2        Q    What is that policy, or was that policy?

3        A    Bayer has a policy of progressive

4   discipline where generally you start with a --

5   with counseling, you go along to a verbal warning,

6   and then written warning, and -- but during any of

7   the process, depending on the severity of the

8   infraction, you can skip one or more of those

9   levels.

10       Q    And you considered this one a severe

11  infraction?

12       A    Yes, I did.

13       Q    In fact, you called it a severe reprimand,

14  didn't you?

15       A    Yeah.  If I had one of my staff that lies

16  to me and disagreed -- or disobeys a direct order,

17  I think that's pretty serious.

18       Q    And this is the same woman who a month

19  earlier you called a dedicated and highly

20  motivated employee?

21            MR. MYERS:  Well, I'm going to object.

22            MR. MUCHINSKY:  Object to what?

23            MR. MYERS:  To the argumentative nature

24       of the question, and also note that I don't

25       know where you get the month earlier.

15

1          MR. MUCHINSKY:  Let's see.  This was --

2      right.  I stand corrected on that.  It's

3      three months later.

4          MR. MYERS:  Is your question is the Mei

5      on this note the same Mei as on that

6      performance evaluation?  Is that what you

7      want to know?

8          MR. MUCHINSKY:  Yes.

9   BY MR. MUCHINSKY:

10     Q     I'm just surprised at the severity of the

11  letter and then a few months later you rate her as

12  a highly dedicated and motivated employee.

13     A     Well, the -- I think she is high -- she

14  was highly motivated and dedicated.  I think she

15  was very headstrong and she could be argumentative

16  and that's where I talk about "based on some

17  isolated incidents that occurred in 2000."

18     Q     Okay.  What was the issue of -- strike

19  that.

20          Do you recall a time when you discussed

21  with Mei that she made an issue of Don Telesca's

22  expense reports?

23     A     Yes, I do.

24     Q     What was that all about?

25     A     Mei was trying to apply different

1    standards to Don's expense account reporting than

2    everyone else at the site.

3        Q    In what way?

4        A    By requiring documentation of backup of

5    expenses that she wasn't requiring of other

6    people.

7        Q    Were you aware she discussed this with

8    Harry Kilvanik at corporate?

9        A    Yeah, after this all came to the front.

10            (Plaintiff's Exhibit 6, marked for

11            identification-described in index)

12   BY MR. MUCHINSKY:

13       Q    Let me give you this, Fuhrman 6.

14       A    (Reviewing document)

15       Q    Apparently these e-mails took place

16   around June 22, 2000, and June 23, 2000, where

17   Mei was discussing this with -- who is Harry

18   Kilvanik?

19       A    I think he's the corporate controller.

20       Q    Did Mei discuss this, the fact that she

21   talked to the corporate controller, with you?

22       A    Yeah, but I don't remember when.

23       Q    And at some time you put another note in

24   her file regarding this incident, didn't you?

25       A    Right.

17

```
 1              (Plaintiff's Exhibit 7, marked for

 2              identification-described in index)

 3     BY MR. MUCHINSKY:

 4         Q    Take a look at this.

 5         A    (Reviewing document)

 6         Q    Could you identify Plaintiff's Exhibit

 7     Fuhrman 7.

 8         A    It's a record of a counseling session I

 9     had with Mei.

10         Q    Was she aware you put this note in her

11     personnel file?

12         A    I'm not sure.

13         Q    What prompted you, on July 27, to write

14     this and put this in her file?

15         A    Because there was a ongoing history of

16     problems like this, and I needed to keep a

17     document, keep a record of them.

18         Q    After the problem and after the incident

19     in June, was there another one between June 22 and

20     July 27?

21         A    Not that I remember.  June 22 was the --

22     was what?

23         Q    When she discussed it with Harry Kilvanik.

24         A    Okay.  I don't -- I would think that the

25     discussion with Harry took place after my
```

18

1 discussion with Mei, but I don't know for sure.

2  Q I guess my question is, Why wait so long?

3   You had a discussion with Mei in late June

4 or early July, why wait until the 27th to put this

5 in her --

6  A I had a lot going on.  I mean --

7  Q Was there anything else going on --

8  A Things slip my mind and then I come back

9 and remember that I needed to do something.

10  Q Why did you feel the need to do this?

11  A Because I felt with Mei's history of

12 stubbornness and some of the other things that

13 happened, I needed to document these incidents.

14  Q What else was going on with her at the

15 time?  July of 2000.

16  A I don't know.

17  Q Were you -- what was the issue with Mei

18 over the line 9 installation?

19  A About issuing a purchase order before we

20 had the capital approved, is that what you're

21 referring to?

22  Q That's right.

23  A I forget who Mei first complained to, but

24 basically what we did was we had verbal approval

25 of this project.  And we were under a very tight

19

1   time schedule, and I got the approval to go ahead

2   and issue the purchase order for the long lead

3   items, which is commonly done.

4       Q    And what happened?

5       A    Again, I don't remember for sure how it

6   came to my attention that Mei complained about it,

7   but I think it heard it first from Peter Geise.

8       Q    What did he tell you?

9       A    Something about that Mei had complained

10  about not following policy or that we were doing

11  something that wasn't appropriate by issuing the

12  purchase order when we did.

13      Q    What's the policy on issuing purchase

14  orders before approvals?

15      A    I don't know that I have ever seen a

16  policy, a written policy, but again, I know it's

17  commonly done frequently; you order something on

18  an expense purchase order and then, when it comes

19  time to pay the bill or when the project gets

20  approved, you transfer the expense.

21      Q    Were those discussions going on in July of

22  2000?

23      A    I really don't remember.  I don't remember

24  when that discussion was.

25      Q    And what was the final result of this note

20

1  of July 27, 2000?  Was it removed from her file?

2    A    I'm not sure.  I don't think so.

3        (Plaintiff's Exhibit 9, marked for

4        identification-described in index)

5  BY MR. MUCHINSKY:

6    Q    Plaintiff's Fuhrman -- Exhibit 9 Fuhrman.

7    A    (Reviewing document)

8    Q    Just take a minute and look at Exhibit 9

9  Fuhrman and see if you can identify that.

10    A    This is the writeup of an investigation on

11  complaints about being asked to do inappropriate

12  tasks.

13    Q    Turn to the second page, the middle

14  paragraph, please.  Just take a minute and read

15  that.

16    A    (Reviewing document)

17        Okay.  I didn't remember that.

18    Q    Does that refresh your recollection?

19    A    Mm-hmm.

20    Q    Do you know if it was taken out of her

21  file, if Plaintiff's Exhibit 7 Fuhrman was taken

22  out of her personnel file?

23    A    I can't say for sure now that it was.  I

24  would think that I would have taken it out.

25    Q    And it was corporate's recommendation that

21

1      it be taken out?

2              MR. MYERS:  When you say "corporate,"

3          are you talking about Mr. Redshaw?

4              MR. MUCHINSKY:  I'm talking about

5          Mr. Redshaw.

6      BY MR. MUCHINSKY:

7          Q      Was it Mr. Redshaw's recommendation that

8      the note be taken out of her personnel file?

9          A      Yeah, he's recommending that.

10         Q      Do you know if Bayer had a policy against

11     an employee helping an applicant secure a job at

12     Bayer?

13         A      I don't know whether there's a policy on

14     that.  I also don't know whether there's a policy

15     on -- I wouldn't think it's appropriate for an

16     employee to give help to one candidate and not

17     give the same kind of help to another candidate.

18         Q      Don't employees recommend people for hire?

19             MR. MYERS:  Are you talking about any

20         employees or the hiring manager?

21             MR. MUCHINSKY:  I'm just asking if there

22         was a policy.

23             MR. MYERS:  Well, the question was "is

24         there a policy" and he answered your

25         question.

1           THE WITNESS:  Yeah, I don't know.

2    BY MR. MUCHINSKY:

3       Q    When did you decide to terminate Mei?

4       A    I don't remember the date.  I'm sure you

5    have documentation that has all that.

6       Q    Let me give you the termination letter.

7               (Plaintiff's Exhibit 11, marked for

8               identification-described in index)

9    BY MR. MUCHINSKY:

10      Q    This is Plaintiff's Exhibit 11, Fuhrman.

11   Just take a minute and read that.

12      A    (Reviewing document)

13          MR. MYERS:  Did you have an 8 that you

14      marked?

15          MR. MUCHINSKY:  I don't think I used it.

16          MR. MYERS:  Okay.

17          MR. MUCHINSKY:  I took some out.

18          MR. MYERS:  I just wanted to make sure I

19      didn't miss it.

20   BY MR. MUCHINSKY:

21      Q    Does that help you recall when Mei was

22   terminated?

23      A    Mm-hmm.

24      Q    Well, when did you decide to terminate

25   her?

23

1      A     I decided to terminate her after the

2  investigation, I had the results of the

3  investigation and consulted with Stuart Redshaw.

4  I don't remember the date.

5      Q     Who did the investigation?

6      A     Denise, I believe.  Denise Church-Ball.

7      Q     Did you participate in the investigation?

8      A     To the extent that I had information that

9  pertained to it, yeah.

10      Q     What did the investigation consist of?

11      A     Talking with Chin, looking at e-mails and

12  dates of e-mails and other communications.

13      Q     And what was the reason that she was --

14  that Mei was terminated?

15      A     Serious misconduct, which was the

16  falsification of a candidate's resume.

17      Q     You stay "substantially enhanced the

18  resume of the candidate."

19      A     Mm-hmm.

20            (Plaintiff's Exhibit 22, marked for

21            identification-described in index)

22  BY MR. MUCHINSKY:

23      Q     I hand you Plaintiff's Exhibit 22 Fuhrman.

24      A     (Reviewing document)

25      Q     Can you identify 22 Fuhrman.

24

1       A     This looks like a record of a conversation

2   with Chin, myself, Denise, and Mei.

3       Q     Do you know who compiled this record, who

4   wrote this?

5       A     Denise.

6       Q     Denise Church-Ball?

7       A     Yeah.

8       Q     Did Chin tell you that she didn't have any

9   computer skills or that she had poor computer

10  skills or not so good computer skills, do you

11  recall?

12      A     When we interviewed her or at this time?

13      Q     No, at this time.

14      A     Yes, she did.

15      Q     What did she tell you regarding that?

16      A     She told me that she didn't have good

17  computer skills and she told Mei that before she

18  was hired.

19                  (Plaintiff's Exhibit 24, marked for

20                  identification-described in index)

21  BY MR. MUCHINSKY:

22      Q     I hand you a record of a June 8 meeting.

23      A     (Reviewing document)

24      Q     In here, in the fifth paragraph down, it

25  states that "Chin stated emphatically that she

25

1    told Mei she was not good with a computer and Mei

2    said don't worry about it."

3         Do you see that?

4    A    Yes.

5    Q    Did Chin tell you that she never laid her

6    hands on a computer?

7    A    She didn't tell me that, no.

8    Q    Did Mei ever tell you that Chin was very

9    poor with a computer?

10   A    I don't remember.  She may have when -- as

11   part of the writeup she did for Chin, pointing out

12   the areas where she needed to improve.

13   Q    And when was that?

14   A    I don't remember the date.

15              (Plaintiff's Exhibit 21, marked for

16              identification-described in index)

17   BY MR. MUCHINSKY:

18   Q    Is this the writeup you were just

19   discussing?

20   A    Yes.

21         MR. MYERS:  Well, excuse me.  It's

22      Plaintiff's Exhibit 21.  Give him a chance to

23      look through.

24         MR. MUCHINSKY:  Absolutely.

25         MR. MYERS:  I think we know these are

1        two different documents, that's why I'm

2        asking.

3    BY MR. MUCHINSKY:

4        Q    I'll ask you about that.

5             Have you seen both of these documents

6    before or the first page and the second two?

7        A    I'm sure I have.  I don't remember them.

8        Q    Did Chin come to you with the first page

9    of Plaintiff's 21?

10       A    Again, you're going back a long time, but

11   I think that's how I first found out about this.

12   I think she came to me with this, very upset.

13       Q    And do you recall what she said to you?

14       A    Not specifically.

15       Q    Do you recall what you did next after

16   receiving this document?

17       A    I think that I went to Mei and expressed

18   my surprise that she issued this document to Chin

19   without my knowing anything about it since, from

20   the time we hired Chin, I had concerns about her

21   being able to do the job.  I favored the other

22   candidate, and Mei all along told me that Chin was

23   doing fine, that everything's coming along fine.

24            And then Chin showed me this and I said,

25   "Well, where did this come from?"

1        So I went and talked to Mei and I said,

2   "Okay.  If this is the case, if Chin really is

3   having all these problems, we need to set up a

4   development plan."

5        Q    And did you ask Mei to provide some more

6   examples?

7        A    That's what this looks like, but I don't

8   remember that.  I may have.  I don't remember.  It

9   might have been -- may have been in preparation to

10  develop an improvement plan.

11       Q    Take a look at paragraph or Section 8.

12       A    Section 8?

13       Q    Yeah, it's on the last page.

14       A    (Reviewing document)

15            Okay.

16       Q    Did you have any reason not to believe

17  Mei -- that statement that Mei made in Section 8?

18       A    Only that Chin had told me that she told

19  Mei that she didn't have computer skills.  So I

20  knew that someone -- someone wasn't being honest

21  with me.

22       Q    Did you ever consider why would Mei hire

23  somebody to work for her who was incapable of

24  working for her?

25       A    We had a lot of discussions when it came

1   down to selecting the candidate and, like I said,

2   I was in favor of another candidate.  Mei wanted

3   to hire Chin, and she told me that she's well

4   qualified, that the only way Oriental people can

5   be given a chance is if you give them a chance;

6   otherwise, you know, no one will ever hire you.

7           So I think -- well, I don't know.  I mean,

8   I was really surprised that Mei preferred Chin

9   over the candidate also.  The other candidate knew

10  the Bayer accounting systems.

11      Q    Knew the what?

12      A    Knew the Bayer accounting systems, could

13  have come right in and started doing a big part of

14  the job.

15          And I had -- you know, I had concerns

16  about Chin's communication skills, her ability

17  with English.  Mei said that's not a problem, she

18  can communicate fine.

19          And I knew that if I insisted we bring in

20  the other candidate, that she wouldn't have a

21  chance working for Mei.

22      Q    So here you are on June 8, 2001, and

23  you've got two different versions of a story.  How

24  do you determine who's lying?

25      A    Well, Chin had brought in an e-mail, a

29

1   copy of an e-mail that she got from Mei.  Now, I

2   don't remember when that was, but that was a part

3   of the investigation that brought us to the

4   conclusion that Mei was lying.  It was an e-mail

5   from Mei to Chin saying that she had made changes

6   to the resume.

7        Q     Okay.  Let's see if I have that.

8              (<u>Plaintiff's</u> Exhibit 16, marked for

9              identification-described in index)

10  BY MR. MUCHINSKY:

11       Q     This is Plaintiff's Exhibit 16 Fuhrman.

12  I'll give you this first and ask you to look at

13  that.

14       A     (Reviewing document)

15       Q     Do you recall receiving this from Chin?

16  "This" being Plaintiff's Exhibit 16.

17       A     I'm sure I did.  I don't remember

18  exactly --

19       Q     Do you see that little note on top?

20       A     Yeah.

21       Q     Is that your writing?

22       A     I think it is.

23       Q     It says "Received 5-30"?

24       A     Yes.

25       Q     "Chin's original resume"?

30

1    A    Yes.

2    Q    Okay.  You can put that down.

3         Now, this morning, Chin testified that she

4    gave you a copy of an e-mail from Mei and -- let

5    me give you the resume first.

6              (Plaintiff's Exhibit 18, marked for

7              identification-described in index)

8    BY MR. MUCHINSKY:

9    Q    Plaintiff's Exhibit 18, Fuhrman.

10   A    (Reviewing document)

11   Q    Now, Chin testified this morning that you

12   had a copy of this resume that I've just handed

13   you.  Did you have a copy or did she give you a

14   copy?

15   A    I think she gave me a copy.

16   Q    That's what I think, too.

17        Now, let me give you one more, Plaintiff's

18   Exhibit 17 Fuhrman.

19             (Plaintiff's Exhibit 17, marked for

20             identification-described in index)

21             (Witness reviewing document)

22   BY MR. MUCHINSKY:

23   Q    Now, is that the e-mail that -- you can

24   take a minute to read it.

25   A    (Reviewing document)