31

1          Yeah, that looks like an e-mail that Chin

2     brought to me.

3          Q    Now, Chin, this morning, testified that

4     she just gave you this e-mail, she didn't give you

5     the attachment.  Is that your recollection?

6          A    I don't remember.

7          Q    Well, you remember the e-mail?

8          A    She definitely gave me the e-mail.  I

9     don't remember if she gave me the resume.  I know

10    I've seen the resume.

11         Q    Which one?

12         A    The second one; the one that was changed,

13    that added the computer skills and changed the

14    school.

15         Q    Now, if you read the e-mail, the third

16    paragraph down, Mei's statement to Chin, it says

17    "I added Computer skills in the Strengths.  (I

18    changed Summary of Qualifications to Strengths)

19    section.  Please add any application that you

20    know."

21         Now, isn't she requesting of Chin to put

22    on her resume any computer application that she

23    may know?

24         A    Yeah, or it could be any additional

25    applications.

32

1  Q  Well, that's not what it says.

2  A  I don't know.

3  Q  Can you tell me where Chin's resume was

4 substantially enhanced?  Chin's original, which is

5 Exhibit 16?

6  A  Well, I would consider the addition of

7 computer skills, when she says that she was very

8 weak in computer skills, that would be a

9 substantial enhancement.

10  Q  But this isn't the resume that she was

11 hired under.

12    MR. MYERS:  Excuse me, I'm sorry.  Would

13  you --

14    MR. MUCHINSKY:  It's number 17.

15    MR. MYERS:  You want the final?

16    THE WITNESS:  Yeah, this is the one --

17  I'm presuming this is the one --

18    MR. MYERS:  This is the final. (Handing)

19    THE WITNESS:  Oh, okay.

20    (Reviewing document)

21    Okay.  I don't know which one she was

22  hired under.

23 BY MR. MUCHINSKY:

24  Q  Well, the two resumes that you had to look

25 at were, according to Chin this morning, were

33

1   Exhibit 16, her original --

2           MR. MYERS:  Now wait a minute.  Get

3       Exhibit 16.

4           THE WITNESS:  It's right here.

5           MR. MYERS:  No, you're looking at the

6       wrong one.

7           THE WITNESS:  Right.

8   BY MR. MUCHINSKY:

9       Q    Okay.  And the -- and Exhibit 18.

10          MR. MYERS:  That is this one.

11          THE WITNESS:  I don't know.  I don't

12      know whether this is the one or if it's one

13      of these other ones.

14          MR. MYERS:  Okay.  What's your question?

15      I agree, that's what Chin said this morning.

16  BY MR. MUCHINSKY:

17      Q    Who does -- who submitted Exhibit 18 to

18  the company?

19      A    I don't know.  I have not seen an e-mail

20  from this person so I don't know whether I have

21  seen this resume or not.

22      Q    In your investigation around June 8, did

23  you see the resume contained in Plaintiff's

24  Exhibit 17?  That's the middle one.

25          MR. MYERS:  Isn't that what you asked

34

1          him before?

2                 THE WITNESS:  Yeah, I'm not sure

3          which --

4                 MR. MUCHINSKY:  He said he saw it, but I

5          don't know whether he saw it then.

6                 THE WITNESS:  I'm not sure which of the

7          enhanced resumes I saw.

8     BY MR. MUCHINSKY:

9          Q     As compared between Chin's original,

10    number 16, and number 17, take me through the

11    enhancements.

12         A     Well, I'm sure I saw 16.  It doesn't list

13    any computer skills and it says "Shu Kuang Girl's

14    High School."

15         Q     Okay.

16         A     That one I saw.  Between -- well, I've got

17    two copies of this, that's what's confusing me.

18                Between 18 and 17, I'm not sure which one

19    I saw.

20         Q     Now, this morning, Chin also testified

21    that she went to a commercial high school.  So

22    that statement, as far as commercial high school,

23    she testified that she made that change.  Am I

24    correct on that?

25                MR. MYERS:  I'm not sure that's exactly

1       it, but --

2               MR. MUCHINSKY:  Something to that

3       effect.

4               MR. MYERS:  She did testify that she

5       went to a high school, to the commercial part

6       of the girls' high school, as I understand

7       it.

8   BY MR. MUCHINSKY:

9       Q    Now, did you ask Mei about this e-mail

10  of -- what's contained in Exhibit 17?

11      A    No.

12      Q    Why not?

13      A    Well, I asked her -- I didn't ask her -- I

14  didn't mention this e-mail.  I asked her about

15  whether she had made any enhancements or any

16  changes to Chin's resume but I did not mention

17  this e-mail.

18      Q    Why not?

19      A    I don't know.

20      Q    Did you show her any of the documents that

21  you were relying on to terminate her?

22      A    I don't think so.

23      Q    Why was that?

24      A    Well, I was advised by HR not to do that.

25  I saw some value in doing that, just to see how

36

1   Mei would respond, but I was told not to do that.

2      Q    Who told you not to do that?

3      A    Stuart.

4      Q    Is there a policy on how investigations

5   should be conducted?

6      A    I don't -- on how?  I don't think so.

7      Q    When you read this e-mail --

8           And you did read it back then, didn't you?

9      A    (No audible response)

10     Q    -- did you question Chin about it?

11     A    When she brought me the e-mail, we had a

12  relatively short conversation about it.  I asked

13  her these questions that she confirmed to me, yes,

14  that Mei did make these change, that she told Mei

15  she didn't have computer skills and Mei changed

16  the resume.

17     Q    But you only had this e-mail?

18     A    I don't remember whether I had the resume.

19     Q    Did you question Chin as to why the

20  attachment wasn't with the e-mail?

21     A    I don't think so.  I don't know if I

22  had -- I may have had the attachment.  I don't

23  remember.

24     Q    Well, according to Chin this morning, you

25  had the final version of it.

1          MR. MYERS:  Okay.  I think you're being

2     argumentative.  I object.

3          MR. MUCHINSKY:  Go ahead.

4          MR. MYERS:  That's not a question, so I

5     object to the form.

6   BY MR. MUCHINSKY:

7     Q    Reading this e-mail now -- strike that.

8          How would you characterize this e-mail

9   now?

10         MR. MYERS:  I don't understand what you

11     mean.

12  BY MR. MUCHINSKY:

13    Q    When I read this, it seems like a request

14  to add an application -- computer application that

15  you know.  I don't see how you could read this as

16  falsifying --

17         MR. MYERS:  I object to that.  I think

18     that's an entirely inappropriate and

19     argumentative question.

20         Do you want me to explain it to you?

21     MR. MUCHINSKY:  No.

22         MR. MYERS:  Okay.  Well, if you want to

23     ask him a question about facts, that's fine,

24     but I don't think it's appropriate for you to

25     argue with him.

38

1          MR. MUCHINSKY:  I'm just trying to see

2     if he's changed his mind after a couple

3     years.

4          MR. MYERS:  Then why don't you ask him

5     that.

6          MR. MUCHINSKY:  I mean, reading this

7     now --

8          MR. MYERS:  Can we take a two-minute

9     break?  Or five-minute break?

10          MR. MUCHINSKY:  Sure.  Absolutely.

11          MR. MYERS:  I mean, is this an okay

12     time?  Do you want to finish this line?

13          MR. MUCHINSKY:  No, go ahead.

14               (Whereupon a recess was

15                held off the record.)

16          MR. MUCHINSKY:  Back on the record.

17     BY MR. MUCHINSKY:

18     Q    Let's go back to Exhibit 24, please, which

19     is the June 8, 2001, meeting.

20          What was the result of the June 8 meeting?

21     You can take a minute and look at the back to

22     refresh your recollection.

23     A    (Reviewing document)

24          Well, the result of that was Mei was

25     suspended pending the investigation.

39

1    Q    Okay.  And she left the building at 3:50?

2    A    That's what it says.

3    Q    And was there an investigation?

4    A    Yeah.

5    Q    Exhibit 11?

6         MR. MYERS:  Is that one you already

7    marked?

8         MR. MUCHINSKY:  Yes.  It's the

9    termination letter.

10  BY MR. MUCHINSKY:

11   Q    Now, this was mailed on June 11, 2001,

12  correct?  Or it was written on June 11, 2001.

13   A    Right.

14   Q    Now, June 8, it says here in Exhibit 24,

15  was a Friday.  So was the investigation done over

16  the weekend?

17   A    I didn't head up the investigation, but I

18  know that there was discussions late that Friday

19  night -- Friday afternoon, Friday night, and first

20  thing Monday morning.

21   Q    And who held those discussions?

22   A    Denise, Stuart, I know Bill Klemick, who

23  is the labor attorney in Pittsburgh.

24   Q    How do you know there were discussions?

25   A    Because I -- Denise's office is right

40

1    across the hall from mine and I was there late and

2    I know Denise was there late and I -- she checked

3    in with me periodically, I checked in with her.

4         Q    Did she tell you anything about those

5    discussions?

6         A    That -- I don't remember exactly, but I'm

7    sure all the documents that we had were circulated

8    among the people who were going to be involved in

9    making -- in reaching a conclusion in the

10   investigation.

11        Q    And then on Monday, the 11th, who came to

12   you to say they made a decision to terminate Mei?

13        A    I don't remember if it was Denise or

14   Stuart.  It may have been a conference call with

15   the three of us and Bill Klemick.  I don't

16   remember exactly, but I remember getting the

17   recommendation and the approval to terminate her.

18        Q    Was that with Mr. Redshaw?

19        A    Yes, Stuart Redshaw.  Yes.

20        Q    Is that when he told you not to show Mei

21   the evidence you had?

22        A    No.  I asked him that question before

23   we -- before this meeting here, the June 8

24   meeting.

25        Q    Did he say why he didn't want you to show

41

1    her the evidence?

2        A    He didn't see any reason to.

3        Q    Did he say that?

4        A    I don't remember if those were his exact

5    words.

6        Q    Did you call Mei on -- did you call Mei

7    and terminate her on the phone?

8        A    Yeah.  If I remember right, I -- she

9    wasn't home when I called.  I talked to her

10    husband and asked him to have her call me when she

11    got back.

12        Q    And did she?

13        A    Yeah.

14        Q    And what did you tell her?

15        A    I told her "The investigation is complete

16    and you're being terminated for serious

17    misconduct."

18        Q    Do you know if any other employees were

19    talked to besides Chin?

20        A    Talked to about what?

21        Q    During the investigation.

22        A    I can't think of any.  Not that I know of.

23    I'm sure I was keeping Peter Geise informed of

24    what was going on.

25        Q    Anybody in finance at corporate?

42

1    A    Not by me.  I'm not sure whether anyone at

2    Pittsburgh talked to them.

3         (Plaintiff's Exhibit 25, marked for

4         identification-described in index)

5    BY MR. MUCHINSKY:

6    Q    I hand you Plaintiff's Exhibit 25 Fuhrman.

7    Take a moment and look at that, please.

8    A    (Reviewing document)

9    Q    Have you seen Plaintiff's Exhibit 25

10   before?

11   A    Yes, I have.

12   Q    Who is Tim Romps?

13   A    He's the corporate ombudsman.

14   Q    Did he contact you regarding Exhibit 25?

15   A    No, he didn't.

16   Q    Who did?  If anybody.

17   A    I think it was Ray Newhouse.

18   Q    Who is Ray Newhouse?

19   A    He's the division controller.

20   Q    And did anyone from his office or the

21   ombudsman's office ever investigate?

22   A    Yeah, they sent in an internal auditor to

23   do an investigation.

24   Q    Who was that?  Do you recall who that was?

25   A    I can't remember his name.

43

1    Q    He was from Ray Newhouse's office?

2    A    No, he was from the internal auditing

3  group.   There was a corporate staff level.

4    Q    Okay.

5    A    Staff department.

6    Q    And was there ever a published result of

7  that investigation?

8    A    Yes, there was.

9    Q    What was the result?

10    A    The result was that until we could confirm

11  what the source of the variance was, that it

12  should be charged to yield.

13    Q    Was the source ever determined when you

14  were there?

15    A    No.

16    Q    When you were the plant manager --

17         Was it plant manager or production

18  manager?

19    A    Plant manager.

20    Q    -- what was your salary level?

21    A    Base was about 125.

22    Q    And what was your bonus arrangement?

23    A    Well, the bonus was -- for my level, the

24  target bonus was 8 percent.

25    Q    Did Mei suggest to you on June 1 or about

44

1    June 1 any answers to the cause of the scrap, the

2    resin scrap variance problem?

3        A    I don't remember the date.  I know we had

4    a number of discussions about the source of the

5    variance.

6        Q    What was the discussion about?  What was

7    the source?

8        A    Well, there were several sources that it

9    could be and we were never able to find which one

10   it was.

11       Q    Do you remember the ones you discussed?

12       A    We discussed underreporting scrap, we

13   discussed finished goods being overreported, and

14   we discussed incoming raw materials being

15   overreported.

16       Q    If it was underreported scrap, who would

17   do the underreporting?

18       A    The operators.

19       Q    The shift operators?

20       A    They're the ones who reported the scrap.

21   They collected the scrap and weighed it.

22       Q    What was Mei's solution that she reported

23   to you sometime around June 1?

24       A    I think Mei wanted to charge all the

25   variance to the yield.

45

1      Q     And did you do that?

2      A     No.  Not at that time.

3      Q     Why not?

4      A     Historically, the total variance was

5    written off.  It was expensed off as a loss.

6            When I became plant manager, I wasn't

7    comfortable with that and, in fact, we started

8    charging a portion to yield and a portion written

9    off.  The reason I wasn't comfortable with writing

10   off the full amount was because the productivity

11   plus or the bonus program for the nonE-level

12   people, one of the measures there was yield and

13   stream time.

14           There were a number of measures that

15   affected the mathematical calculation of what

16   their bonus would be, and since the target was

17   based on historical numbers, I didn't think it was

18   right to change the way we were reporting the

19   number because it would have taken a big hit.

20     Q     The bonus would go away.

21     A     Yes.

22     Q     What are E level, executive level?

23     A     Yes.  They're not eligible for

24   productivity plus.

25     Q     What are the criteria for the executive

46

1    level bonuses?

2     A    I don't know.  I think it's a dart board.

3     Q    But the target is 8 percent?

4     A    The target for my level is 8 percent,

5    yeah.  The higher the level, the higher the

6    target.

7     Q    In your -- did you get yearly reviews?

8     A    Mm-hmm.

9     Q    Did you get target goals you had to hit --

10     A    Mm-hmm.

11     Q    -- to get a bonus?

12        MR. MYERS:  You should verbalize an

13     answer rather than saying "mm-hmm."

14        THE WITNESS:  Yeah.

15        MR. MYERS:  She can't take that down.

16        THE WITNESS:  Okay.  The calculation --

17     the way my bonus was calculated wasn't

18     defined, but we had goals that --

19     subjectively there would be judgments made on

20     overall performance and that would determine

21     the bonus, as far as I know.

22        I mean, you'd have to ask my boss or

23     someone else who was determining bonuses if

24     there was any objective way of doing it.

25   BY MR. MUCHINSKY:

1    Q    At some time did you tell Mei Rogus to

2   stop calling the ombudsman with complaints?

3    A   No, I didn't tell her to stop calling.

4   What I asked her to do is that if she has concerns

5   about what I or anyone else at the plant is doing,

6   that she bring them to my attention first and give

7   me a chance to work out -- work them out without

8   getting other people involved outside of the

9   plant.  But I didn't tell her to stop calling.

10    Q   Okay.  And you don't remember who from

11  corporate investigated that ombudsman complaint?

12    A   The auditor?

13    Q   The name didn't pop back to you, the

14  auditor?

15    A   It's a funny last name.  I think his first

16  name was Gary.

17    Q   Gary auditor.

18       MR. MUCHINSKY:  Okay.  Let me just check

19     my notes here.

20       (Pause in the proceeding)

21  BY MR. MUCHINSKY:

22    Q   One thing I did forget to ask you.  Whose

23  decision was it to keep Chin?

24    A   To keep Chin when?

25    Q   Employed, back in 2001, January of 2001.

48

1      A    When all the areas she didn't improve?

2      Q    No, when you discovered there were

3   untruths on her resume.

4      A    Oh.  It was a consensus of Denise, Stuart,

5   myself, Bill Klemick.

6      Q    What was discussed?

7           MR. MYERS:  I'm going to ask the witness

8       not to disclose any discussions that involved

9       Bill Klemick since he was corporate counsel.

10          MR. MUCHINSKY:  All right.

11          MR. MYERS:  But independent of

12      discussions which he was involved in, you

13      should answer the question.

14          THE WITNESS:  Okay.  The discussion was

15      the severity of what Chin did and whether it

16      was a terminable offense.

17   BY MR. MUCHINSKY:

18     Q    What did Chin do?

19     A    Chin submitted a resume that Mei had

20   enhanced.

21     Q    That Mei had enhanced?

22     A    That was our conclusion, yeah.

23     Q    Did you think or conclude that Mei wrote

24   the final resume, which is Exhibit 18?

25     A    No, that she had made the additions that

49

1    she said in her e-mail that she had done.

2        Q    We talked about that.  Okay.

3            MR. MUCHINSKY:  That's it.

4            MR. MYERS:  I just have a couple

5        follow-up questions.

6

7            CROSS-EXAMINATION

8    BY MR. MYERS:

9        Q    Mr. Fuhrman, were you -- did you

10   participate in the productivity plus bonus program?

11       A    No, I wasn't eligible.

12       Q    So that the bonuses you were talking about

13   historically or -- excuse me, that the other

14   people at the plant would get and would be

15   affected by the variance being charged to finished

16   goods, that was the productivity plan plus bonus?

17       A    That's right.

18       Q    Your bonus was determined by your boss,

19   the target amount as well as what factors would be

20   looked at?

21       A    The target amount is a corporate standard

22   based on your level.

23       Q    The 8 percent.

24       A    Right.

25       Q    Okay.  And that's the maximum you could

50

1    get in bonus, correct?

2        A    No, that's target.

3        Q    That's the target?

4        A    Yes.  You can go above or below that.

5        Q    Okay.  The criteria that are applied to

6    determine whether you get a bonus, do they include

7    both corporate-wide as well as personal

8    objectives?

9        A    I don't know the criteria.

10       Q    Was Chin given any form of disciplinary

11   action?

12       A    If I remember correctly, there was a

13   letter put in her file.

14       Q    A warning?

15       A    Warning about --

16       Q    Reprimand?

17       A    Right.

18       Q    In the meeting of June 8, do you recall

19   Ms. Rogus indicating that there was another Bayer

20   employee involved in helping Chin with her resume?

21       A    Yeah.  I don't remember that specific

22   discussion, but it's documented here.

23       Q    Do you recall Ms. Rogus -- do you recall

24   trying to find out from Ms. Rogus who that

25   individual was?

51

1    A    Yeah.    She wouldn't give us any

2    information on that.

3    Q    Had she disclosed the identity of that

4    person, would you have followed up, checking,

5    talking to that person, as part of your -- or

6    would you have expected HR to follow up and

7    discuss with that person as part of their

8    investigation?

9    A    Yeah, that's why we wanted to know who it

10   was.

11            MR. MYERS:    That's all I have.

12

13            REDIRECT EXAMINATION

14   BY MR. MUCHINSKY:

15   Q    Just a couple follow-up.

16        Did you ask Chin who the person was that

17   Mei wouldn't reveal?

18   A    I didn't ask her.    I don't know whether

19   anyone else did.

20   Q    That would seem like a pretty important

21   question.    You never questioned anybody on that?

22   A    No, I didn't.    Again, I was basing my

23   conclusion basically on the e-mail that I saw.

24   Q    And you just said that the 8 percent bonus

25   was a target, it could be below or above that.

52

1    A    (No audible response)

2    Q    How high could it go?

3    A    I don't know how high it could go.

4    Q    Sky is the limit?

5    A    Probably not.  Not with Bayer.  But I

6    don't know what the top is.

7            MR. MUCHINSKY:  Any other questions?

8    BY MR. MUCHINSKY:

9    Q    What was the largest bonus you ever

10   received, percentage-wise?

11   A    I got around -- somewhere around 11

12   percent one year.

13           MR. MUCHINSKY:  Okay.

14           MR. MYERS:  All right.  You have the

15      opportunity to read through the transcript

16      after it's been prepared and to correct any

17      errors that may have been made and then to

18      sign off on it.  On the other hand, you can

19      waive reading and signing and simply take

20      whatever the stenographer happens to put down.

21           It would be my recommendation that you

22      read and sign the transcript.

23           THE WITNESS:  Yeah, I'd rather do that.

24           (Whereupon the witness was dismissed and

25            the deposition concluded at 3:28 p.m.)

53

I N D E X

------------------------------------------------

WITNESS                         RICHARD FUHRMAN

------------------------------------------------

| DIRECT | CROSS | REDIRECT | RECROSS |
|--------|-------|----------|---------|
| 3*     | 49**  | 51*      |         |

\*   By Mr. Muchinsky        \*\*  By Mr. Myers

------------------------------------------------

EXHIBIT            DESCRIPTION                PAGE

------------------------------------------------

Plaintiff's Exhibit 1, a 1999 performance
   review                                      7

Plaintiff's Exhibit 2, a 2000 performance
   review                                      8

Plaintiff's Exhibit 3, a Dec. 8, '99, memo
   with attachments                            9

Plaintiff's Exhibit 4, a Feb. 10. '00, memo   11

Plaintiff's Exhibit 5, a one-page
   handwritten note dated 1/26/00             12

Plaintiff's Exhibit 6, a 6-23-00 e-mail       16

Plaintiff's Exhibit 7, a one-page typed note  17

Plaintiff's Exhibit 9, a Nov. 29, '00, memo   20

Plaintiff's Exhibit 11, a June 11, 2001,
   letter                                     22

Plaintiff's Exhibit 22, a typed note dated
   May 25, 2001                               23

54

```
1    --------------------------------------------------

2    EXHIBIT              DESCRIPTION              PAGE

3    --------------------------------------------------

4    Plaintiff's Exhibit 24, a three-page typed
        note dated June 8, 2001                    24
5
     Plaintiff's Exhibit 21, a three-page
6       internal memoranda dated May 11, 2001      25

7    Plaintiff's Exhibit 16, a two-page resume     29

8    Plaintiff's Exhibit 18, a Nov. 17, '99,
        e-mail with an attachment                  30
9
     Plaintiff's Exhibit 17, a Nov. 16, '99,
10      e-mail with an attachment                  30

11   Plaintiff's Exhibit 25, a one-page letter
        dated June 28, 2001                        42
12

13

14

15           (The original exhibits were
             retained by Attorney Muchinsky.)
16

17               *  *  *  *  *  *  *  *

18

19

20

21

22

23

24

25
```

1    C E R T I F I C A T E   O F   D E P O N E N T

2

3        I, RICHARD FUHRMAN, have read the foregoing

4    transcript of the testimony given and it is true

5    and accurate to the best of my knowledge as

6    originally transcribed and/or noted on the

7    attached Errata Sheet.

8

9                        _____

10                            RICHARD FUHRMAN

11

12        Subscribed to and sworn to before me on

13   this _____ day of _____ , 2003.

14

15                        _____

16                            Notary Public

17   My Commission expires:

18   _____

19
     3:02CV1778(JCH)
20

21   MEI ROGUS

22   -vs-

23   BAYER CORPORATION

24   RICHARD FUHRMAN - SEPTEMBER 19, 2003

25   WJL

1    STATE OF CONNECTICUT

2    COUNTY OF TOLLAND

3         I, Wendy J. Leard, a Notary Public for the

4    State of Connecticut, do hereby certify that the

5    deposition of RICHARD FUHRMAN, a witness, was

6    taken before me pursuant to Section 243, et seq,

7    of the Connecticut Practice Book, at the law

8    offices of UPDIKE, KELLY & SPELLACY, P.C., One

9    State Street, Hartford, Connecticut, commencing at

10   1:52 p.m., on Friday, September 19, 2003.

11        I further certify that the deponent was first

12   sworn by me to tell the truth, the whole truth,

13   and nothing but the truth, and was examined by

14   counsel, and his testimony stenographically

15   reported by me and subsequently transcribed as

16   herebefore appears.

17        I further certify that I am not related to

18   the parties hereto or their counsel, and that I am

19   not in any way interested in the event of said

20   cause.

21        Dated at Somers, Connecticut, this 30th day

22   of September, 2003.

23                          Wendy J. Leard
24                          Notary Public

25   My Commission Expires May 31, 2007