UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MEI ROGUS, | : | Civil Action No. |
| Plaintiff, | : | 3:02CV1778(MRK) |
| | : | |
| v. | | |
| | : | |
| BAYER CORPORATION, | | |
| Defendant. | : | December 31, 2003 |

**MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Plaintiff, Mei Rogus, provides this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment on all of Plaintiff's claims. For the reason's set forth below, Defendant is not entitled to judgment as a matter of law and there exist genuine issues to be tried.

**STATEMENT OF THE CASE**

The Plaintiff, Mei Rogus, a former employee of the defendant, Bayer Corporation brought this action for monetary and equitable relief against the defendant, Bayer Corporation. The Complaint alleges five causes of action; (First Count), Wrongful Termination in Violation of Public Policy, (Second Count), Sexual Harassment in Violation of the Connecticut Fair Employment Practices Act (CFEPA) Section 46a-60 (a)(1)(8), (Third Count), Retaliation in Violation of the CFEPA, Section 46a-60(a)(4), (Fourth Count), Intentional Infliction of

Emotional Distress and (Fifth Count) Defamation. The matter was initially filed with the Superior Court of the State of Connecticut and removed by the Defendant on October 8, 2003.

## STATEMENT OF MATERIAL FACTS

Plaintiff was employed by Bayer Corporation (hereinafter "Bayer") in its Berlin, Connecticut location from April 5, 1999 to June 13, 2001. (Plaintiff Affidavit ¶ 3). Plaintiff's position at Bayer was Plant Controller. (Plaintiff Aff. ¶ 4). Bayer AG is a publicly traded company and is listed and traded on the New York Stock Exchange, symbol BAY. (Plaintiff Aff. ¶ 5). Plaintiff reported to Richard Fuhrman, the Plant Manager. (Plaintiff aff. ¶ 6, Rogus Depo. 34).

### *Sexual Harassment Claim*

Shortly after Plaintiff was hired, during the months of May, June and July of 1999, Bayer's Human Resources Manager, Donald Telesca, engaged in a number of acts directed at the Plaintiff because of her gender. (Complaint ¶ 10). Mr. Telesca would comment to Plaintiff about her looks and appearance every time he would talk to her. (Complaint ¶ 10 B). On two occasions Mr. Telesca touched the Plaintiff inappropriately. (Complaint ¶10 B, Plaintiff Aff. ¶ 10). Plaintiff reported Mr. Telesca's behavior to Mr. Fuhrman. (Complaint ¶10 C). Mr. Telesca stopped the physical contact as well as the comments of physical appearance, however from July 1999 on, Mr. Telesca was hostile toward the Plaintiff. (Complaint ¶10 E). Mr.

Telesca's conduct toward the Plaintiff continued and in January 2001, Mr. Telesca ridiculed Plaintiff during a business meeting. (Complaint 10 D, Rogus Deposition 51). Both Mr. Fuhrman and Mr. Telesca openly laughed at the Plaintiff in front of her peers. (Rogus Deposition 54-55). In April of 2001 a comic strip was placed on the Plaintiff's office door, which stated "I am the newest sadist in the accounting department". (Rogus Deposition 58-60). Although the sexual comments and touching had stopped, the hostile treatment of Plaintiff continued.

### *Retaliation Incidents*

The first reported incident of retaliation of December 8, 1999 concerned a severe written letter of reprimand concerning behavior Mr. Fuhrman described as insubordinate. The Plaintiff had not countermanded Mr. Fuhrman's directive about a business trip in December 1999. (Rogus Affidavit ¶ 6). Mr. Fuhrman also knew, prior to writing the letter of severe reprimand that the Plaintiff had not lied to him. Mr. Fuhrman had inquired of Helen Kjellquist, the Senior Accounting Clerk who worked directly for the Plaintiff, about the incident. (Defendant's Exhibit "5"). Mr. Fuhrman inquired of Ms. Kjellquist as to whether both the Plaintiff and Helen were approved to go on the trip. Mr. Fuhrman found out from Ms. Kjellquist "that I [Fuhrman] had approved one of them and that on Friday, it was going to be Mei, and on Monday she [Kjellquist] was informed that she would be going". (Defendant's Exhibit "9" page 3). Despite this knowledge Mr. Fuhrman still put the damaging letter in the Plaintiff's personnel file. In

fact, at his deposition, Mr. Fuhrman testified that he called it a severe reprimand because Plaintiff had lied to him. (Fuhrman Deposition 14). However, Mr. Fuhrman knew that Plaintiff had not lied. Mr. Fuhrman further told the Plaintiff "I told Mei, that the letter would stand and that a response would be attached to the letter and both placed in the file. I told her that if there were not other infractions of this type for six months both would be removed from the file." (Defendant's Exhibit "9" Page 3; Exhibit "10" page 1; Rogus Deposition 69-74).

Plaintiff complained to the Corporate Ombudsman, Tim Romps, and Stewart Redshaw Corporate Human Resources Manager who investigated the Plaintiff's complaint. Redshaw recommended that the letter of reprimand be removed from Plaintiff's file and replaced with a verbal warning in the form of a note to her file to counsel her. (Rogus Deposition 72-73, Defendant's Exhibit "11").

Fuhrman did not comply with Redshaw's recommendation to replace the insubordination letter with a hand written letter of counseling. On the handwritten note (Defendant's Exhibit "11") Mr. Fuhrman attached yet another note, the additional note stated "Don, please put this document in Mei's file and return the insubordination letter to me, Rich". The result of this additional note attached to the counseling note was to convey to any future party looking at the file that there had been an accusation of insubordination against the Plaintiff by Mr. Fuhrman.

The Plaintiff did suffer an adverse employment consequence. Because of her pleas to the Corporate Ombudsman for fair treatment she was ultimately terminated. (Rogus aff. ¶ 24).

In February of 2000, Mr. Fuhrman told the Plaintiff that with so many production employees having contacted the Ombudsman complaining about so many issues, that since Plaintiff is a member of the management team, it did not reflect well on him that the Plaintiff also contacted the Corporate Ombudsman. However, the Plaintiff had attempted to discuss her disagreement with Mr. Fuhrman over the severe reprimand letter to no avail. (Rogus Deposition 64-66). In fact, even after Redshaw's recommendation that the severe reprimand letter be removed from the Plaintiff's file, Mr. Fuhrman retaliated against the Defendant with his "insubordination note". (Defendant's Exhibit "11").

On July 27, 2000, Mr. Fuhrman secretly placed another note in Plaintiff's personnel file regarding an incident that took place prior to June 22, 2000. (Fuhrman Deposition 17, Fuhrman Exhibit "7"). The note concerned a belief that Mr. Fuhrman had that the Plaintiff was applying a different standard pf review to Donald Telesca's expense report than those standards she used for others. (Fuhrman Deposition 15-19).

On June 22, 2000 and June 23, 2000 the Plaintiff was communicating with Harry Kilvanick. (Fuhrman Exhibit "6"). Harry Kilvanick was Bayer's Corporate Controller. (Fuhrman Deposition 16). Mr. Fuhrman knew that the Plaintiff had talked to Mr. Kilvanick (Fuhrman Deposition 16). Furthermore, Mr. Fuhrman had looked at the expense report of others and found no unequal treatment, in fact, the Plaintiff offered to review every employee's expense report with Mr. Fuhrman and compare the procedures used to review with those used on Mr. Telesca's expense report. (Plaintiff Affidavit ¶ 7). Despite having this information Mr.

Fuhrman, without the knowledge and notification to the Plaintiff, placed yet another warning letter in the Plaintiff's file. (Complaint ¶ 12 E., Rogus Deposition 79-80). Plaintiff found the July 27, 2000 note along with the substituted January 2000 note (Fuhrman Exhibit "5") in October of 2000 when she was going through her personnel file. (Rogus Deposition 73, 80).

Plaintiff complained to Peter Geise, Fuhrman's superior who disagreed with Plaintiff. (Rogus Deposition 81, 86). Plaintiff objected and Ray Newhouse, a Vice President of Finance, conducted an investigation. (Rogus deposition 86, 95-96). The investigation regarding the July 2000 note uncovered several other requests from Fuhrman, Geise and Telesca to circumvent procedures, which Plaintiff believes gave Mr. Fuhrman and Mr. Telesca additional reasons for retaliating against her. (Rogus Affidavit ¶ 8). At the conclusion of the investigation Stewart Redshaw offered a confidential report. (Fuhrman Exhibit "9"). The report was dated November 29, 2000 and it concluded that the July 2000 note should be removed from the Plaintiff's personnel file. It did not address the January 27, 2000 note. The report also considered the Plaintiff's complaint about the continued behavior of Don Telesca towards the Plaintiff and that "on occasions his behavior toward her had been inappropriate, confrontational and uncooperative". (Fuhrman Exhibit "9").

Stewart Redshaw's report of November 29, 2000 indicates that as of the end of 2000 the hostile behavior of Don Telesca towards the Plaintiff was still ongoing. Plaintiff's reason for believing the reprimand counseling letters were retaliatory is not that she assumed that Mr. Telesca was involved in issuing them; it is that Mr. Fuhrman told her that Mr. Telesca had

endorsed issuing the reprimand letter. Defendant's Exhibit "9" at Page 3, Rogus Deposition states in the first paragraph "She [Rogus] asked whether Don endorsed issuing such a serious letter. "I [Fuhrman] replied that he had". While Mr. Fuhrman may never have criticized Plaintiff openly for her sexual harassment complaint, Plaintiff believes that Mr. Fuhrman was on a witch-hunt looking for ridiculous reasons to write her up and put notes in her file without her knowledge. (Rogus Deposition 96).

Shortly after the July 27, 2000 note, at a business meeting where the subject was the rewarding of employees who have gone out of their ways to do their jobs, Telesca again held the Plaintiff out to ridicule in front of her business associates and stated "Mei you don't count." (Rogus Deposition 54, 56-58). (Rogus Affidavit ¶ 9).

In January of 2001 at a business meeting in front of the management team (Defendants Exhibit "5") and less than two months after the issuance of Redshaw's November 29, 2000 report, which was critical towards Mr. Fuhrman and Mr. Telesca, Mr. Telesca taunted the Plaintiff by stating that "even Miss America is trying to claim credit for business success." Only Mr. Fuhrman, Mr. Telesca and the Plaintiff knew what "Ms. America" meant and how the Plaintiff felt about it. Mr. Telesca and Mr. Fuhrman sarcastically laughed at the Plaintiff. (Rogus Deposition 54, 56). Three months later in April 2001, and only two months before the Plaintiff's termination, a comic strip was put on the Plaintiff's office door, which stated "I am the newest sadist in the accounting department". (Rogus Deposition 58, 60). Another example of the hostile environment the Plaintiff endured.

### *Plaintiff's Discharge from Employment*

The Plaintiff was discharged on June 13, 2001. The reason alleged for the discharge was that the Plaintiff had falsified company documents and that she was found to have substantially enhanced the resume of an applicant for an Accountant 1 position. (Defendant's Exhibit "18"). Plaintiff believes that it was retaliation for her past complaints and that Mr. Fuhrman had been waiting for an opportunity to get rid of Plaintiff. When Mr. Fuhrman found out that Chin Chen was so desperate to get a job that she lied to get it, he enlisted her to help him get rid of Plaintiff. (Rogus deposition 140).

Chin Chen was initially rejected but begged the Plaintiff for a chance. (Chin Chen Deposition at 29). Plaintiff gave Chin Chen a chance thinking that no one would ever hire Orientals unless someone gives them a chance. (Fuhrman Deposition 28). Plaintiff did not want to hire the other candidate that was referred by Mr. Telesca and Mr. Fuhrman because the other candidate did not have an accounting education. (Rogus Deposition at 187).

Plaintiff had never discussed her problems with Don Telesca regarding sexual harassment with Chin Chen. Chin Chen told the Plaintiff in October of 2000 that Cliff Chen had told her everything about Don Telesca and his harassment of the Plaintiff. (Rogus Affidavit ¶ 11).

Plaintiff had asked Cliff Chen, who worked at another Bayer location, to keep an eye out for her to see if he knows anyone who is interested in the position of Accountant 1 at the Berlin location. He could not find the posting on the Bayer posting system so Plaintiff sent him the job

description for the Accountant 1 position. Cliff Chen recommended Chin Chen for the position stating that he thought she was an ideal candidate. He told Plaintiff that she had the required experience, education and skills for the position. (Rogus Deposition 106). The person that Mr. Telesca and Mr. Fuhrman wanted to hire, someone they both knew, did not have an accounting education and had never done inventory control. Plaintiff did not feel that she was qualified or suitable for the job. (Rogus Deposition 187). During the interview process Plaintiff provided Chin Chen with a copy of the standard interview questions that would be asked of her and she explained them in Chinese and English so that Chin Chen fully understood the terms. (Rogus Deposition 111-112).

### 1. The Changes Made To Chin Chen's Resume Were Minor And Insignificant.

The Plaintiff suggested to Chin Chen that she change the phrase "have demonstrated excellent attention to detail, organization and management" to "excellent attention to detail and strong organizational and management skills". (Rogus Deposition 115-116). (Defendant's Exhibit "22" and "23". Plaintiff discussed Chin Chen's qualifications with her before suggesting that anything be changed on the resume. Plaintiff also talked to Chin Chen and Cliff Chen about Chin Chen's qualifications. (Rogus Deposition 113-116). On the sample resume that Plaintiff sent to Chin Chen (Defendant's Exhibit "23"), the Plaintiff asked Chin Chen to add any computer applications that *she might know* and to list them on her resume. (Rogus Deposition 115). The Plaintiff also discussed the school that Chin Chen attended in Taiwan

where she received her Accounting training. (Rogus Deposition page 114). Shu Kuang Girls School has two parts to it, a normal school and commercial school. (Chin Chen Deposition 15-16, 21). Ms. Chen went to the commercial High School for three years. (Chen Deposition 21). Ms. Chen made the change on her resume from Shu Kuang Girls School to Shu Kuang Commercial School. (Chen Deposition 25). The Shu Kuang Girls School is in fact both a commercial and a normal high school and has had an accounting program since it's founding. (Rogus Affidavit ¶ 12). Chin Chen also stated that the CHRO Fact-Finding that Cliff Chen made the changes in her final resume. (Rogus Affidavit ¶ 17).

Chin Chen also sent Plaintiff a draft of her thank you note. Plaintiff made only minor suggestions such as a comma or period to the letter. (Rogus Deposition 124, Exhibit "26", Rogus Affidavit ¶ 16). Chin Chen stated that Plaintiff asked her to make a thank you note and send it to Mr. Telesca and Mr. Fuhrman. (Chin Chen deposition 27-28). Chin Chen wrote it and sent it to Plaintiff to make sure that it was okay. (Rogus Deposition 124). Cliff Chen thanked the Plaintiff for hiring Chin Chen. (Rogus Deposition 128-129).

"Horse-horse, tiger-tiger" is a Chinese expression that in America can be translated into "so-so". (Rogus Deposition 123). In the Chinese culture, the way people express themselves if they do something well and asked how well they may know a subject, they usually say "horse-horse, tiger-tiger". This is a humble way of expressing oneself. (Rogus Deposition 123).

When Plaintiff met with Chin Chen in April 2001 because of the problems with her performance Plaintiff testified that Chin Chen told her in this meeting that she had never

Page 10 of 34

touched a computer before. Plaintiff then accused her of lying in her resume, Plaintiff said that Chin Chen apologized and said that it was Cliff Chen's idea to lie so that she can get the job. (Rogus Deposition 141-142). However, Denise Church Ball's memorandum of the June 8th meeting stated that Chin Chen stated emphatically that she told Mei she was not good with the computer, not that she had never touched a computer. (Defendant's Exhibit "31" and "34" to Rogus Deposition). Plaintiff testified that if she had known that Chin Chen had no computer skills at all she would never have been interviewed. However, she told Plaintiff that her computer skills were not very good, which meant to Plaintiff that she had some computer skills. (Rogus Deposition 165).

On May 11th Plaintiff met with Chin Chen and gave her a corrective action plan. (Rogus Deposition 144-145, Exhibit "28"). Chin Chen asked to be laid off. (Rogus Deposition 145). When the Plaintiff suggested that Chin Chen look for other opportunities within the company Chin Chen declined. (Rogus Deposition 147, Chin Chen Deposition 35). Chin Chen then went to Mr. Fuhrman and asked to be laid off after Plaintiff declined to lay her off. (Rogus Deposition 145-146). At that time Chin Chen made a complaint to Mr. Fuhrman about the Plaintiff poking her, however, at the CHRO Fact-Finding Conference Chin Chen did not know the difference between poking and pointing. (Rogus Affidavit ¶ 18). Plaintiff denied that she ever physically touched or poked Chin Chen. (Defendant's Exhibit "30", Rogus Affidavit ¶ 18).

Cliff Chen had told Plaintiff that Chin Chen's computer expertise were "horse-horse, tiger-tiger" or "so-so". (Rogus Deposition 122-123). During the interview Chin Chen had told

Plaintiff that she had taken computer classes at Ziao-Tung University, which is a reputable university in Taiwan and is known for its expertise in computers and information technologies. (Rogus Affidavit ¶ 13).

After Chin Chen's meeting with Mr. Fuhrman, Chin Chen gave Mr. Fuhrman Plaintiff's email suggesting changes to Chin Chen's resume. (Fuhrman Deposition 31). She had printed it out from her computer at home. (Chin Chen Deposition 53). The email given to Mr. Fuhrman did not contain the icon that alerts one to an attachment. (Rogus Affidavit ¶ 19). Mr. Fuhrman compared the final resume to Chin Chen's original resume without the benefit of seeing the suggested changes. (Chin Chen Deposition 57-61). Plaintiff was never shown the evidence against her so she could not explain it. (Rogus Deposition 160). The result of the meeting on June 8th was that Plaintiff was suspended, however, she explained to the investigator, Denise Church Ball, that Mr. Telesca and Mr. Fuhrman had been on a witch-hunt to get rid of her for two years in retaliation against her for her complaints and she wanted to make sure that the investigation would be unbiased. Ms. Church Ball promised her an opportunity to present her side of the story, however Plaintiff was never given that opportunity. (Rogus Deposition 162).

Plaintiff has testified that she did not want to get Cliff Chen involved because he was in a very fragile condition and she was concerned that if Cliff Chen was brought into the investigation that his medical condition might worsen and might even kill him. (Rogus Deposition 136-137). She was also concerned about his long-term disability benefits. However, Cliff Chen's name had already been brought into the investigation. (Rogus Deposition 136-137).

Fuhrman represented to Chin Chen that the investigation was still ongoing on Monday June 11, 2003 following the Friday June 8th meeting. (Chin Chen Deposition 44-45). However, Plaintiff's email had already been taken down from the system on Monday morning following the June 8th meetings. (Chin Chen Deposition 45-46).

2.     **Inventory Variance Issue**

On June 1, 2001, Plaintiff met with Fuhrman and told him that the reason for the variance they had been experiencing between actual and book inventory numbers was that production employees were not reporting all the waste materials on their daily production reports. Plaintiff's position was that this variance should be applied against production yield and not expensed. This would have resulted in lower productivity performance figures. (Rogus Deposition 176-177, Fuhrman Deposition 44-45).

While Mr. Fuhrman was the person who had directed the Plaintiff to investigate the reason for the variances, he did not support her efforts to resolve the variance problem. (Rogus Deposition 179). Production Manager Tim Conway, who works for Mr. Fuhrman (Defendant's Exhibit "5"), told one of his production employees who was trying to help Plaintiff identify the variance resin problem not to discuss it with her anymore. (Rogus Deposition 178-179, Jewczyn Affidavit ¶ 8).

The difference in raw materials that were purchased and the raw materials, which were used in the cost of production, had not been traditionally charged as an expense. (Rogus

Deposition 181-183). It had been improperly charged as an expense. (Rogus Deposition 181-183). When Mr. Fuhrman was Plant Manager and while Plaintiff was Plant Controller, Mr. Fuhrman did not authorize the correct charge off of the scrap resins to reduce the percentage of production yield. The first time that it was done properly was after an audit from Bayer's Headquarters in Pittsburgh following the Plaintiff's complaint in July of 2001 after her termination. (Rogus Affidavit ¶ 22).

Mr. Fuhrman participated in a bonus program. He had been going through a lot of employee relations' problems. (Rogus Deposition 183, Cruz Affidavit ¶ 9). Mr. Fuhrman was going through a leadership crisis at the Berlin site and if yields were reduced his management bonus might have been affected. (Rogus Deposition 186).

Plaintiff did report her conclusions to employees other than Mr. Fuhrman. Chris Hamilton was the Senior Procurement Coordinator at Bayer's Berlin site. (Rogus Deposition 179, Rogus Affidavit ¶ 23, Hamilton Deposition 4). Plaintiff told Mr. Hamilton that the source of the variance was the under-reporting of scrap by production employees. (Rogus Deposition 176-178).

# ARGUMENT

## *Summary Judgment Standard*

Summary judgment is appropriate when the evidence demonstrates "there is no genuine issue as to any material fact as to moving party entitled to judgment as a matter of law". Fed. R. Civ. P. 56(c); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574. 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159 (1970); see also *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (Court is required to "resolve all ambiguities and draw all inferences in favor of the non-moving party"), cert. denied, 506 U.S. 965 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58F.3d 865, 872 (2d Cir. 1995).

Summary judgment is proper "[o]nly when reasonable minds could not differ as to the import of the evidence". *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991); see also *Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable" or "it is not significantly

probative", summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts is material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonably jury could return a verdict for the non-moving party." Id. at 248.

The Second Circuit has held, however, that summary judgment is a procedural mechanism particularly ill suited for deciding discrimination cases because employers rarely memorialize any discriminatory intent, and such intent must therefore be ascertained through circumstantial evidence and evaluation of witness credibility. See *Chertkova v. Connecticut General Life Ins. Co.*, 92 F. 3d 81, 87 (2d Cir. 1996) ("since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination."). The Second Circuit has stated that a district court should exercise particular caution when deciding whether summary judgment should issue in an employment discrimination case. *Carlton v. Mystic Transportation Inc.*, 202 F. 3d 129, 134 (2d Cir.), cert