denied 120 S.Ct. 2718 (2000); *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F. 3d 1219, 1223 (2d Cir. 1994). In particular, at the summary judgment stage when intent is at issue, the court must carefully scrutinize the depositions and affidavits for circumstantial evidence that, if believed, would show discrimination. *Gallo*, 22 F. 3d at 1223.

### A. PLAINTIFF HAS PLEAD A VIOLATION OF PUBLIC POLICY SO AS TO STATE A CLAIM FOR WRONGFUL TERMINATION OF AN AT-WILL EMPLOYEE.

In Connecticut, the landmark case of *Sheets v. Teddy's Frosted Foods*, 179 Conn. 471, 475 (1980) provides an exception to the employment at-will doctrine when a former employee can show a "demonstrably improper reason for dismissal, a reason where impropriety is derived from some important violation of public policy." The tort of wrongful termination permits recovery by dismissed employee only when the dismissal violates a clear expression of public policy. *Morris v. Hartford Courant Co.*, 200 Conn. 676, 513 A.2d. 66 (1986); *Battista v. United Illuminating*, 10 Conn. App. 486, 523 A.2d 1356 (1987). In the first count of Plaintiff's complaint, the Plaintiff alleged that she was discharged in violation of public policy. (Complaint ¶ 5). The Plaintiff alleged that the Defendant discharged her in order to cover up the intentional misreporting of financial data. (Complaint ¶ 10D). Specifically, Plaintiff reported to Mr. Fuhrman that production management personnel had been intentionally misreporting certain financial information relating to the consumption of inventory of Defendant's manufacturing process in order to enhance the deficiencies of the defendant's production operations and, *as a*

*direct result, increase the amount of money that production and management personnel would receive in performance bonuses.* (Complaint ¶ 10 C.) Following her termination Plaintiff complained to Corporate Ombudsman and Bayer Corporation conducted an internal audit. The audit report (Attachment "4" to Rogus Affidavit) stated in Section II, Second Paragraph "with defective production yields being a part of the film business performance appraisals and productivity plus score card, payroll and bonus moneys are correspondingly affected. Therefore it is important for plant site personnel to implement a standard policy for properly and consistently accounting for raw material resin variances in the financial records."

Mr. Fuhrman testified that when he became Plant Manager he was not comfortable with writing off the full amount against yield because the productivity plus with the bonus program would be impacted and the numbers would have taken a big hit and the bonus would go away. (Fuhrman Deposition 45). Mr. Fuhrman was underreporting the scrap variance in order to maintain production yields and maintain the bonus payments for the production workers and possibly his own bonus as well.

The Production Manager, Tim Conway attempted to keep the Plaintiff from getting too close to identifying the source of the variances in the resin materials. A production worker who was working with the Plaintiff was told to stop talking to Mei Rogus about the resin variances. (Jewczyn Affidavit ¶ 8).

Connecticut General Statute § 53a-119 provides that "a person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person,

he wrongfully takes, obtains or withhold such property from an owner. Larceny includes, but is not limited to (1) Embezzlement. A person commits embezzlement when he wrongfully appropriates for himself or another property of another in his care or custody." By allowing the production yields to be over reported and production workers overpaid bonus' that would not have been paid had the true numbers been reported, Mr. Fuhrman wrongfully appropriated to others property in his care or custody. Those acts fall within the definition of embezzlement found in Connecticut General Statues 53a-119. In *Town of Groton v. United Steel Workers of America*, 254 Conn. 35, 46, 757 A.2d 501, the Connecticut Supreme Court found that "there was a clear public policy against embezzlement."

Because of the foregoing and because Plaintiff has identified a violation of a clear public policy in her termination Plaintiff's claim of wrongful discharge should not be dismissed.

1. **Connecticut General Statute § 31-51m Does Not Have Any Application To The Present Matter.**

*Lowe v. Ameri-Gas*, 52 F. Supp 2d. 349, D. Conn. (1999) is not applicable to the present matter. In Lowe, the Plaintiff was relying on the public policy of a violation of §31-51m when he did not complain to any public body a requirement under C.G. S. 31-51m.

> No employer shall discharge, discipline or otherwise penalize any employee because the employee ... reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or municipal ordinance or regulation *to a public body*....

The present matter more closely resembles *Sheets v. Teddy's Frosted Food* wherein Sheets complained to his superiors that the company was using substandard raw materials and underweight components in the defendant's finished products. His recommendations were ignored and shortly thereafter he was terminated. The Plaintiff in the present matter has no statutory remedy because she did not complain to a public body. She brought her findings to the attention of her supervisor and one week later she was terminated.

The present matter is also not virtually on point with *Burnham v. Karl and Gelb P.C.*, 252 Conn. 153. In that matter an employee reported to the Connecticut State Dental Association that her employers were not following sanitary and healthy dental practices. The Court found that the Dental Association was not a public body and since the Dental Association was not a public body, 31-51m did not apply. The Plaintiff's common law cause of action for wrongful discharge was precluded because she had a statutory remedy for her employer's conduct under 29 U.S.C. § 660 (c).

The Court in *Adkin v. Bridgeport Hydraulic Company*, 5 Conn. App. 643 (1985) finding that Plaintiff had a statutory remedy through the CFEPA stated that "the cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy have relied upon the fact that in contents of their case the employee was otherwise without remedy and that permitting the discharge to go unaddressed would leave the valid of social policy to go unvindicated. In the present case the Plaintiff did not complain to a public

body, she complained to internal management about improper procedures, which violated a public policy against embezzlement.

2. **There Is A Temporal Nexus Between Plaintiff's Reporting Of Her Findings To Mr. Fuhrman Regarding Her Inventory Variances And Her Termination.**

Second Circuit in *Quinn v. Green Tree Credit Corporation*, 159 F.3d. 759 stated:

> "Additionally because Quinn's discharge came two months after she filed a complaint with Green Tree Management and just ten days after she filed the complaint with DHR, the third prong of the prima facie case – "a casual connection between the protected activity and the adverse employment action" -- is satisfied as well. See *Manoharan* 842, F.2d. at 593.

Michael Jewczyn a production worker who was assisting the Plaintiff in trying to find a resolution to the variances in resin materials was told to stop talking to Mei Rogus and shortly thereafter the Plaintiff was no longer employed by Bayer. (Jewczyn Affidavit ¶ 8). The Plaintiff reported her findings regarding the variances in resin materials used in production to Mr. Fuhrman on June 1, 2001. On June 8, 2001, one week later, Plaintiff was suspended and three days later, terminated.

**B.    SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THE PLAINTIFF HAS RAISED A QUESTION OF FACT AS TO WHETHER SHE WAS SUBJECTED TO SEXUAL HARASSMENT.**

   **1.    Plaintiff Was Subjected To Sexual Harassment That Altered The Conditions Of Her Employment.**

Sexual harassment is a form of sex discrimination prohibited by the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* as well as the Connecticut Fair Employment Practice Act (CFEPA),C.G.S. 46a-60(a) Title VII and CFEPA cases follow the same standards. While the Supreme Court in *Burlington Industries v. Ellerth*, 118 S. Ct. 2257 (1998) has diminished the distinction between hostile environment and quid pro quo sexual harassment where a supervisor is a harasser, in the present case the Plaintiff claims that she was subject to hostile environment sexual harassment by a co-worker. In order to prove hostile environment sexual harassment, Plaintiff must prove that there was unwelcome conduct of a sexual nature at her workplace that was, "sufficiently severe or pervasive to alter the conditions of the [victims'] employment and create an abusive working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. at 67 quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). However,

> The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases. See *Harris [v. Forklift Sys., Inc.,]* 510 U.S. [17], 22, 114 S. Ct. [367], 370 (1993). (Stating that "Title VII comes into play before the harassing conduct leads to a nervous breakdown" and noting that the "appalling conduct" alleged in prior cases should not be taken to mark the boundary of what is actionable.") Harassed employees do not have to be Jackie Robinson, nobly turning the other cheek

and remaining unaffected in the case of constant degradation. They are held only to a standard of reasonableness. Whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable under Title VII, so long as the employee subjectively experienced a hostile work environment. See Id. at 21, 114 S. Ct. at 370. *Torres v. Pisano*, 116 F.3d 625, 631(C.A.(N.Y.) 1997)

### 2. Plaintiff Did Establish A Claim of Sexual Harassment.

On Wednesday January 12, 2001, Stewart Redshaw of Bayer's Human Resources Department investigated Plaintiff's complaints of sexual harassment during the period of May to July 1999. (Rogus Deposition, Defendant's Exhibit "10"). Mr. Redshaw concluded with regard to the issue of sexual harassment as follows: "It is my opinion that Telesca's comments to Mei could be regarded as marginally falling under the third paragraph of the Bayer definition of sexual harassment: less extreme examples of sexual harassment may include sexually suggestive comments, innuendoes, or witticisms. Such behavior may interfere with the individuals work performance or create a hostile work environment." It was Mr. Redshaw's opinion in his report, dated February 10, 2000, that there was in fact sexual harassment.

At the time he also wrote: "there is not evidence of any continuing inappropriate behavior on the part of Telesca with regard to sexual harassment, it is my recommendation that this issue now be closed unless further complaints are received or incidents reported."

On November 15, 2000 during an investigation of complaints made by Ray Newhouse and Stewart Redshaw visited Bayer at its Berlin Connecticut site and conducted a lengthy

interview with Plaintiff. Stewart Redshaw published a memorandum of the investigation on November 29, 2000. (Rogus Deposition, Defendant's Exhibit "16"). On the second page of the memorandum, in the last paragraph, Mr. Redshaw describes behavior complained about by the Plaintiff with regard to Mr. Telesca. She complained that Mr. Telesca continued to be inappropriate with regard to his interactions with her and that he is confrontational and uncooperative.

Shortly after the publication of Mr. Redshaw's memorandum, recommendations were made that Mr. Telesca's behavior be addressed and that the zero tolerance plan be adopted towards him. (Defendant's Exhibit "16"). In January 2001 at a management meeting, Telesca taunted the Plaintiff with comments about "Ms. America". Two months later a cartoon clipping was placed on the Plaintiff's office door apparently depicting her as the "new sadist in accounting". Mr. Redshaw had determined in his investigation in February of 2000 that sexual harassment was indeed present and that a hostile work environment was created by Mr. Telesca's actions towards the Plaintiff. While the Defendant did in fact take action, those actions were not enough to stop Mr. Telesca from his continued abusive treatment of the Plaintiff and such treatment did create a hostile work environment for the Plaintiff.

Summary Judgment should not be granted on this count. The Defendant's own report established that there was sexual harassment and that inappropriate behavior towards the Plaintiff continued through 2001.

C.  **PLAINTIFF'S RETALIATION CLAIM**

Plaintiff's retaliation claim is sufficient s a matter of law because she can establish that she as engaged in a protective activity and that there is a casual connection between the protective activity and her termination.

In order for the Plaintiff to establish a claim of retaliation by the Defendant she has the burden of proving the following essentials by a preponderance of the evidence: (1) that she participated in a protective activity known to the defendant, (2) that there was an employment action disadvantaging the plaintiff and (3) that there was a casual connection to the plaintiff's activity and the adverse action. *Quinn v. Green Tree Credit Corp.*, 159 F. 3d 759. CA.2 NY 1998; *Tomka v. Seiler Corp.* 66 F. 3d 1295 (2nd Cir. 1995).

Summary Judgment is inappropriate where intent and state of mind are an issue. A trial court must be cautious about granting summary judgment to an employer when its intent is an issue". *Gallo*, 22 F.3d at 1224. In addition, Plaintiff is not required to show that employers reasons were false or played no rule in its decision to terminate but only that they were not the only reasons and that [retaliation] was at least one of the reasons. *Cronin v. Aetna Life Insurance Company*, 46 F. 3d 196, 203 (2nd Cir. 1995).

In the present matter, the Plaintiff complained to human resources in July of 1999 about sexual harassment by Mr. Telesca. Plaintiff also complained to Richard Fuhrman, her supervisor about Mr. Telesca's behavior and comments. Human Resources ultimately

conducted an investigation regarding Plaintiff's complaint and Mr. Telesca's comments and behavior. She engaged in protective behavior.

Mr. Fuhrman in December of 1999 began a series of retaliatory actions against the Plaintiff. In December of 1999 on the recommendation of Mr. Telesca, Mr. Fuhrman put a severe reprimand letter in Plaintiff's personnel file criticizing Plaintiff with regard to a business trip, even though he knew the letter contained inaccurate facts.

Mr. Fuhrman had checked with a person who worked for Plaintiff, Helen Kjellquist, about the incident. Mr. Fuhrman had found out from Kjellquist that Plaintiff had told her that only one of them would be going to Pittsburgh on the business trip. (Defendant's Exhibit "9", page 3). Mr. Fuhrman disregarded this knowledge and put the damaging letter in the Plaintiff's personnel file.

Plaintiff complained to the Corporate Ombudsman, Tim Romp, and Stewart Redshaw of Corporate Human Resources was assigned to investigate the Plaintiff's complaint. Redshaw recommended that the letter of reprimand be removed from the Plaintiff's file and be replaced with a verbal warning in the form of a counseling note to her file. (Defendant's Exhibit "11"). However, Mr. Fuhrman attached to the replacement letter of counseling a hand written note (Defendant's Exhibit "11") stating "Don, Please put this document in Mei's file and return the insubordination letter to me, Rich.". This was an attempt by Mr. Fuhrman to partially comply with Mr. Redshaw's recommendation by removing the severe reprimand letter but maintaining the accusation of insubordination. On July 27, 2000, Mr. Fuhrman secretly put another note in

plaintiff's file regarding an incident, which took place prior to June 22, 2000. (Fuhrman Deposition 17, Fuhrman Exhibit "7"). However Fuhrman knew that Plaintiff had been communicating with Bayer's Corporate Controller Harry Kilvanick about the proper procedure. (Fuhrman Deposition 16). Furthermore, Mr. Fuhrman looked at the expense reports of others and found no unequal treatment. In fact the Plaintiff offered to review every other employees expense report with Fuhrman and compare the procedures used to review those used on Mr. Telesca's expense reports. (Rogus Aff. ¶ 7). Despite having this information Mr. Fuhrman, without the knowledge and notification to the Plaintiff, placed yet another warning letter in the Plaintiff's file some 35 days later. When asked at his deposition as to why he kept putting these notes in the Plaintiff's personnel file, Mr. Fuhrman said that "he needed to keep a document, a record of them and because of Mei's history of stubbornness and some of the other things that happened", Fuhrman needed to document these incidents. (Fuhrman Deposition 17-18). The only conclusion that one can draw from Mr. Fuhrman's actions is that he intended to build a case against Plaintiff over a period of time towards her ultimate termination, which is in fact what did happen.

Mr. Redshaw's report of November 29, 2000 indicates that at the end of 2000 the hostile behavior of Don Telesca toward the Plaintiff was still ongoing. Plaintiff believed that the counseling letters were retaliatory and Mr. Fuhrman had told her that Mr. Telesca had endorsed issuing the reprimand letter. (Defendant's Exhibit "9" at page 3).

Shortly after the July 27, 2000 note to Plaintiff's file she was retaliated against by Mr. Telesca at a business meeting and was held out to ridicule in front of her business associates when Mr. Telesca stated "Mei you don't count." (Rogus Deposition 54, 56-58, Rogus Aff. ¶ 9).

Retaliation continued into January 2001, when at a business meeting in front of the management team, and less than two months from Mr. Redshaw's November 29, 2000 report, which was critical toward Mr. Fuhrman and Mr. Telesca, Mr. Telesca taunted the Plaintiff by stating that "even Ms. America is trying to claim credit for business success." Mr. Fuhrman, Telesca and the Plaintiff knew what Telesca meant by "Ms. America" and how the Plaintiff felt about it. Three months later, in April 2001 and only two months before the Plaintiff's termination, a comic strip was put on Plaintiff's office door, which stated "I am the newest sadist in the accounting department."

There is temporal nexus between the alleged acts of retaliation against the plaintiff and her termination. The Court in *Robin v. Expo Engineering Corp.*, 200 F. 3d 1081, 1089 (7th Cir. 2000) stated that "courts will not read invidious intent into isolated comments that standing alone are hardly offensive and remote in time to adverse employment action. However, stray remarks however may be sufficient to establish an inference of discrimination at the *prima facie* stage of an employment discrimination suit. *Danzer v. Noden System Inc.*, 151 F.3d 50, 56 (2nd Cir. 1998). In *Danzer*, stay remarks were made some twenty (20) months ahead of the adverse employment action.

Plaintiff had engaged in the protective activity known to the Defendant, there was an employment action disadvantaging the Plaintiff, she was terminated and there was a casual connection between the Plaintiff's activity and the adverse action. She was terminated less than six months after her last complaint and less than two months before the last hostile act directed at her. Therefore this count should not be dismissed.

1. **Defendant's Reason For Discharge Is A Pretext.**

> The United States Supreme Court has held that, under the last step of the three step McDonald Douglas burden shifting analysis, the plaintiff does not always need to "introduce additional, independent evidence of discrimination". *Reeves v. Sanderson Plumbing Products, Inc.* 120 Sup. Ct. 2097 (2000). The Complainant may attempt to show discrimination or retaliation by showing that the employer's proffered explanation is unworthy of credence". Id. at 2106. In appropriate circumstances the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Id at 2108. Thus the plaintiff's prima facie case, combined with sufficient evidence to find that the employers asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

There is evidence in the record that will permit a reasonable jury to find the Defendant's explanation that Plaintiff's discharge was for falsification of a resume is fabricated and not worthy of belief. It made no sense for the Plaintiff to hire someone to be one of two employees that would work for her, who had no skills and would not be able to do the job.

The Plaintiff had a reasonable belief that Chin Chen was conversant with a computer because of the fact that almost the entire communications during the hiring process between

Page 29 of 34

Chin Chen, Cliff Chen and the Plaintiff were conducted by email. See Defendant's Exhibits "19", "20", "21", "22", "23", "24", "25", "26" and Attachment "1" to Rogus Affidavit the "thank you note". All these documents were communicated to and from the Plaintiff and the other parties by email.

When Chin Chen was attempting to convince Mr. Fuhrman that she was telling the truth about her lack of skills on the computer and that she did not lie to the Plaintiff, Chin Chen stated that she went home to get her emails from her computer. (Chin Chen Deposition 53-58).

Denise Church Ball promised plaintiff an adequate investigation. (Rogus Deposition 162). However the plaintiff was never given the opportunity to look at the evidence that Defendant was using against her or to provide an explanation. The inadequacy of the investigation and the failure of the Defendant to allow the Plaintiff to view the evidence (Rogus Deposition 166) coupled with the fact that one week earlier the Plaintiff had presented her findings on the resin variance inventory issue to Mr. Fuhrman gives rise to an inference that the reason for Plaintiff's dismissal was pretextual.

**D.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Plaintiff abandons her claim of intentional infliction of emotional distress.

### E. DEFAMATION

In *Torosyan v. Boehringer Ingelheim Pharmaceuticals Inc.*, 234 Conn. 1, the court stated "We agree with the Defendant that communications between managers regarding a review of an employees job performance and the preparation of documents regarding an employees termination are protected by a qualified privilege". However, where the privilege has been abused and where false or reckless statements have been published regarding the Plaintiff then that privilege is lost. "The privilege is defeated despite assertion of such interest, however, if the Defendant acts with an improper motive or to scope or the manner of publication exceeds what is reasonably necessary to further the interest." *Bleich v. Ortiz*, 196 Conn. 498, 501 (1995).

In the instant case, the Plaintiff is alleging that the privilege was abused through the wrongful allegations made against her during her employment and in order to terminate her. "Whether a defamatory communication implicates an interest worthy of protection is a question of law for the trial court to determine, but whether the privilege is nevertheless defeated through its abuse is a question of fact to be decided by the jury." *Bleich* at 501. Therefore, whether Bayer's qualified privilege for intera-corporate communications has been defeated by its alleged behavior towards the Plaintiff is a factual determination to be made by the trier of fact. The court in *Torosyan* in considering inter-corporate communications stated "[a]lthough inter-corporate communications once were considered by many courts not to constitute "publication" of a defamatory statement, that view has been almost entirely abandoned, and we reject it here." The court goes on further "the communication within the scope of its employee by one agent to

in his profession and calling." *Battista v. United Illuminating Company* 10 Conn. App. 486 at 492. In the present matter the defamatory remarks defame the Plaintiff in her profession. "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor prove it." *Torosyan* at 35. Plaintiff has alleged the required elements of a claim for defamation and therefore this count should not be dismissed through summary judgment.

## CONCLUSION

Because of the foregoing, and because there are substantial issues of fact that need to be tried, summary judgment should be denied on all counts.

By: /s/ Robert B. Muchinsky
ROBERT B. MUCHINSKY
39 Russ Street
Hartford, CT 06106
Federal Bar No.: ct 12702
Telephone: 860-297-0037
Facsimile: 860-297-0040

## CERTIFICATION

I hereby certify that a copy of the foregoing has been mailed, postage prepaid, to the following counsel and pro se parties of record on December 31, 2003.

**The Defendant**

John J. Myers, Esq.
Federal Bar No. ct11377
Eckert, Seamans, Cherin & Mellott
600 Grand Street – 44th Floor
Pittsburgh, PA  15222

Christopher Brigham, Esq.
Federal Bar No. ct02761
Updike, Kelly & Spellacy, PC
PO Box 231277
One State Street
Hartford, CT  06123-1277

**Filing Location**

Clerk of Court
United States District Court
141 Church Street
New Haven, CT  06510

_____
Robert B. Muchinsky

Page 34 of 34

Robert B. Muchinsky, Attorney at Law * Juris No. 101514
39 Russ Street, Hartford, CT  06106 * Telephone: (860) 297-0037 * Facsimile (860) 297-004