## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MEI ROGUS, | : | |
| | : | |
| Plaintiff, | : | NO.    3:02cv1778 (MRK) |
| | : | |
| v. | : | |
| | : | |
| BAYER CORP., | : | |
| | : | |
| Defendant. | : | |

## <u>RULING ON SUMMARY JUDGMENT</u>

Plaintiff Mei Rogus ("Rogus") brings this action against her former employer Bayer Corporation ("Bayer") for various state law claims arising from her discharge in June 2001. She alleges causes of action for wrongful discharge in violation of public policy, sexual harassment in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), retaliation in violation of the CFEPA, and defamation. Defendant has moved for summary judgment. For the reasons stated below, Defendant's Motion for Summary Judgment [doc. #27] is GRANTED in part and DENIED in part.

## I.

Rogus began to work for Bayer on April 5, 1999, as a Plant Controller at Bayer's Berlin, Connecticut manufacturing plant. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 1. Rogus was hired by Richard Fuhrman, the Plant Manager, and reported to him during her employment. *Id.* ¶ 4. Rogus alleges that soon after she began work at the plant, Don Telesca, the Human Resources Manager for the Plant, began to engage in inappropriate behavior toward Rogus. *Id.* ¶¶ 9, 10. The harassment consisted of frequent comments about Rogus's appearance and wardrobe, including

references to her as "Miss America." *Id.* ¶ 11. Rogus alleges that on two occasions Telesca touched her in an inappropriate manner. Rogus Aff. [doc. #32], ¶ 10. Telesca regularly hung around Rogus, though he never asked her for a date, sexually propositioned her, or used any vulgar language. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 11.

Rogus reported Telesca's behavior to Fuhrman in July 1999, and the physical contact and the comments soon stopped. *Id.* ¶¶ 10, 14. Fuhrman told Rogus that she should let him know if Telesca made any further similar comments, and Rogus later confirmed to Fuhrman that the conduct had in fact stopped. *Id.* ¶ 14. However, Rogus alleges that as soon as the harassing behavior ceased, hostile behavior directed against her began. Rogus gives four examples of hostile incidents that occurred. In December 1999, at a Christmas lunch, Rogus, Telesca, and another employee were in line waiting to be served. The other employee said she was going to have dessert, to which Rogus responded, "Yeah. Go ahead. Enjoy life." Telesca then responded, "Yes, this woman loves to live on the edge." *Id.* ¶ 34. In August 2000, at a business meeting, someone mentioned that Rogus and another employee had gone to Wisconsin for an audit over the weekend, as an example of employees going out of the way to do their jobs. Telesca responded that the other employee could be rewarded but "Mei, you don't count." *Id.* ¶ 31. In January 2001, at a meeting discussing the financial reports from 2000, Telesca said, "Even Miss America is trying to claim credit," and then looked at Fuhrman and they both laughed. *Id.* ¶ 32. Finally, in April 2001, someone put on Rogus's office door a Dilbert comic strip that said, "I am the newest sadist in the accounting department." *Id.* ¶ 33.

Rogus also alleges that she was retaliated against because of her complaints of harassment against Telesca. On December 9, 1999, Fuhrman issued a reprimand to Rogus

2

because he believed that she had countermanded his directive regarding a business trip and had lied to him as well. *Id.* ¶¶ 16, 17. Rogus claims that she did not lie to Fuhrman, that Fuhrman knew she had not lied, and that she had in fact followed his directions completely. Pl's Local Rule 56(a)2 Statement [doc. #33], ¶ 17. Rogus wrote a letter of rebuttal to the reprimand, and then met with Fuhrman in an effort to remove the reprimand from her file, but Fuhrman refused, instead agreeing that Rogus's rebuttal would be attached. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 18. Rogus then complained to the Corporate Ombudsman, Tim Romps, and the Corporate Human Resources Manager, Stewart Redshaw, who investigated Rogus's complaint. *Id.* ¶ 19. On February 10, 2000, Redshaw prepared an investigation report which recommended that the letter of reprimand be removed from Rogus's file and replaced with a verbal warning in the form of a note to her file counseling her that she must abide by the directives of her manager. *Id.* ¶ 20. Fuhrman complied with this directive, replacing the reprimand with the note, but then attached another note (the "January 2000 note") to the counseling note stating, "Don, please put this document in Mei's file and return the insubordination letter to me, Rich," thus indicating to anyone who looked that there had been an insubordination letter in Rogus's file. Pl's Local Rule 56(a)2 Statement [doc. #33], ¶ 21.

In February 2000, Fuhrman told Rogus that many production employees were contacting the Ombudsman about many issues, and it did not look good for him that Rogus had complained to the Ombudsman because Rogus was also a member of the management team. *Id.* ¶ 23. Fuhrman told her to bring her concerns to him first before going outside the plant. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 23.

On July 27, 2000, Fuhrman placed another note in Rogus's file (the "July 2000 note"), this

3

time without notifying her. *Id.* ¶ 24. Fuhrman states he put the note in the file as a record of counseling, as he had problems with Rogus stemming from what he believed to be stubbornness and because he believed that she applied a different standard to Telesca's expense reports than to others, including Fuhrman's own. *Id.* ¶ 25. The note stemmed from an incident that took place between Fuhrman and Rogus about a week earlier. Rogus discussed the issue with Harry Kilvanick, the Corporate Controller, who approved her methodology for dealing with expense reports and receipts. Pl's Local Rule 56(a)2 Statement [doc. #33], ¶ 25. Rogus claims that she offered to review every employee's expense reports with Fuhrman and compare them with her treatment of Telesca's expense reports, but Fuhrman refused to do so. Rogus Aff. [doc. #32], ¶ 7.

Rogus discovered the July 2000 note when she went through her personnel file in October 2000. Pl's Local Rule 56(a)2 Statement [doc. #33], ¶ 26. Rogus asked Fuhrman to remove the note from her file, but he refused. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 27. She then complained to Fuhrman's superior Peter Geise, who advised her that he believed the July 2000 note should stay in the file. *Id.* Rogus objected to this assessment, and Geise arranged an investigation by the Corporate Human Resources Department and Ray Newhouse, a Vice President in the corporate finance area. *Id.* This investigation concluded that the July 2000 note should be removed from Rogus's file, but that the January 2000 note should remain. *Id.* ¶ 28. Rogus claims that the investigation revealed several other attempts by Fuhrman, Telesca, and Geise to circumvent the system and gave them several additional reasons to retaliate against her. Rogus Aff. [doc. #32], ¶ 8. Rogus believes that Telesca consulted with Fuhrman and recommended the issuance of the reprimand letter in an effort to retaliate against her for complaining about the original sexual harassment. Rogus Depo. [doc. #32], at 97-98.

4

At some point before June of 2001, Fuhrman directed Rogus to investigate a variance the plant was experiencing in terms of differences between the amounts of raw materials being purchased and the amounts being used in production. Def's Local Rule 56(a)1 Statement [doc. #28], ¶¶ 58, 59. This variance had traditionally been charged as an expense by the accounting department, an approach Rogus found to be improper. *Id.* ¶ 59; Pl's Local Rule 56(a)2 Statement [doc. #33], ¶ 59. On June 1, 2001, Rogus met with Fuhrman and told him that the source of the variance was that production employees were not reporting all of the waste material on their daily production reports. She told Fuhrman that the variance should not be written off or expensed, but should be applied against the production yield. Charging the variance against production yields would result in lowered productivity figures for the plant. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 57. Fuhrman told Rogus he would think about it and get back to her. *Id.* He testified that he did not want to charge the whole variance to production yield, because it would have had too great an effect on the productivity-plus bonuses of the plant's employees. *Id.* ¶ 59. While Fuhrman did not personally participate in the productivity-plus bonus program, Rogus alleges that he was going through a leadership crisis at the plant at that time and that if production yields at the plant were reduced, his performance would look worse and his management bonus might have been affected. Pl's Local Rule 56(a)2 Statement [doc. #33], ¶ 60.

The parties disagree on whether Rogus reported her conclusions about how the variance should be treated to anyone else. Rogus claims she told Chris Hamilton, the Senior Procurement Coordinator at the Berlin plant, that the source of the variance was the under-reporting of scrap by production employees. *Id.* ¶ 61. Bayer claims Rogus told no one other than Fuhrman. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 61. Fuhrman testified that Rogus discussed with him

5

the possibility that the source of the variance was under-reporting of scrap by production employees, as well as over-reporting of finished goods or of incoming raw materials. *Id.* After her discharge, which is discussed below, Rogus reported to the Ombudsman that she was fired because of the concerns she had raised about the variance. *Id.* Her complaint to the Ombudsman was investigated by Bayer's internal auditors who concluded, as Rogus had recommended, that the variance should be charged to the plant's production yield until its source could be confirmed.

Rogus was discharged on June 13, 2001 for falsification of company documents, stemming from an incident in which she is alleged to have improperly enhanced the resume of an applicant for an accountant position, whom Rogus had recommended hiring in December 1999. *Id.* ¶ 35. The parties disagree on almost every detail of this incident, many of which are not crucial for the disposition of this motion. Rogus was the hiring manager for an accountant position and wanted to hire an applicant named Chin Chen, instead of the candidate preferred by Fuhrman and Telesca, who lacked an accounting background. *Id.* ¶ 36; Pl's Local Rule 56(a)2 Statement [doc. #33], ¶ 36. Cliff Chen, a friend of Rogus's who worked for Bayer in a different location (and is not related to Chin Chen) had recommended Chin Chen to Rogus. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 38.

What happened next is the source of much of the dispute, but the parties agree that Rogus modified Chin Chen's resume somewhat, either to a minor degree and based on representations from Chin Chen and Cliff Chen, as Rogus maintains, or in a significant way (most importantly, by adding computer skills Chin Chen did not possess), as Bayer claims. Pl's Local Rule 56(a)2 Statement [doc. #33], ¶¶ 42, 43, 44, 46, 50; Def's Local Rule 56(a)1 Statement [doc. #28], ¶¶ 40, 41, 42, 46. Chin Chen was hired, and started work in December 1999. *Id.* ¶ 45.

In April 2001, Rogus met with Chin Chen because of problems with her performance. Chin Chen told Rogus during this meeting that she had never touched a computer before. *Id.* ¶ 46.[1] On May 11, 2001, Rogus met with Chin Chen again and gave her a Corrective Action Plan, detailing performance problems. *Id.* ¶ 47. Chin Chen asked Rogus to lay her off, and Rogus responded by suggesting that Chin Chen be transferred to a different job within the company. However, Chin Chen declined Rogus's suggestion. *Id.* A few days later, Chin Chen went to Fuhrman to complain about Rogus's treatment of her, and to offer to be laid off. *Id.* ¶ 48. Chin Chen also complained about Rogus "poking" her, although Rogus claims that Chin Chen does not know the difference between "poking" and "pointing." *Id.*; Pl's Local Rule 56(a)2 Statement [doc. #33], ¶ 48. Rogus denies poking or otherwise touching Chin Chen. *Id.* ¶ 50.

Various meetings and an investigation ensued regarding whether Rogus had falsified Chin Chen's resume. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 52. Rogus stated that she helped to proofread the resume and to correct it based on what she had been told, but denied introducing substantive changes. *Id.* Chin Chen supplied Fuhrman and Denise Church Ball, the new Human Resources Manager,[2] with the emails between her and Rogus. *Id.* ¶¶ 49, 51. The investigation concluded that Rogus had made the changes in Chin Chen's resume, and Rogus was informed by Fuhrman in a telephone conversation on June 13, 2001 that she was terminated for falsification of company documents. *Id.* ¶¶ 54, 55. Chin Chen was given a written warning for

---

[1] This assertion is belied somewhat by evidence submitted by Defendant consisting of email correspondence between Rogus and Chin Chen and the fact that Chin Chen's original resume was produced on a computer. *See* Def's Exhibits 19, 22, 23, 25. [doc. #29].

[2] Telesca was terminated in early May 2001, and was not involved in these events. Def's Local Rule 56(a)1 Statement [doc. #28], ¶ 49, n.7.

falsification of the resume. *Id.* ¶ 56.

Rogus filed suit in the Superior Court in New Britain on September 18, 2002, alleging five state law causes of action: wrongful termination, sexual harassment under the CFEPA, retaliation under the CFEPA, intentional infliction of emotional distress,[3] and defamation. Bayer removed the case to federal court on October 8, 2002 based on diversity of citizenship. Bayer now moves for summary judgment.

## II.

### A.    Standard for Summary Judgment

Summary judgment is appropriate when there is no dispute as to a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of demonstrating that there is no genuine material dispute of fact. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). The Second Circuit has cautioned that "in determining whether a genuine issue has been raised, the inferences to be drawn from the underlying facts revealed in the affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Tomka v. Seiler*, 66 F.3d 1295, 1304 (2d Cir. 1995).

### B.    Wrongful Discharge

Rogus claims that she was discharged in violation of public policy because Bayer fired her in order to cover up the intentional misreporting of financial data. Compl. [doc. #1], ¶ 5d.

---

[3]Rogus has dropped the claim for intentional infliction of emotional distress. Mem. of Law in Opp'n to Def's Mot. for Summ. J. [doc. #32], at 30.

The Connecticut Supreme Court's decision in *Sheets v. Teddy's Frozen Foods* created a common law cause of action where "the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." 179 Conn. 471, 475 (1980). Rogus asserts that the public policy implicated in her termination was her dispute with Fuhrman over the variance in the accounting for the plant's raw materials. As she states, "By allowing the production yields to be over-reported and production workers overpaid bonuses that would not have been paid had the true number been reported, Mr. Fuhrman wrongfully appropriated to others property in his care or custody. These acts fall within the definition of embezzlement found in Connecticut General Statutes 53a-119." Mem. of Law in Opp'n to Def's Mot. for Summ. J. [doc. #32], at 19.[4] Rogus correctly points out that the Connecticut Supreme Court has referred to "the clear public policy against embezzlement." *Town of Groton v. USW*, 254 Conn. 35, 46 (2000).

Bayer argues that it is entitled to summary judgment on Rogus's claim for wrongful discharge because she fails to meet the requirements of the Connecticut whistle-blower statute, Conn. Gen. Stat. § 31-51m. This statute provides, in part: "No employer shall discharge, discipline or otherwise penalize any employee because the employee, or a person acting on behalf of the employee, reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body." Conn. Gen. Stat. § 31-51m(b). Bayer claims that insofar as Rogus did not report her complaint to a public body and did not report a violation of law, she has failed to state a claim under this

---

[4]Conn. Gen. Stat. § 53a-119(1) provides: "A person commits embezzlement when he wrongfully appropriates to himself or to another property of another in his care or custody."

statute. Bayer argues that "to hold that a whistleblower whose conduct does not meet the requirements for protection under the whistleblower law can still assert a claim for wrongful discharge would amount to judicially amending the statute." Def's Mem. of Law in Supp. of Mot. for Summ. J. [doc. #29], at 18. Defendant cites a number of Connecticut cases, including *Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153 (2000) and *Lowe v. Amerigas, Inc.* 52 F. Supp. 2d 349 (D. Conn. 1999) for the proposition that a statutory remedy under § 31-51m precludes resort to a common law wrongful discharge claim based on a violation of public policy. Def's Mem. of Law in Supp. of Mot. for Summ. J. [doc. #29], at 18.

Rogus agrees that she does not have a cause of action under § 31-51m, but argues that § 31-51m does not eliminate the possibility of a common law wrongful discharge claim for conduct that does not fall within the ambit of the statute.  She maintains that the cases cited by Bayer are inapposite: in *Lowe*, the plaintiff relied on § 31-51m, and did not assert a common law wrongful discharge claim, 52 F. Supp. 2d at 360; and in *Burnham*, the Supreme Court only held that the "existence of the statutory remedy precludes the plaintiff from bringing a common-law wrongful discharge action based on an alleged violation of § 31-51[m]." 252 Conn. at 162. Rogus distinguishes herself from Burnham because she does not claim a violation of § 31-51m and unlike Burnham she complained only within the company (much as Sheets did). Mem. of Law in Opp'n to Def's Mot. for Summ. J. [doc. #32], at 19-21; *Sheets*, 179 Conn. at 478.

Were the Court required to decide this issue, it would be inclined to side with Rogus. While the Connecticut Supreme Court held in *Burnham* that §31-51m displaces the common law wrongful discharge cause of action based on conduct that falls within the ambit of the statute – that is, a discharge or discipline for reporting a violation of municipal, state or federal law to a

10

*public body* – there is no indication in *Burnham*, and counsel has not referred the Court to any language in the statute or its legislative history that would suggest that the General Assembly intended to entirely displace Connecticut's common law of wrongful discharge. Therefore, where, as in *Sheets*,[5] an employee is discharged not for reporting violations to a public body but instead for *internally* complaining about matters that implicate the state's public policy**,** this Court would be inclined to conclude that the common law wrongful discharge claim remains available to the employee.[6]

As it happens, however, this Court need not decide this issue in this case. For even assuming that Rogus is correct in her reading of § 31-51m and *Burnham*, this Court nonetheless concludes that she has failed as a matter of law to state a claim for common law wrongful discharge in violation of public policy as that cause of action has been interpreted and applied by Connecticut courts.

Rogus claims the violation of public policy in question here is embezzlement. But it is not clear that what this case involves could even be considered embezzlement under Conn. Gen. Stat. § 53a-119. There was a variance of raw materials at the plant. Bayer was aware of this variance and indeed, Fuhrman asked Rogus to look into the issue. The only question was how

---

[5]Sheets had alleged that "he was discharged because of his conduct in calling to his employer's attention repeated violations of the Connecticut Uniform Food, Drug and Cosmetic Act. This act prohibits the sale of mislabeled food." *Sheets*, 179 Conn. at 478.

[6]The Court notes that the Sarbanes-Oxley statute does protect internal whistle-blowers, but Rogus would not be covered by that statute, because the conduct she complained of did not "constitute[] a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A.

this variance should be accounted for internally at Bayer: namely, whether it should be expensed or charged to production. Even if Rogus is correct in asserting that the productivity-plan bonuses of the employees would be negatively affected by the change in accounting for the variance, the Court cannot see how that sort of management decision could possibly constitute criminal embezzlement – that is, the wrongful appropriation of another's property within Fuhrman's care and custody, as is required by § 53a-119(1).

Additionally, it is not at all clear to this Court that a claim based on embezzlement of the kind alleged in this case is sufficient to trigger Connecticut's wrongful discharge cause of action. While, as Rogus noted, there is certainly a public policy against embezzlement (as there is against all crimes), that generalized concern does not seem to be what the Connecticut Supreme Court had in mind when it created the public policy exception. All of the cases that have successfully invoked this cause of action have involved harms *against the public* that were being perpetrated by the employer and that would have gone unremedied without the employee's complaints. As the Connecticut Appellate Court has held: "'A finding that certain conduct contravenes public policy is not enough by itself to warrant the creation of a contract remedy for wrongful dismissal by an employer. The cases which have established a tort or contract remedy for employees discharged for reasons violative of public policy have relied upon the fact that in the context of their case the employee was otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated.'" *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn. App. 643, 648 (Conn. App. Ct. 1985) (quoting *Wehr v. Burroughs Corp.*, 438 F. Supp. 1052, 1054 (E.D. Pa. 1977)); *see also, e.g., Sheets*, 179 Conn. at

473; *Faulkner v. United Techs. Corp.*, 240 Conn. 576, 578-79 (1997).[7] In those circumstances, it makes sense to allow the employee to sue because he or she has been discharged for seeking to protect the public from the company and permitting the discharge to go unredressed would leave the public vulnerable and a valuable social policy unremedied.

That is not the case here at all. The victim of the alleged violation of public policy – assuming there is a victim in this situation – is the company itself. There is no allegation that Bayer's accounting for raw material variances at a single plant is harming the public in any way. And it seems clear that Bayer is fully capable of vindicating its own interests and whatever "valuable social policy" is implicated by the raw material variances. The Court emphasizes that this is not a case of an employee alleging that a company's financial or tax records were fraudulent, thus endangering the investing public or the Treasury. This case is not Enron or Worldcom, or anything remotely close to those situations. Instead, this case solely involves internal judgments about how one plant deals with known variances in the purchase and use of raw materials, a matter that Rogus has not shown implicates the public interest or raises any issue of public policy.

The Connecticut Supreme Court has repeatedly highlighted its "adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will

---

[7]*Faulkner* involved an allegation that "the defendant actually discharged [the plaintiff] because he refused to accept the substandard and defective helicopter parts supplied by the defendant's subcontractors on the Blackhawk helicopter project. He alleged further that the defendant discharged him because he refused to participate in allowing the use of the defective parts in producing helicopters under the government contract. He claimed that the defendant's action constituted a breach of the covenant of good faith and fair dealing existing between the parties because the discharge violated public policy against government contract fraud as expressed in the Major Frauds Act." *Faulkner*, 240 Conn. at 578-79.

employment relationship is a narrow one." *Parsons v. United Techs. Corp.*, 243 Conn. 66, 79

(1997); *see also Burnham*, 252 Conn. at 159. To allow this disagreement between two employees

over internal accounting for raw materials at a single plant to constitute a sufficient violation of

public policy to trigger the public policy exception to the at-will employment rule would allow

the exception to swallow the rule. This Court is disinclined to do so. The Court concludes as a

matter of law on the basis of the undisputed facts that Rogus has failed to state a common law

claim for wrongful discharge in violation of public policy. Accordingly, Bayer is entitled to

summary judgment on Rogus's wrongful termination count.

**C.    CFEPA - Hostile Work Environment**

Rogus has asserted that she was subjected to a hostile work environment in violation of

the prohibition on discrimination on the basis of sex in the workplace set forth in the CFEPA,

Conn. Gen. Stat. § 46a-51 *et seq*. Connecticut courts have interpreted CFEPA to mirror the

coverage of Title VII. *See, e.g., Brittell v. Dept. of Correction*, 247 Conn. 148, 164 (Conn. 1998)

("In defining the contours of an employer's duties under our state antidiscrimination statutes, we

have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of

1964, the federal statutory counterpart to § 46a-60."). Therefore, this Court will discuss Rogus's

CFEPA claim with regard to the legal standards set forth under Title VII.

"[T]o prevail on a hostile work environment claim, a plaintiff must demonstrate: '(1) that

[the] workplace was permeated with discriminatory intimidation that was sufficiently severe or

pervasive to alter the conditions of [the] work environment, and (2) that a specific basis exists for

imputing the conduct that created the hostile environment to the employer.'" *Schwapp v. Town of*

14

*Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996)). The Supreme Court has ruled that a work environment must be both subjectively and objectively hostile and abusive in order to establish a hostile environment claim. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) ("The conduct alleged must be severe and pervasive enough to create an environment that would reasonably be perceived, and is perceived, as hostile or abusive.").

"A plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment.' To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse. Relevant factors include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) and *Harris*, 510 U.S. at 23).

The Court is skeptical that the behavior Rogus complains of approaches this standard. Even assuming that she can make such a showing, however, her claim fails as a matter of law because she cannot make the second part of the showing required by Title VII and CFEPA, namely, "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant*, 80 F.3d at 715. The Second Circuit has held that "[w]hen harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment

15

but did nothing about it.'" *Feingold v. New York,* 366 F.3d 138, 152 (2d Cir. 2004) *(quoting*

*Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

Rogus cannot make any such demonstration. In her Local Rule 56(a)2 Statement, she

admits that Telesca's sexual harassment ended in July 1999, shortly after she reported it to

Fuhrman. Pl's Local Rule 56(a)2 Statement [doc. #33], ¶¶ 10, 14. Thus, the undisputed facts

show that Bayer did provide an avenue for complaint, and promptly did something about the

complaint. Under these circumstances, the Court can find no basis for imputing the conduct that

created the hostile environment, assuming such conduct existed, to Bayer. *See, e.g., Reissner v.*

*Rochester Gas & Elec. Corp.*, No. 02-cv-6353 (CJS), 2004 U.S. Dist. LEXIS 8019 (W.D.N.Y.,

Apr. 22, 2004) ("There is no evidence that management failed to provide an avenue of complaint,

or ignored [Plaintiff's] complaints once made. Consequently, [the] alleged harassing acts cannot

be imputed to defendants."). Bayer is therefore entitled to summary judgment on Rogus's sexual

harassment claim.

**D.    CFEPA - Retaliation**

Rogus claims that she "was retaliated against on account of having filed a complaint of

sexual harassment with the defendant," in violation of the CFEPA. Compl. [doc. #1], ¶ 12. The

Second Circuit has held that "a plaintiff may state a prima facie case for retaliation even when

her primary claim for discrimination is insufficient to survive summary judgment." *Wimmer v.*

*Suffolk County Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999). In order to establish a *prima facie*

case of retaliation, "a plaintiff must demonstrate that (1) she was engaged in an activity protected

under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity;

16

(3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d Cir. 2003) (internal quotations omitted). The Court finds that Rogus has made a *prima facie* case of retaliation. Rogus has submitted evidence that: (1) she complained about the harassment, an activity protected under Title VII; (2) her employer was aware of the complaint, insofar as Rogus made her complaint directly to her supervisor; (3) she was ultimately fired; and (4) she has asserted that the sequence of what she alleges to be unfounded disciplinary actions against her directly stems from her complaint and gives rise to an inference that the reason for the firing was because of her complaints.

Once the plaintiff establishes a *prima facie* case, "the burden of production shifts to the employer who must defeat a rebuttable presumption of discrimination by articulating a legitimate, non-discriminatory reason for the employment decision." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). Like the plaintiff's burden on her *prima facie* case, the employer's burden of production is also not very demanding. *Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999). Bayer has met that burden by asserting that Rogus was terminated because of her role in falsifying company documents.

If the employer offers a non-discriminatory explanation for the employment decision, the presumption raised by the *prima facie* case is rebutted and the factual inquiry "proceeds to a new level of specificity." *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir. 1997) (en banc). The plaintiff then bears the ultimate burden of establishing that the employer's proffered reasons are a pretext for discrimination. *Id.* Here, Rogus has testified as follows: that she did not make significant changes to Chin Chen's resume; that the changes she did make were strictly cosmetic

17

and grammatical; that she believed that Chin Chen had computer skills based on their conversations and those with Cliff Chen and the fact that her correspondence with Chin Chen was conducted via email; that it made no sense for her to hire as a subordinate an employee who could not do the work and then complain to that employee about it; and that she never touched Chin Chen, who did not know the difference between "poking" and "pointing." Based on this testimony, the Court concludes that there exists a dispute over a material issue of fact regarding the real reasons why Rogus was terminated. Pl's Local Rule 56(a)2 Statement [doc. #33], ¶¶ 35, 41, 42, 43, 44, 46, 50. Insofar as the Court must accept all of Plaintiff's allegations as true at the summary judgment stage, the Court concludes that Rogus's assertions, if believed, could conceivably support a jury finding that the stated reason for her termination was pretextual.

However, Rogus must also establish that there was a causal connection between protected activity and the adverse employment action. *Mack*, 326 F.3d at 129. Rogus's evidence for that causal connection is somewhat slim. At oral argument, Rogus's counsel clarified that the termination is the only adverse employment action that Rogus complains of and that the letters Fuhrman placed in Rogus's file are not adverse employment actions but rather are evidence connecting her sexual harassment complaint regarding Telesca to her eventual termination. Her evidence for causation is thus essentially as follows: Rogus complained to Fuhrman about Telesca's harassment in July, 1999; Fuhrman and Telesca were friends; in January 2000, soon after she complained of the sexual harassment, Fuhrman put an unflattering note in her file, which she complained about; Fuhrman got more annoyed at Rogus when she got Bayer headquarters involved in removing the note; Fuhrman then placed another letter in her file in June 2000, which she also complained about and which was also ordered removed from her file;

18

Telesca continued to make annoying remarks about her during this period, at least one of which elicited a laugh from Fuhrman, until Telesca left the company; and that she was eventually terminated by Fuhrman. Mem. of Law in Opp'n to Def's Mot. for Summ. J. [doc. #32], at 25-29. This is extremely thin evidence. This Court is hesitant to find that because an employee once complains, no matter how that initial complaint is resolved, any adverse employment actions thereafter taken are by definition connected to the initial complaint and could constitute a cause of action for retaliation.

However, elsewhere in the Title VII context the Second Circuit has recently cautioned district courts that "we have repeatedly cautioned against setting the bar too high." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) ("In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.") (internal quotation omitted). When Rogus's testimony about the continued nature of her troubles with Fuhrman and his friendship with Telesca (including Fuhrman's participating in one of Telesca's deprecating comments about her) is combined with her evidence suggesting that the reasons for her firing are pretextual, the Court concludes that Rogus has proffered sufficient evidence to get her over this bar (albeit just barely). Accordingly, the Court finds that taking all the facts in the light most favorable to Plaintiff, a finder of fact could find that the ultimate termination of Rogus stemmed from her original complaint about sexual harassment. The motion to dismiss the retaliation claim is therefore denied.

**E.     Defamation**

Rogus alleges that Bayer defamed her by having "published or caused to be published statements alleging wrongful behavior on the part of plaintiff including the falsification of company documents, falsely accusing her of battering another employee, and of lying." Compl. [doc. #1], ¶ 17. The Connecticut Supreme Court has held that "[t]o find that the defendants were liable for defamation or intentional infliction of emotional distress as alleged in the plaintiff's complaint, the jury was required to find that the defendants published false statements that harmed the defendant, and that the defendants were not privileged to do so." *Kelley v. Bonney*, 221 Conn. 549, 563 (1992). At oral argument, counsel for Rogus identified four defamatory items: the two letters Fuhrman placed in Rogus's file; Bayer's June 1, 2001 letter to Rogus stating the reasons for her termination; and the report summarizing the meeting between Rogus, Fuhrman, Chin Chen, and Church Ball containing Chin Chen's complaint that Rogus had poked her. The Court concludes that none of these items supports a claim for defamation.

Rogus complained about each of the two letters placed in her file and, after investigation, each of them was ordered removed. It is not clear to this Court that such conduct would satisfy the publication requirement of the defamation tort, but the Court need not decide that question since Bayer was privileged to make these communications in any event. The Connecticut Supreme Court has held that "communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." *Torosyan v. Boehringer Ingelheim Pharm.*, 234 Conn. 1, 29 (1995). Thus, insofar as a privilege

20

applies in this situation, the only question is whether that qualified privilege was abused. *Id.* at 28. ("'There are two facets to the defense of privilege. The occasion must be one of privilege, and the privilege must not be abused.'") (quoting *Charles Parker Co. v. Silver City Crystal Co.*, 142 Conn. 605, 615 (1955)) The *Torosyan* Court continued: "'Whether the privilege was abused . . . depends upon whether there was malice in fact . . . in uttering and broadcasting the alleged defamatory matter.'" *Id.* (quoting *Charles Parker Co.*, 142 Conn. at 615). Given that the company promptly investigated the complaints regarding the notes and ordered Fuhrman to remove them from the file, no reasonable juror could conclude on the basis of the undisputed facts that Bayer acted with regard to these two letters with malice in fact.

Rogus also claims that the June 1, 2001 letter detailing the reasons for Rogus's termination was defamatory. However, Rogus cannot demonstrate any publication of this letter insofar as there is no evidence whatsoever that anyone other than Rogus ever saw this letter. Rogus testified that she had no knowledge of anyone other than Bayer's human resources personnel and Fuhrman knowing about the investigation or the letter. Rogus Depo. [doc. #32], at 190, 192-93.[8] Insofar as a publication of the letter to Rogus herself is not actionable,[9] she has thus failed to meet her burden of raising a genuine issue of material fact as to the publication element of her defamation claim.

_____

[8]At oral argument, counsel for Rogus pointed out that the copy of the letter that is Defendant's Exhibit 18 shows a fax confirmation on the bottom and claimed that it must have been faxed to someone, although he did not know to whom. For all this Court knows, however, it could have been the CHRO to whom the letter was faxed. Without more, this Court cannot consider the fax confirmation as evidence of publication.

[9]"In order to be defamatory a false statement must be communicated to someone other than the plaintiff." *Backert v. BIC Corp.*, CV000376394, 2002 Conn. Super. LEXIS 2706, *5 (Conn. Super. Ct.  Aug. 9, 2002).

Rogus's claim for defamation regarding the report summarizing the meeting between Rogus, Fuhrman, Chin Chen, and Church Ball in which Chin Chen complained that Rogus had poked her is no stronger than Rogus's other defamation claims. Rogus's counsel conceded at oral argument that a statement from Chin Chen would not be attributable to Bayer, so even if Chin Chen's statement were false, that false statement could not constitute defamation by Bayer. Furthermore, the only statement by the company – an accurate reporting of another employee's complaint about Rogus – was truthful. Therefore, it cannot be the subject of a defamation claim. *Kelley*, 221 Conn. at 563. Accordingly, the Court dismisses Rogus's defamation claim.

### III.

Defendant's Motion for Summary Judgment [doc. # 27] is GRANTED in part and DENIED in part. The Court dismisses Plaintiff's claims for wrongful discharge, sexual harassment, and defamation. The only remaining claim in this case is Plaintiff's claim for retaliation under CFEPA. The Court will hold a telephonic conference with the parties on **September 8, 2004 at 5:00 p.m.** to set a schedule for the trial.

IT IS SO ORDERED.

/s/      Mark R. Kravitz
United States District Judge

Dated at New Haven, Connecticut: August 25, 2004

22